UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| LANDIS + GYR, INC., a Delaware Corporation, f/k/a LANDIS & GYR METERING, INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:16-CV-00082-JTM-APR |
| v. | ) ) | |
| ZURICH AMERICAN INSURANCE COMPANY, a New York Corporation, f/k/a ZURICH INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) ) | |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CHOICE OF LAW

Plaintiff, Landis + Gyr, Inc. ("Landis"), is seeking partial summary judgment on various coverage issues without addressing a fundamental threshold issue: which state's substantive law applies to the insurance policies at issue in this case, which were issued by defendant, Zurich American Insurance Company ("Zurich"). In a transparent attempt to avoid legal precedent from other jurisdictions that strongly support Zurich's coverage defenses (*e.g.*, on the pollution exclusion, late notice, and the personal injury coverage), Landis simply assumes that Indiana law applies because the polluted site for which it seeks coverage is located in Indiana. Contrary to Landis's assumption, well-established Indiana choice-of-law rules provide that a polluted site's location does not dictate the law applicable to an insurance policy. Rather, Indiana courts attempt to discern the state with the "most intimate contacts" with an insurance policy and apply that state's law to the entire contract. *Nat'l Union Fire Ins. Co. v. Standard Fusee Corp.*, 940 N.E.2d 810, 814 (Ind. 2010).

Here, the undisputed evidence shows that New York law should govern the 21 primary, excess, and excess umbrella policies in effect from October 1, 1977 to October 1, 1986 and that

Connecticut law should govern the six primary, excess, and excess umbrella policies in effect from October 1, 1986 to October 1, 1988 (collectively, the "Policies"). New York and Connecticut law apply because: (1) during all of the relevant policy periods, Landis's headquarters was located in either New York or Connecticut; (2) the Policies insured not only the Indiana facility that gave rise to this lawsuit, but also Landis's other facilities scattered throughout the country; and (3) the Policies were consistently underwritten, negotiated, and/or issued in New York, between Zurich's Manhattan office and Landis's insurance broker in New York. By contrast, Indiana bears no relationship to the Policies aside from the fact that one of the several subsidiaries insured under the Policies was located in Indiana. As such, this Court should grant Zurich's motion for partial summary judgment and conclude that New York law applies to the Policies effective from 1977 to 1986, and that Connecticut law applies to the Policies effective from 1986 to 1988.  By granting Zurich's motion, this Court can narrow the issues in this case and focus the parties' arguments and proof in all future proceedings.

I.      **STATEMENT OF UNDISPUTED MATERIAL FACTS**

      A.      **The Policies**

The Policies in effect from October 1, 1977 to October 1, 1982 identified "Landis & Gyr, N.A., Inc." as the first named insured, with an address of either 4 Westchester Plaza, Elmsford, New York 10523 or 101 Executive Boulevard, Elmsford, New York 10523. (Exhibits 1-5, 11-13 to Affidavit of Benjamin Harper, attached as Exhibit A ("Harper Aff.").) The Policies in effect from October 1, 1982 to October 1, 1986 identified "Landis & Gyr, Inc." as the first named insured, with an address of 4 Westchester Plaza, Elmsford, New York 10523. (Exs. 6-9, 14-17, 20-21 to Harper Aff.) The policies in effect from October 1, 1986 to October 1, 1988 list Landis

301141578v1 1004168

& Gyr, Inc.'s address as 100 First Stamford Place, Stamford, Connecticut 06902. (Exs. 10-11, 18-19, 22-23 Harper Aff.)[1]

The Policies also insured Landis's various subsidiaries. At various times, the Policies identified Duncan Electric Co., Inc. ("Duncan Electric"), Landis & Gyr Metering, Inc. ("Landis & Gyr Metering"), Moore Systems, Inc. ("Moore Systems"), Landis & Gyr Systems, Inc. ("Landis & Gyr Systems"), Metal Products Co. ("Metal Products"), Dayton Electronics Products Co. ("Dayton Electronics"), and Andover, Inc. ("Andover") as named insureds by endorsement. (Exs. 1-24 to Harper Aff.) Duncan Electric, Landis & Gyr Metering, and Andover were never the first named insured on any of the Policies. (*Id.*)

Zurich's New York office was involved in the underwriting and/or issuance of all the Policies. (Harper Aff. ¶ 11; Exhibit 15 to Affidavit of Timothy Wright, attached as Exhibit B ("Wright Aff.").) A stamp reading, "Special Risk Region Manhattan" is reflected on all of the declarations pages of the primary policies effective from October 1, 1981 to October 1, 1988, the umbrella policies effective from October 1, 1982 to October 1, 1988, and the four available excess umbrella policies. (Harper Aff. ¶ 11; Exs. 5-12, 15-24 to Harper Aff.) That stamp refers to an underwriting office located in New York. (Harper Aff. ¶ 11.) Moreover, Important Risk Data Notice sheets listing the policies in effect from October 1, 1977 to October 1, 1981, which Zurich "prepared and processed within 24 hours of binding coverage" (Ex. 25 to Harper Aff. at ZUR 002015), listed Zurich's "Producing Branch" as "Manhattan." (Ex. 25 to Harper Aff. at ZUR 002026-37.) Those sheets also bore the "Special Risk Region Manhattan" stamp for all policies in effect from October 1, 1981 to October 1, 1984. (Harper Aff. ¶ 11; Exs. 25 to Harper

---

[1] The policies in effect from October 1, 1985 to October 1, 1986 all include an endorsement that went into effect on March 12, 1986, changing Landis & Gyr, Inc.'s address from the Elmsford, New York location to the Stamford, Connecticut location. (Ex. A at ___.)

301141578v1 1004168

Aff at ZUR 002011, 002013-14, 002016, 002018-25.) In sum, this evidence demonstrates that all of the Policies were underwritten by or issued from Zurich's New York office.

Each of the Policies also lists Landis's New York-based broker, Marsh & McLennan ("Marsh"), on the Policies' declarations pages. (Harper Aff. ¶ 12; Exs. 1-24 of Harper Aff.) Zurich issued the Policies from its New York office to Marsh's New York office. (Harper Aff. ¶ 15; Ex. 28 to Harper Aff.) Zurich sent invoices and checks for Landis & Gyr, Inc., from its New York office through Marsh's New York office. (Harper Aff. ¶ 14; Ex. 27 to Harper Aff.)

Marsh's New York office also negotiated the terms of the Policies on Landis & Gyr, Inc.'s behalf with Zurich's New York office. For example, Marsh sent Zurich correspondence directing Zurich to remove certain terms from the policies. (Harper Aff. ¶ 13; Ex. 26 Harper Aff.) Marsh notified Zurich's New York office of Landis & Gyr, N.A., Inc.'s sale of Andover in March 1982. (Ex. 8 Wright Aff.)

### B.     Landis & Gyr, N.A., Inc., Landis & Gyr, Inc., and Their Subsidiaries

Landis is an international manufacturer of electrical power meters based in Zug, Switzerland. (Ex. 1 to T. Wright Aff.)[2] Landis established its first United States office in New York in 1924. (*Id.*)

The underlying environmental contamination at issue in this case occurred at 3601 Sagamore Parkway, Lafayette, Indiana (the "Sagamore Site"). (Dkt. 1 at ¶ 1.) Beginning in 1952, the Sagamore Site was the location of Duncan Electric Co., Inc. ("Duncan Electric"). (Pl. Resp. to Zurich's First Set of Interrogatories, Resp. No. 4, attached as Exhibit C.) On September 30,

---

[2] This page was taken from Landis's website, https://www.landisgyr.com/about/history. (T. Wright Aff. ¶1.) Landis cites the same webpage in support of its motion for partial summary judgment. (Dkt. 54 at 2.) However, since Landis filed that motion, the webpage has been taken down.

4

1976, Landis purchased Duncan Electric and began performing operations at the Sagamore Site. (Ex. 18 to T. Wright Aff.)

Landis & Gyr, N.A., Inc., also known as Landis & Gyr North America, was the holding company and parent of the following subsidiaries:

1.     Landis & Gyr, Inc., which was based in New York and maintained two locations:

      a.     4 Westchester Plaza, Elmsford, New York; and

      b.     4 Warehouse Lane, Elmsford, New York;

2.     Moore Systems, Inc., ("Moore Systems"), a power regulations equipment and computer program manufacturer based in California; and

3.     The Duncan Division, Landis & Gyr's electric meter manufacturing arm, which included three locations:

      a.     Metal Products Co., based in Miami, Florida;

      b.     Dayton Electronics Products Co. ("Dayton Electronics"), based in Dayton, Ohio; and

      c.     Duncan Electric, located at the Sagamore Site.

(Ex. 2 to Wright Aff. at ZUR 002142-43; Ex. 3 Wright Aff. at ZUR 002078; Ex. 4 to Wright Aff. at ZUR 001451; Ex. 5 to Wright Aff. at ZUR 001467, 001480.) At various times, all of these subsidiaries were listed as named insureds under the Policies. (Exs. 1-24 to Harper Aff.)

Another of Landis & Gyr, N.A., Inc.'s subsidiaries, called Andover, Inc. ("Andover"), was listed as a named insured on the two primary policies in effect from October 1, 1980 to October 1, 1982, and the three umbrella policies in effect from October 1, 1978 to October 1, 1979 and from October 1, 1980 to October 1, 1982. (Exs. 4-6, 11-13 to Harper Aff.; *see also* Ex.

25 to Harper Aff. at ZUR 002031 (omitting Andover as additional named insured for October 1, 1979-October 1, 1980 policy period)) Andover was located in Lafayette, Indiana. (Exhibit 6 to Wright Aff. at ZUR 002071-72.) Landis & Gyr, N.A., Inc., sold Andover on March 1, 1982, and Andover was removed as a named insured effective March 1, 1982. (Ex. 8 to Wright Aff.)

On October 1, 1982, Landis reorganized its corporate structure. Landis & Gyr, N.A., Inc. merged with Landis & Gyr, Inc., forming a new entity also called Landis & Gyr, Inc. (Ex. 3 Wright Aff.) As a result of the merger, the industrial control division previously operated by the subsidiary Landis & Gyr, Inc. was placed under the direct control of the newly-formed Landis & Gyr, Inc., which then functioned "as an operating part of the parent and not a subsidiary." (*Id.*) The new Landis & Gyr, Inc. combined its headquarters into the facility at 4 Westchester Plaza, Elmsford, New York, expanded its offices at that location, and brought production into that facility. (*Id.*)

Because the new Landis & Gyr, Inc. assumed the New York operations of the former subsidiary, Landis & Gyr, Inc., this left the new Landis & Gyr, Inc.—now the operating parent company—with two main subsidiaries:

1.     Moore Systems; and

2.     The Duncan Division, consisting of:

      a.     Metal Products Co.;

      b.     Dayton Electronics; and

      c.     Duncan Electric.

The subsidiaries' locations remained unchanged after the restructuring. (Ex. 9 to Wright Aff.; Ex. 10 to Wright Aff. at ZUR001726.)

301141578v1 1004168

On October 1, 1984, Landis changed the name of Duncan Electric to Landis & Gyr Metering, Inc. ("Landis & Gyr Metering"). (Ex. 18 to Wright Aff.) According to Landis, "The name change was the only change. The organization structure did not change nor did the nature of the business." (Ex. 11 to Wright Aff.)

Also in 1984, Landis changed the name of its Moore Systems to Landis & Gyr Systems, Inc. ("Landis & Gyr Systems"). (Ex. 10 to Wright Aff. at ZUR 001727.) It remained in California. (Ex. 12 to Wright Aff.).

Landis & Gyr, Inc. maintained its headquarters at 4 Westchester Plaza, Elmsford, New York in 1984 and 1985. (Ex. 10 to Wright Aff. at ZUR 001726; Ex. 13 to Wright Aff.) In 1986, Landis & Gyr, Inc. moved its headquarters to 100 First Stamford Place, Stamford, Connecticut, where it remained until the Policies expired on October 1, 1988. (Exs. 10-11 Harper Aff. at ZUR 000638, 000605; Ex. 14 to Wright Aff. at ZUR 001717.)

### C.      The Underlying Claim and This Case

According to Landis, the Sagamore Site was contaminated by the operations of Duncan Electric and Landis & Gyr Metering from 1953 to 2000. (Dkt. 55-3 at 17.) In 1983, Duncan Electric voluntarily entered into a consent decree with the Indiana Department of Environmental Management ("IDEM"), agreeing to clean up pollution at the Sagamore Site. (Ex. 19 to Wright Aff.) That consent decree kicked off a decades-long cleanup effort that was not completed until 2017. (Dkt. 54 at 3.)

On October 7, 2016, Landis filed its complaint in this action, alleging that Zurich "was notified many years ago and wrongfully denied coverage [for the cleanup] based on its 'pollution exclusion,' which is not a bar to coverage under Indiana law." (Dkt. 1 at ¶ 2.) Zurich denies being given timely notice of the Sagamore Site as required by the Policies. (Dkt. 11 at 2.)

301141578v1 1004168

Landis subsequently moved for partial summary judgment, seeking to establish that the Policies cover the cleanup of the Sagamore Site. (Dkt. 53, 54.) Landis's motion for partial summary judgment applies Indiana law, but engages in no choice of law analysis. (Dkt. 54.)

## II.    ARGUMENT

### A.    This Court Must Undertake a Choice-of-Law Analysis Because Several Critical Coverage Issues Will Be Decided or Impacted by Choice of Law

As a federal court sitting in diversity, the court should apply the choice-of-law rules of the forum, *i.e.*, Indiana. *Nautilus Ins. Co. v. Reuter*, 537 F.3d 733, 737 (7th Cir. 2008). Under Indiana choice-of-law rules, "[b]efore entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states." *Hartford Acc. Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind. Ct. App. 1997) (internal quotation marks omitted).

Here, several relevant coverage questions may be resolved by determining which state's substantive law applies, including:

• Pollution Exclusions: Indiana courts do not enforce the type of pollution exclusions that are included in the Policies, finding that they are ambiguous. *State Auto. Mut. Ins. Co. v. Flexdar*, 964 N.E.2d 845, 850 (Ind. 2012); *American States Ins. Co. v. Kiger*, 662 N.E.2d 945, 948-49 (Ind. 1996). By contrast, New York and Connecticut courts enforce such exclusions to bar coverage for traditional environmental contamination like the contamination at issue here. *Buell Indus. v. Greater N.Y. Mut. Ins. Co.*, 259 Conn. 527, 531, 536 (2002); *Heyman & Assoc. No. 1 v. Ins. Co. of Pa.*, 231 Conn. 756, 771-72 (1995); *Cont'l Cas. Co. v. Rapid Amer. Corp.*, 593 N.Y.S.2d 966, 972-73 (1993); *Cincinnati Ins. Co. v. Roy's Plumbing, Inc.*, No. 13-CV-1000S, 2016 U.S. Dist. LEXIS 75958, at *10-11 (W.D.N.Y. June 10, 2016).

301141578v1 1004168

• <u>Late Notice Defense</u>: Indiana law provides that an insurance company may only establish a late notice defense if it is prejudiced by an insured's late notice. *Tri-Etch, Inc. v. Cincinnati Ins. Co.*, 909 N.E.2d 997, 1005 (Ind. 2009). By contrast, New York law does not require prejudice. *Argo Corp. v. Greater N.Y. Mut. Ins. Co.*, 4 N.Y.3d 332, 336-37 (2005). If New York law applies to the policies in effect from October 1, 1977 to October 1, 1986, then Zurich will not have to establish prejudice in support of its late-notice defense.

• <u>Personal Injury Coverage</u>: Indiana courts have held that the standard CGL insurance coverage for "personal injury" may cover environmental contamination that migrates from an insured's site to adjacent property. *Thomson, Inc. v. Ins. Co. of N. Am.*, 11 N.E.3d 982, 1010-13 (Ind. Ct. App. 2014). By contrast, both New York and Connecticut courts have refused to extend personal injury coverage to pollution. *Buell Indus.*, 259 Conn. at 560-62; *County of Columbia v. Cont'l Ins. Co.*, 83 N.Y.2d 618, 627-28 (1994).

Simply assuming that Indiana law applies, Landis already has raised all three of these coverage issues in its motion for partial summary judgment. (Dkt. 54 at 11-18.) And the resolution of these coverage questions will have important implications for Landis's allegations of bad faith and breach of contract, as the absence of coverage will defeat those claims as a matter of law. *See, e.g.*, *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 801-03 (2013) (where a claim is not covered by an insurance policy, insured cannot establish claim of bad faith); *Gordon v. Nationwide Ins. Co.*, 30 N.Y.2d 427, 431 (1972) ("More than an 'arguable case' of coverage responsibility must be shown before liability may be imposed for a breach of an implied covenant to act in good faith in denying coverage."); *Knight v. Ind. Ins. Co.*, 871

9

N.E.2d 357, 362-63 (Ind. Ct. App. 2007) (insurer entitled to summary judgment on bad faith and breach of contract claims where underlying claim not covered by policy). Before this Court can properly address the coverage issues in this lawsuit, it should decide what law applies to the Policies. Doing so will narrow the issues before the Court and focus the parties' arguments in any future proceedings. Additionally, choice of law is a legal question that is appropriately resolved through a motion for summary judgment. *Reuter*, 537 F.3d at 737; *see also Flowers v. Southwest Airlines Co.*, 2007 U.S. Dist. LEXIS 2061, at *23 (S.D. Ind. Jan. 10, 2007) (choice of law is an appropriate issue to be resolved by motion for partial summary judgment).

## B.        The Parties to the Policies Were Located in New York and Connecticut

Before engaging in a choice of law analysis, it is important to clarify which entities are parties to the insurance policies being interpreted. When conducting a choice of law analysis involving an insured parent company and insured subsidiary, it is important to "frame the choice of law/contract interpretation issue as to the parties who entered into the contracts: [the parent company] and the various insurance companies." *American Employers Ins. Co. v. Coachmen Industries*, 838 N.E.2d 1172, 1177-78 (Ind. Ct. App. 2005). In *Coachmen*, the parent company's headquarters were in Elkhart County, Indiana, and the subsidiary was located in Texas. *Id.* at 1174. The underlying claim involved pollution that the Texas subsidiary's site. *Id.* at 1175. The parent company negotiated and purchased the policies at issue to cover risks incurred by it and its subsidiaries. *Id.* The Texas subsidiary was listed as a named insured by endorsement. *Id.*

Before discussing the choice of law factors, the court emphasized that "[t]he ultimate issue in this lawsuit is the interpretation of the insurance contracts entered into by [the parent company] for the benefit of it and all of its subsidiaries." *Id.* at 1177. The court acknowledged "the general rule that distinct corporations, even parent and subsidiaries, are presumed separate," but stressed that "the parent and subsidiary . . . did not act separately but rather acted through the

10

parent company . . . in securing the[ ] policies." *Id.* at 1177-78. Thus, the court "frame[d] the choice of law/contract interpretation issue as to the parties who entered into the contracts: [the parent] and the various insurance companies." *Id.* at 1178.

Here, like *Coachmen*, the New York and Connecticut based parent companies (Landis & Gyr, N.A., Inc., and Landis & Gyr, Inc.), acquired insurance on behalf of its wholly-owned subsidiaries, Duncan Electric and Landis & Gyr Metering. All of the Policies were issued to either Landis & Gyr, N.A., Inc. or Landis & Gyr, Inc., as first named insureds. (Exs. 1-24 to Harper Aff.) Like the subsidiary in *Coachmen*, Duncan Electric and Landis & Gyr Metering were simply insured by virtue of additional named insured endorsements. Thus, in applying the choice-of-law factors, the proper focus is on the parties to the contract (*i.e.*, Landis & Gyr, N.A., Inc., and/or Landis & Gyr, Inc. and Zurich), rather than Duncan Electric or Landis & Gyr Metering.

Landis attempts to obfuscate the record by repeatedly referring to the Sagamore Site as the "principal headquarters for the metering operations of Landis + Gyr." (Dkt. 1 at ¶ 5; Dkt. 54 at 2.) But as explained above, the fact that Duncan Electric and Landis & Gyr Metering operated from Indiana does not properly address where the parties to the insurance contracts were located. Duncan Electric and Landis & Gyr Metering did not acquire the policies independently; they received coverage because their New York and Connecticut-based parent companies purchased coverage for them as additional named insureds. The choice of law issue is thus framed in terms of the parties who entered into the contracts: the New York and Connecticut-based insureds, on the one hand, and Zurich, on the other. *Coachmen*, 838 N.E.2d at 1178.

301141578v1 1004168

**C.**     **The Fact that the Polluted Site is Located in Indiana Does Not Mean that Indiana Law Applies**

The Indiana Supreme Court has endorsed the uniform-contract-interpretation approach, which requires a court to apply "the law of a single state to the whole contract even though it covers multiple risks in multiple states." *Standard Fusee*, 940 N.E.2d at 813; *Visteon Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 777 F.3d 415, 418 (7th Cir. 2015). In applying that approach to a claim of environmental contamination, "the site of the pollution should not control if it is not located in the state with the most intimate contacts" to the policy. *Standard Fusee*, 940 N.E.2d at 815; *see also Visteon Corp.*, 777 F. 3d at 416, 418-19 (applying Michigan law to insurance policy even though sole polluted site was located in Indiana). The Indiana Supreme Court has rejected the site-specific approach (*Standard Fusee*, 940 N.E.2d at 813), in which a court views "a multiple risk policy as if it involved [multiple] policies, each insuring an individual risk." *Pulse Engineering, Inc. v. Travelers Indem. Co.*, 679 F. Supp. 2d 969, 973 (S.D. Ind. 2009) (internal quotation marks omitted).

**D.**     **New York and/or Connecticut Have the "Most Intimate Contacts" with the Policies**

Indiana applies the "most intimate contact" rule of the Restatement (Second) of Conflict of Laws (1971). *Standard Fusee*, 940 N.E.2d at 814. Under that rule, a court looks to five factors to determine which state has the most intimate contact with an insurance policy: (1) the location of the subject matter of the contract; (2) the place of contracting; (3) the place of contract negotiation; (4) the place of performance; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Id.*; Restatement (2d) Conflict of Laws § 188. All of these factors point to New York and/or Connecticut as being the states with the "most intimate contact" with the Policies.

301141578v1 1004168

**1.    New York or Connecticut is the Location of the Subject Matter of the Contract, *i.e.*, the Principal Location of the Insured Risk**

The location of the subject matter of the contract, also known as the principal location of the insured risk, is the most important factor. *Standard Fusee*, 940 N.E.2d at 816. When determining what the parties' viewed as the principal location of the insured risk, courts look to the parties' understanding at the time of contracting, rather than with hindsight. *Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 933 n.6 (Ind. Ct. App. 1999).

Generally, the principal location of the insured risk may be determined by looking to the state having more insured locations than any other. *Standard Fusee*, 940 N.E.2d at 816. Here, Landis maintained either two or three locations in Elmsford, New York until it restructured in 1982. (Ex. 2 to Wright Aff. at ZUR 002143; Ex. 3 to Wright Aff. at ZUR 002078-79.) Landis & Gyr, N.A., Inc. maintained a location at 101 Executive Boulevard, and Landis & Gyr, Inc. maintained two locations at 4 Warehouse Lane and 4 Westchester Plaza. (Ex. 2 to Wright Aff. at ZUR 002143.) Because New York had the most sites from October 1, 1977 to October 1, 1982, New York was the principal location of the insured risk for those periods.

New York remained the principal location of the insured risk even after Landis & Gyr, Inc. consolidated into the 4 Westchester Plaza site on October 1, 1982. All of the policies effective October 1, 1982 to October 1, 1986 list Landis & Gyr, Inc. (a New York entity) as the first named insured and one additional named insured located in each of the following states: California, Indiana, Ohio, and Florida. In other words, no one state had more insured sites than another.

Where a tally of the insured sites does not reveal that one state has more insured sites than another, an insured's headquarters is considered the principal location of the insured risk.

301141578v1 1004168

*See Standard Fusee*, 940 N.E.2d at 816 (noting that, while "both Maryland and Indiana have one site each . . . the fact that the Maryland site is also [the insured's] headquarters suggests that it is the principal location of the insured risk"); *see also Visteon Corp.*, 777 F.3d at 418 (finding that Michigan was the principal location of the insured risk in part because "Michigan is . . . the jurisdiction in which [the insured's] headquarters is located"). Because the policies effective October 1, 1982 to October 1, 1986 insured an equal number of sites in various states, the site of Landis's headquarters—New York—is the principal location of the insured risk.

The same rationale leads to the conclusion that Connecticut law applies to the policies effective October 1, 1986 to October 1, 1988. During that time, Landis & Gyr, Inc., which had moved to Connecticut, was the first named insured on all of the Policies. The three other named insureds, Landis & Gyr Systems, Metal Products, and Landis & Gyr Metering, were located in California, Florida, and Indiana, respectively. Because the number of insured sites was distributed evenly between Connecticut, California, Florida, and Indiana, this Court should consider the location of Landis's headquarters—Connecticut—to be the principal location of the insured risk for those periods.

There is also other evidence indicating that the parties viewed Landis's headquarters to be the principal location of the insured risk. In fact, Zurich expressly referred to Landis & Gyr, N.A., Inc.'s Elmsford, New York location as the principal location of the insured risk. In an amendment of notification of coverage sent to the New York Interstate Compensation Rating Bureau on March 11, 1982, Zurich listed the "Principal Name of Risk" as, "Landis + Gyr, N.A., Inc.," and the "Address of Principal Risk" as "Elmsford, New York." (Ex. 16 to Wright Aff.) Consequently, this Court should view the location of the first named insureds and parent entities as the principal location of the insured risk for all of the Policies.

301141578v1 1004168

While Landis has asserted that Indiana law applies (*see generally* Dkt. 54), it has never maintained its headquarters in Indiana. Rather, only certain subsidiaries, Duncan Electric and Landis & Gyr Metering, were located in Indiana. However, as stressed above, those subsidiaries did not enter into the insurance contracts with Zurich; Landis & Gyr, N.A., Inc. and Landis & Gyr, Inc. did.

Landis attempts to deflect from this fact by asserting that Indiana was the "principal headquarters for the metering operations of Landis + Gyr." (Dkt. 1 at ¶ 5; Dkt. 54 at 2.) Even assuming that this assertion is accurate, the Policies did not provide coverage solely for Landis's "metering operations." The Policies provide broad general liability coverage for "property damage" that occurs within the "policy territory" and is caused by an "occurrence," subject the Policies' other terms, exclusions, and conditions. (Dkt. 55-4 at 25.) The Policies define "policy territory" to include the United States, its territories or possessions, and Canada. (*Id.* at 10.)

The other entities insured under the Policies did not perform metering operations, or at least not exclusively. Moore Systems, which was an additional named insured under all of the Policies, manufactured "power regulations equipment and computer programs for power control." (Ex. E, ZUR 002137.) Metal Products, an entity insured in a majority of the policy periods, "manufactur[ed] metal products for the electronic industry." (*Id.*) Because metering operations was just one of a variety of risks insured by Zurich, the parties would not have envisioned that the state where Landis maintained its "metering operations" would be the principal location of the insured risk. *See Visteon Corp.*, 777 F.3d at 418 (rejecting the notion that polluted site was principal location of insured risk where policies insured a "great variety of risks" and insured had "worldwide operations").

15

Because the Policies provided coverage to various entities spread throughout the United States, Landis's headquarters is the principal location of the insured risk. This factor thus supports the application of New York law to the policies in effect from October 1, 1977 to October 1, 1986,[3] and Connecticut law to the policies in effect from October 1, 1986 to October 1, 1988.

**2.     New York Was the Place of Contracting**

The place of contracting is where the last act giving rise to the contract occurred. *Visteon Corp. v. Nat'l Union Fire Ins. Co.*, No. 1:11-cv-00200-RLY-TAB, 2013 U.S. Dist. LEXIS 111109, at *16 (S.D. Ind. July 22, 2013), *aff'd* 777 F.3d 415 ("The place of contracting is defined as 'the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect.'") (quoting Restatement (2d) Conflict of Laws § 188 cmt. e).

In *Standard Fusee*, 940 N.E.2d at 817, the Indiana Supreme Court found that the place of contracting "tend[ed] to favor Maryland" law where the insured's communications with its brokers originated from its Maryland headquarters; the insured procured, reviewed, and made decisions regarding the policies in Maryland; the policies were retained in Maryland; and the insured paid its premiums from Maryland.

Here, Zurich issued the Policies to Landis & Gyr, N.A., Inc., and/or Landis & Gyr, Inc. in either New York or Connecticut. (Exs. 1-24 to Harper Aff.) Zurich sent the Policies from its New York office to the New York office of Landis's insurance broker, Marsh. (Harper Aff. ¶ 15;

---

[3] While the October 1, 1985 to October 1, 1986 policies include an endorsement changing Landis & Gyr, Inc.'s address to 100 First Stamford Place, Stamford, Connecticut 06902 (Ex. A at ___), that endorsement was not effective until March 12, 1986. Because the principal location of the insured risk should be determined based on the parties' understanding at the time of contracting, New York law should apply to these policies. *Summit Corp.*, 715 N.E.2d at 933 n.6.

301141578v1 1004168

Ex. 28 to Harper Aff.) Zurich sent invoices and checks to Landis & Gyr, Inc. from Zurich's New York office through Marsh's New York office. (Harper Aff. ¶ 14; Ex. 27 to Harper Aff.) In other words, the Policies were executed and the premiums were paid entirely in New York. The place of contracting was thus New York.

It is true that, when contracting occurs between more than one state, "Indiana courts have regularly struggled to find that [the place of contracting] conclusively points to a single state." *Visteon Corp.*, 2013 U.S. Dist. LEXIS 111109, at *16. But those cases all involved situations where insurance policies were issued between different states. *See*, *e.g.*, *Reuter*, 537 F.3d at 739, (finding it "impossible to pinpoint the place of contracting" where the insured procured the policies from its Indiana office, the insurer's agent was based in New Jersey, the policies were ordered from and underwritten by a Pennsylvania insurance agency, and the insurer was based in Arizona); *Coachmen*, 838 N.E.2d at 1179 (finding that the place of contracting was "indeterminate" because the insurance companies' agents negotiated with the insured from several states); *Employers Ins. v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1024 (Ind. Ct. App. 1999) (finding the place of contracting to be indeterminate where the insured's personnel responsible for purchasing insurance, paying premiums, and resolving disputes with the insurer were in Indiana, while the insurer issued the policies from New York).

This case presents a different situation. Here, the first named insured, the insured's broker, and the office of the insurer issuing the Policies were all located in New York. (Harper Aff. ¶¶ 11, 12, 16.) Thus, the last act giving rise to the formation of the Policies in effect from October 1, 1977 to October 1, 1986 occurred wholly in New York.

### 3.       New York Was the Place of Contract Negotiation

To determine the place of contract negotiation, courts have looked to where the insured's insurance personnel or broker were located. *See*, *e.g.*, *Visteon*, 777 F.3d at 418-19 (noting that

the insured's "personnel who . . . negotiated the contract with [the insurer]" were stationed in Michigan, which weighed in favor of Michigan law); *Standard Fusee*, 940 N.E.2d at 817 (facts "tend[ed] to favor Maryland" law where "all of [the insured's] written and verbal communication with the brokers originated from its Maryland headquarters").

Here, all of the Policies list Marsh, Landis's insurance broker, on the declarations pages. (Harper Aff. ¶¶ 12, 15.) Zurich sent the policies from its New York office to Marsh's New York office. (Harper Aff. ¶ 15; Ex. 28 to Harper Aff.) The Policies were underwritten out of its office in Manhattan. (Harper Aff. ¶ 11.)

And Marsh's New York office negotiated with Zurich's New York office regarding the specific terms of the Policies. For example, after Landis & Gyr, N.A., Inc., sold Andover in March 1982, Marsh wrote to Zurich's New York office "regarding the necessary premium adjustments to be made as a result of this sale." (Ex. 8 to Wright Aff.) In 1984, Marsh sent a memo to Pat Armstrong, an underwriter in the Manhattan Special Risk Region (Harper Aff. ¶ 11), requesting that an exclusion be deleted on the umbrella and excess umbrella policies. (Ex. 26 to Harper Aff.) And when Landis & Gyr, N.A., Inc., requested certificates of insurance for the Sagamore Site, it did so through Marsh, who communicated with Zurich's New York office. (Ex. 17 to Wright Aff.) The place of contract negotiation was New York.

### 4.   The Place of Performance Is Indeterminate Because, At the Time the Parties Entered Into the Contract, They Were Uncertain Where the Insurance Funds Would Be Put to Use

The place of performance is the place where the insurance funds will be put to use. *Standard Fusee*, 940 N.E.2d at 817. The Seventh Circuit has stated that "the place of performance will not significantly affect the choice-of-law analysis when '(1) *at the time of contracting* it is either uncertain or unknown, or when (2) performance by a party is to be divided more or less equally among two or more states with different local law rules on the

18

particular issue.'" *Reuter*, 537 F.3d at 740 (quoting Restatement (2d) Conflict of Laws § 188 cmt. e) (emphasis added); *see also Coachmen*, 838 N.E.2d at 1180 (finding that the place of performance "bears little weight . . . because *at the time of contracting*, the place of performance was uncertain because of [the insured's] subsidiaries throughout the country, although they were primarily located in Indiana") (emphasis added).

Here, while Landis is seeking coverage for cleanup of the Sagamore Site in Indiana, the parties would not have envisioned that the policy funds would certainly be put to use there. The Policies insured entities located all over the country, and provided coverage for "property damage" that occurs within the "policy territory" (i.e., anywhere in the United States or Canada), subject to the Policies' other terms. And as discussed above, the Policies insured various entities performing a variety of operations in multiple states, not just Indiana.

Landis implicitly recognizes this fact, asserting that it first notified Zurich of the pollution at its site in 1995, well after the final policy terminated on October 1, 1988. (Dkt. 55-2 at ¶ 7; Dkt. 55-5 at ¶ 5.) Thus, at the time of contracting, the parties would not have foreseen where the insurance funds might be put to use. This factor is indeterminate.

### 5.   The Domicile, Residence, Nationality, Place of Incorporation, and Place of Business of the Parties Favors New York Law

"[A] corporation's principal place of business is a more important contact than its place of incorporation." *Recticel Foam*, 716 N.E.2d at 1025 (citing Restatement (2d) Conflict of Laws § 188 cmt. e). An insured's principal place of business is generally viewed as more important than the insurer's principal place of business. *See Standard Fusee*, 940 N.E.2d at 816 (finding that this factor favored Maryland law because the insured's headquarters was based in Maryland, even though the insurers were located in many different states).

301141578v1 1004168

Here, Landis & Gyr, N.A., Inc., and Landis & Gyr, Inc., kept their principal places of business in New York from 1977 to 1986, and in Connecticut from 1986 through 1988. While Zurich's headquarters was located in Illinois during the policy periods, that fact is given less weight. *Standard Fusee*, 940 N.E.2d at 816. Moreover, Zurich was incorporated in New York. (Dkt. 11 at 3.)

Certainly, this factor does not support the application of Indiana law. Again, it is important to emphasize that Landis & Gyr, N.A., Inc., and Landis & Gyr, Inc., were the first named insureds on the Policies, not Duncan or Landis & Gyr Metering. Thus, the parent entities (Landis & Gyr, N.A., Inc., and Landis & Gyr, Inc.), rather than their subsidiaries (Duncan Electric or Landis & Gyr Metering), were the parties to the contract. *See Coachmen*, 838 N.E.2d at 1177-78. The fact that Duncan Electric and Landis & Gyr Metering may have maintained their principal place of business in Indiana is irrelevant.

This factor thus favors the application of New York law to the policies in effect from October 1, 1977 to October 1, 1986 and Connecticut law to the policies in effect from October 1, 1986 to October 1, 1988.

**6.    Viewed Together, the Factors Show that New York or Connecticut Have the "Most Intimate Contract" with the Policies and that Indiana Bears Little Relationship to the Policies**

In sum, the principal location of the insured risk and principal place of business of the insured factors require the application of New York law to the policies in effect from October 1, 1977 to October 1, 1986 and Connecticut law to the policies in effect from October 1, 1986 to October 1, 1988. The place of contracting and place of negotiation factors further support the application of New York law. The place of performance factor is indeterminate and has no bearing.

20

None of the factors favors the application of Indiana law. The only relationship between Indiana and the Policies is that the underlying environmental contamination occurred there, but that relationship is irrelevant because the Policies provide coverage for multiple locations throughout the country. *Standard Fusee Corp.*, 940 N.E.2d at 813, 815.

## III.   CONCLUSION

This Court should grant Zurich's motion for partial summary judgment and find that New York law applies to the policies in effect from October 1, 1977 to October 1, 1986 and Connecticut law applies to the policies in effect from October 1, 1986 to October 1, 1988.

Respectfully submitted,

HINSHAW & CULBERTSON LLP


By:   /s/ *Michael M. Marick*
One of the Attorneys for Defendant ZURICH AMERICAN INSURANCE COMPANY, a New York Corporation, f/k/a ZURICH INSURANCE COMPANY

Kyle A. Lansberry (#20977-49)
Michael R. Giordano (#31317-53)
Lewis Wagner, LLP
501 Indiana Avenue, Suite 200
Indianapolis, IN  46202-6150
317-237-0500 (Phone)
317-630-2790 (Fax)
klansberry@lewiswagner.com
mgiordano@lewiswagner.com

Michael M. Marick (#6183285)
James H. Kallianis, Jr. (#6207178)
Timothy H. Wright (#6298003)
Hinshaw & Culbertson LLP
222 N. LaSalle St., Suite 300
Chicago, IL  60601
mmarick@hinshawlaw.com
jkallianis@hinshawlaw.com
twright@hinshawlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was filed electronically on February 2, 2018.  Notice of this filing will be sent by operation of the court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

/s/ *Timothy H. Wright*
Timothy H. Wright

301141578v1 1004168