IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

| | |
|---|---|
| LANDIS+GYR INC., a Delaware Corporation, f/k/a LANDIS & GYR METERING, INC., <br><br> Plaintiff, <br><br> v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, a New York Corporation, f/k/a ZURICH INSURANCE COMPANY, <br><br> Defendant. | Case No. 4:16-CV-00082-JTM-APR |

**LANDIS+GYR'S BRIEF IN SUPPORT OF ITS MOTION
TO STRIKE CERTAIN INADMISSIBLE EVIDENCE CITED
BY ZURICH**

## I.  Introduction

Landis+Gyr Inc. ("Landis") filed a Fed. R. Civ. P. 56 motion on coverage issues on December 1, 2017. Zurich American Insurance Company ("Zurich") responded to this motion on February 2, 2018. In its response, Zurich cited and relied on the affidavit of Ms. Cherish Hairrell to support its argument that Zurich has no record, or cannot find a record, of Landis' initial claim concerning the Sagamore Parkway site in the 1980s and 90s. Zurich further relied on Ms. Hairrell's affidavit to support its contention that because no such record could be found, Landis must not have notified Zurich prior to September 16, 2014. Zurich also cited and relied on the affidavit of Mr. Peter Alvey to support its argument that Landis' allegedly late notice prejudiced Zurich, but Mr. Alvey's general assertions about what "could have been done" and what may have been "likely" are insufficient to establish that Zurich has been prejudiced.

Because these affidavits are not based on personal knowledge and consist of unsubstantiated speculation and hearsay, they are inadmissible and cannot create genuine issues of material fact for purposes of Rule 56.  Therefore, Landis respectfully requests that the Court strike paragraphs 5, 7, 8, 10, 11, 13 and 14 of the affidavit of Ms. Hairrell and paragraphs 13, 14, and 15 of the affidavit of Mr. Alvey.

## II.     Law and Argument

### A.     Rule 56

Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that "[a]n affidavit or declaration used to support or oppose a motion ***must be made on personal knowledge***, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." (emphasis added).  Rule 701 of the Federal Rules of Evidence further provides: "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is rationally based on the witness's perception [and] helpful to clearly understanding the witness's testimony or to determining a fact in issue."  While "[t]he affiant may include reasonable inferences drawn from his own observations . . . he may not testify as to the knowledge or observations of another." *Hayes v. Menard, Inc.*, 2012 WL 6553109 at *2 (citing *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2002)).  Rule 702 of the Federal Rules of Evidence allows for opinion testimony by a qualified expert if the expert's knowledge will help the trier of fact to understand or determine a fact in issue; if the expert's opinion is based on sufficient facts or data; if the expert's opinion is the product of reliable principles and methods; ***and*** if the expert reliably applied those principles and methods.  In determining whether or not genuine issues of material fact exist, "[a] court must not consider those parts of an affidavit that

do not comply with [these] mandatory requirements." *Adusumilli v. City of Chicago*, 164 F.3d 353, 359 (7th Cir. 1998).

> **B.     Paragraphs 5, 7, 8, 10, 11, 13 and 14 of Ms. Hairrell's Affidavit lack foundation, are hearsay and are not based on personal knowledge, making them inadmissible and insufficient to establish a genuine issue of material fact.**
>
> **1.     The Hairrell Affidavit**

Ms. Hairrell manages Zurich's environmental claims department. (February 20, 2018 Deposition of Cherish Hairrell attached at Appendix, Ex. E, 19:9-16) (hereinafter, "Hairrell Dep."). She has worked at Zurich since December of 2002. (Hairrell Dep. 23:17-24:3). However, in her affidavit, Ms. Hairrell tried to testify about "facts" dating back to the 1980s and 90s:

> ¶ 5    Zurich first received notice of the environmental contamination and remediation at the Sagamore Site on September 16, 2014, when Zurich received a letter from Landis+Gyr, Inc.'s counsel, Brent Huber of Ice Miller. In that letter, Mr. Huber stated that Landis + Gyr, Inc. had previously given notice of the Sagamore Site to Zurich. By letter dated September 25, 2014, Landis contended that Zurich was notified of the Sagamore Site claim in 1987.
>
> ¶ 7    Zurich maintains a claims database that includes all claims reported to Zurich from May 1, 1986 through the present. Zurich does not delete claim information that is entered into this database.
>
> ¶ 8    Zurich employees can search all of the claims that have been reported to Zurich and entered into this database through software known as "eZACCESS."
>
> ¶ 10   If Zurich had received notice of the Sagamore Site after May 1, 1986, a record of the claim would have been maintained in the claim database.
>
> ¶ 11   Zurich has never systematically disposed of old claim files from the 1980s and 1990s, even if Zurich's relevant document retention policy would have permitted Zurich to dispose of certain types of claim files under certain circumstances. Instead, it has always been Zurich's practice to transfer older claims files to storage.
>
> ¶ 13   During this search, Zurich employees working under my supervision did locate a claim related to Landis & Gyr, Inc.'s disposal of hazardous wastes at a landfill operated by Lakeland Disposal Services in Claypool, Indiana (the "Lakeland Site"). The claim

> regarding the Lakeland Site was reported to Zurich in 1987 and was unrelated to the Sagamore Site. None of the correspondence or documents in the Lakeland Site claim file referred to environmental contamination or remediation at the Sagamore site.
>
> ¶ 14  Even if the physical claim file for the Sagamore Site had been disposed of pursuant to Zurich's document retention policies, a record of the claim would have remained in the claim database and would be identifiable through a search run on eZACCESS.

(Zurich Opp., Ex. B, Hairrell Aff. ¶¶ 5, 7, 8, 10, 11, 13, 14, Dkt. 71-3) (hereinafter, "Hairrell Aff."). Ms. Hairrell does not have personal knowledge of these "facts," and they contradict Zurich's written policies, practices and procedures on these issues.

### 2. The above portions of Ms. Hairrell's Affidavit are pure speculation, lack foundation, hearsay and are not based on personal knowledge.

Ms. Hairrell relied on word-of-mouth statements about Zurich's alleged 30-plus year old records maintenance practices, which directly contradict Zurich's written records maintenance policies. She concluded that, because Zurich has been unsuccessful in locating the Sagamore claim in Zurich's claim database, Landis must not have given notice. "Because no record of any Sagamore Site claim exists, the only reasonable conclusion is that Zurich did not receive notice of the Sagamore Site." (*See* Zurich's Opp., Dkt. 71 at 14). These "facts" should not be considered by the Court for purposes of Rule 56 because they are speculative, hearsay, lack foundation and are not based on personal knowledge.

Ms. Hairrell first began working at Zurich in 2002. How does she know every claim since 1986 appears on the claims database? (Hairrell Aff. ¶¶ 5, 7, 8, 10, 14). What about claims made before that date? How does she know that Zurich "never" disposed of old claim files, when Zurich's own company policies and documents state that it did? (Hairrell Aff. ¶ 11). She even conceded at the outset of her deposition that she does not have personal knowledge of such matters:

4

>Q: When would you, Ms. Hairrell, first be in a position to have personal knowledge with respect to how Zurich handles claims? What would be the first date?
>
>A: I guess it would be when I started handling claims in 2002.

(Hairrell Dep. 23:17-24:3).

Presumably, Ms. Hairrell gathered information from other Zurich employees; however, Ms. Hairrell further conceded in her deposition that she did not speak to anyone who had worked at Zurich prior to 2000 to investigate and prepare for her testimony. (Hairrell Dep. 27:19-22). After meeting with her counsel off the record, later in the day, Ms. Hairrell tried to backtrack somewhat on this point and offered that she did speak with a "Joel Robinette" about her testimony. (Hairrell Dep. 94:7-95:7). After struggling to remember his name and stating that she does not know how to spell it, Ms. Hairrell testified that Joel works in Zurich's records maintenance department, but stated that he did not work at Zurich in the 1980s either. (Hairrell Dep. 157:16-159:7). At one point in her deposition, Ms. Hairrell unequivocally confirmed that she did not talk to anyone who actually worked in Zurich's records group in 1985. (Hairrell Dep. 157:16-22).

Even later in her deposition, Ms. Hairrell claimed that she also spoke with "Larry" from IT – no last name, just "Larry." (Hairrell Dep. 247:6-20). She was not sure how long "Larry" had worked for Zurich or whether he was there in the 1980s, but he apparently explained to her how he had understood the eZACCESS claims database system—previously known simply as ACCESS—was initially set up in 1986. (Hairrell Dep. 247:21-248:3; 234:4-9). According to what "Larry" had been told, and what he passed along to Ms. Hairrell, all of the then-open claims, in 1986, were added to the database, as well as "recently" closed claims and "select claims that needed to be converted for further handling." (Hairrell Dep. 248:13-19). Other so-

called "not recently closed" claims were not added to this system, according to "Larry." (*Id*.). Ms. Hairrell stated that she was not sure whether there was any documentation of this policy; instead, she relied exclusively on her conversation with "Larry," but failed to ask "Larry" about his last name or his work history at Zurich. (Hairrell Dep. 248:23-249:3).

Clearly, Ms. Hairell does not have personal knowledge of the matters asserted in her affidavit, nor did she speak to anyone with personal knowledge. Ms. Hairrell's affidavit is the product of *at least* two layers of hearsay from unidentifiable sources. Zurich's notice argument, in turn, is built on multiple levels of speculation and hearsay on top of that. Zurich says that it maintains a searchable database of all claims and that it keeps a record of all physical claim files that are destroyed (Hairrell Aff. ¶¶ 7, 8, 10, 14, Dkt. 71-3)—but, at the same time, that it has literally "never" destroyed any claim files (Hairrell Aff. ¶ 11)—and that, therefore, "Zurich *first* received notice of the environmental contamination and remediation at the Sagamore Site on September 16, 2014." (Hairrell Aff. ¶ 5) (emphasis added).

Such assertions are plainly inadmissible, nothing more than "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from [observations or other first-hand personal experience]." *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655. 659 (7th Cir. 1991). These "facts" do not comply with the mandatory requirements of Rule 56, and therefore must not be considered by the Court in evaluating Landis' partial motion for summary judgment. *See Hayes,* 2012 WL 6553109 at *1 (citing *Adusumilli,* 164 F.3d at 659).

As in *Visser* and *Hayes,* Ms. Hairrell's outlandish assertions cannot be considered evidence. She purports to relay and report on the practices of Zurich employees who she never met and who worked at Zurich over 30 years ago, based on conversations she had with one or two current employees who themselves were speculating and did not have first-hand knowledge.

6

Ms. Hairrell's deposition testimony is helpful in confirming just how disorganized and inconsistent Zurich's internal processes for managing and maintaining its files have been over the years. Ms. Hairrell also gave remarkable testimony about Zurich's handling of another Landis claim relating to the Lakeland Disposal site, a Superfund site. Her testimony about the Lakeland site further highlights the problems surrounding Zurich's document management system over the years, and in turn, the inherent unreliability of Zurich's so-called evidence about the Sagamore Parkway site.

As Zurich would have it, Landis only gave notice in the 1980s and 90s of one environmental claim, the Lakeland Disposal site, and there was only one such claim, one claim file, and one claim or file number. However, based on Ms. Hairrell's testimony and Zurich's own documents, this is not the case.

Indeed, Zurich's own documents and file materials show that Zurich initially combined the Lakeland Disposal file and claim number with at least one other claim and site, which pre-dated Zurich's electronic file-keeping systems. Zurich's documents also show that Zurich re-opened the Lakeland Disposal claim file and re-numbered it in the 1990s, after Zurich's electronic system was on line. Ms. Hairrell admitted as much in her deposition:

Q: Do you know at what point in time the file number was changed?

A: I do not.

Q: Do you know why the file number was changed?

A: No.

(Hairrell Dep. 231:19-24).

As discussed previously, according to "Larry" from IT, only the claims open or recently closed as of 1986, or "select claims that needed to be converted for further handling," were

loaded into the eZACCESS database. (Hairrell Dep. 248:13-19). The so-called "not-recently closed claims" were not added to this system. (*Id.*). Notice of the Lakeland matter was originally given right around this alleged cutoff point, in 1987. The claim file on the Lakeland claim was reopened and closed in 1995, at which time a memo was written stating: "PLEASE CLOSE PHYSICAL FILE, WHICH SHOULD ALREADY BE CLOSED ON ACCESS. PLACE CONTENTS OF THE BLUE FILE IN THE COVERAGE DRAWER UNDER LANDIS & GYR, *WHICH IS AN ESTABLISHED COVERAGE DRAWER FILE*" (Hairrell Dep., Ex. E-48 at ZUR001511) (emphasis added).

Of course, as Zurich would have it, there was only one claim, the Lakeland claim, and one file for that claim. When questioned about why there was already an "established coverage drawer file" and what this meant, Ms. Hairrell stated:

Q: Does that mean that there were other claims or files already there?

A: It could mean there were other claims related to this claim.

(Hairrell Dep. 239:3-6). Additionally, when a claim is closed in the eZACCESS system, an option is given for "Close entire claim, Y/N," indicating that multiple claims can be aggregated in a single file, and then may be closed in part and separated, or closed *in toto*, depending on how the form is completed. (Hairrell Dep., Ex. E-46 at ZUR001491).

Despite this testimony and evidence, Mr. Hairrell tried to assert in her affidavit that she was certain Zurich had only been notified of one claim, the Lakeland site, in the 80s and 90s. However, Ms. Hairrell's statement in her affidavit that "[n]one of the correspondence or documents in the Lakeland Site claim file referred to environmental contamination or remediation at the Sagamore Site" is plainly inaccurate. (Hairrell Aff. ¶ 13). On November 30, 1987, Zurich sent a reservation of rights letter to Joan Considine at Marsh & McLellan, Inc., that

8

repeatedly referenced "claims" in the plural and stated: "Landis+Gyr alleged repeated and continuous [storage and/or discharge and/or disposal] of all hazardous substances at its Lakeland site facility [ad [sic] at other sites referred to in the complaints] over a period of years…." (Hairrell Dep., Ex. E-43 at ZUR000922). The letter then cited the owned property exclusion, which applies only to property owned, occupied, or rented by the insured. (Hairrell Dep., Ex. E-43 at ZUR000923). Landis owned the Sagamore site, but it did not own the Lakeland site, which was merely an off-site landfill in Claypool, Indiana where Landis had disposed of waste from its on-site operations. The waste in question that was disposed of at the Lakeland site came from Landis' plating and degreasing operations at the Sagamore site. Obviously, the owned property exclusion could not apply to the Lakeland site, which did not involve owned property, yet Zurich made the conscious decision to reserve rights on this basis.

Ms. Hairrell had no good explanation for any of these references when questioned about them in her deposition, but she agreed that the owned property exclusion would not apply to a claim involving a Superfund site that was owned by a third party, like the Lakeland site. (Hairrell Dep. 225:2-229:6). These references in the Lakeland claim file did not escape Zurich's attention either as claims adjuster Julie York wrote in an email to Bob Koscielniak, Zurich's vice president of latent and environmental claims, an October 3, 2016 that "notice was tendered in 1987 pertaining to an unrelated landfill site, the 'Lakeland Disposal Site', and possibly other sites (see 5. section below)." (Hairrell Dep., Ex. E-19 at ZUR001306-07).

Along these same lines, Ms. Hairrell's conclusion that all claims that had ever been advanced against Zurich can be searched electronically using the eZACCESS system is misleading and inaccurate. (Hairrell Aff. ¶ 8). The eZACCESS system is a database of claim information that is organized by claim number. (Hairrell Dep. 107:5-107:18, 240:1-2). Zurich's

9

physical storage facilities, meanwhile, are searchable exclusively by indexes such that claim files can only be retrieved by searching for the corresponding claim number. (Hairrell Dep. 104:15-20).  Therefore, Zurich would have to successfully search both the eZACCESS system and the indexes at each and every physical storage facility in order to successfully retrieve a claim file. In the case of the Lakeland claim, the claim had been "re-opened" after the system went on line, the claim number was found in the eZACCESS system, which was then used to find the physical claim file in storage at Retrievex, one of Zurich's storage facilities that is searchable only using indexes of claim numbers. (Hairrell Dep. 111:23-112:5-14, 155:4-8).  Without the correct claim number, the files cannot be located, much less retrieved.

These are additional reasons why Mr. Hairrell's assertions in her affidavit are unreliable, internally inconsistent, speculative, and inadmissible.

### 3. Ms. Hairrell's affidavit conflicts with Zurich's own written policies, practices, and procedures in the 1980s and 90s.

Paragraph 11 of Ms. Hairrell's affidavit and her assertion that literally no claim files were ever destroyed also contradicts Zurich's own document retention policies, practices, and procedures in the 1980s and 90s.  Those policies required old claims files to be destroyed after a period of time, but insurance policies themselves were to be kept "indefinitely."  (Hairrell Dep. 89:5-11, 173:6-11). Specifically, a general liability claim file was to be "retained in storage" for "5 yrs after closing (unless Statute of Limitations is longer) or 3 yrs after close of subrogation, whichever is later." (Hairrell Dep. 163:2-164:23; Hairrell Dep., Ex. E-22 at ZUR001325). Zurich did not bother to look up and list the statute of limitations for Indiana, (Hairrell Dep., Ex. E-22 at ZUR001329), and Ms. Hairrell confirmed in her deposition that, with regard to the policies at issue here, the 1985 retention policy required retention for five years after closing the claims file. (Hairrell Dep. 169:1-170:2).

In contrast, Zurich followed a much different retention procedure for insurance policies. For example, as to general liability umbrella policies, the 1985 retention policy stated: "Retain Indefinitely," (Ex. E-22, ZUR001339); yet, Zurich could not find several of Landis' old insurance policies despite its historic practice of keeping insurance policies "indefinitely." In her deposition, Hairrell conceded that she has no explanation as to why Zurich could not locate all of the Landis policies. (Hairrell Dep. 95:8-14).

Remarkably, for a company claiming that it has literally never destroyed any documents, Zurich has struggled to locate its historical document retention policies as well, producing only excerpts of some. Zurich's 1985 retention policy is nonetheless clear that "[t]he primary purpose of the Corporate Records Retention Schedule is to provide criteria for the *routine destruction of records*." (Hairrell Dep., 155:15; Ex. E-22 at ZUR001313) (emphasis added). It further provided that "[t]he destruction of claim files will be done according to the most current retention procedure." (Hairrell Dep., Ex. E-22 at ZUR001313). This policy was periodically updated, including updates in at least the following years: 1990 (Hairrell Dep., Ex. E-23 at ZUR001340-41); February 1991 (Hairrell Dep., Ex. E-24 at ZUR001380-88); May 1992 (Hairrell Dep., Ex. E-25 at ZUR001351-91); September 1993 (Hairrell Dep., Ex. E-26 at ZUR001347-67); and August 1994 (Hairrell Dep., Ex. E-27 at ZUR001343-46). Ms. Hairrell did not know how many individuals were involved in purging documents in the 1980s (Hairrell Dep. 162:1-3); however, Zurich's records purging schedule required that each clerk commit a certain number of hours each day, week, and year purging files (Hairrell Dep., Ex. E-22 at ZUR001312). The purging schedule also provided: "Year-to-date progress in completing the Purge/Audit routine should be monitored quarterly to assure completion by year-end by

11

determining the number of file sections, terminals, etc., completed each quarter." (Hairell Dep., Ex. E-22 at ZUR001312).

Ms. Hairrell nonetheless contends that this policy—despite all of its detail and its numerous and regular updates—was all for naught because no documents were ever destroyed. In sum, we are to believe that Zurich lost or misplaced documents it was supposed to keep, *i.e.* the policies, and kept forever the claims files for thousands of claimants and policyholders, the documents that its retention policy dictated should be promptly purged and destroyed.

These evidentiary defects in Zurich's position are not mere technicalities in this case. Ms. Hairrell is Zurich's only witness to substantiate Zurich's contention that it was not notified of the Sagamore Parkway site years ago. She offered no analysis or explanation for her conclusory and speculative assertions about what "would have happened" after Zurich's receipt of such a notice in the 80s and 90s, and she dismissed Zurich's document retention policies with the claim that Zurich "didn't follow" these policies in the 80s and 90s, even though she has no personal knowledge as to what Zurich was doing or not doing with its files years ago.

These are additional reasons why her affidavit does not and cannot create a genuine issue of material fact.

### C. Paragraphs 13-15 of Mr. Alvey's Affidavit are inadmissible and do not create a genuine issue of material fact regarding whether Zurich was prejudiced.

Mr. Alvey's affidavit provides:

¶ 13   If Landis's insurance company had been notified of the contamination before 2014, the insurance company could have taken numerous steps to assist in mitigating the length and cost of the closure of the Site, including but not limited to:

> a. when chlorinated solvents (chlorinated volatile organic compounds CVOCs) were first detected in the soil and groundwater near the unlined surface impoundment, Landis should have taken steps to identify the source of the CVOCs.

12

    b. these potential source areas include, CVOC handling and storage areas (drum and tank storage), CVOC usage areas (degreasers) and CVOC waste handling and storage areas;

    c. once these source areas were identified, investigations should have been conducted to delineate the extent of contamination associated with each;

    d. once the delineation identified the areas of CVOC contamination, immediate steps should have been taken to remove or isolate these sources.

¶ 14   It is likely that the failure of Landis to properly and adequately investigate and remediate the CVOC contamination in a timely manner allowed the contaminants to migrate and ultimately increased the cost of site closure.

¶ 15   The Exhibits and the VFC do not demonstrate that Landis's investigation or remediation of Site was diligent or reasonable for various reasons, including but not limited to the following:

    a. IDEM repeatedly found Landis's closure plans to be inadequate, which prolonged the closure and negotiation process;

    b. the VFC and Exhibits show that Landis installed degreasers at the Site as of 1973, but did not investigate the possibility of contamination from those degreasers until the late 1990s;

    c. the VFC and Exhibits do not show the process of negotiation between Landis and IDEM, making it impossible to determine whether Landis was compelled to complete various activities by IDEM.

(Zurich Opp., Ex. D, Alvey Aff. ¶¶ 13-15, Dkt. 71-5) (hereinafter "Alvey Aff."). Zurich relies on these "facts" to argue that Zurich was prejudiced by the timing of the 2014 notice.

But Mr. Alvey's testimony of generally what "could have been done" and what may have been "likely" does not establish what Zurich would have done or how Zurich would have achieved different results. As such, these statements are insufficient to carry Zurich's burden of establishing a genuine issue of material fact on prejudice. In *Wolf Lake Terminals, Inc. v. Mut. Marine Ins. Co.*, 433 F. Supp. 2d 933, 953 (N.D. Ind. 2005), this Court found that "general

13

statements of actions made possible by early detection do not satisfy [the insurer's] obligation to show that those steps in fact would have been taken or would have achieved different results". This is particularly true when, like in this case, the insurer did nothing in response to the notice. *Id*.

Further, Mr. Alvey claims to be an expert with "over thirty years' experience in environmental dispute investigation and management." (Alvey Aff. ¶ 4). However, under Rule 702, someone's expert experience does not automatically qualify that person's affidavit as expert testimony. As this Court is well aware, expert testimony must also be "based on sufficient facts or data" and conclusions must be "the product of reliable principles and methods" that the expert "reliably applied . . . to the facts of the case." Mr. Alvey fails to support any of his conclusions with any reliable principles or scientific methods. Instead, Mr. Alvey's affidavit states that he has been hired to render an opinion on the reasonableness of the costs claimed by Landis, (Alvey Aff. ¶ 5), gives a brief recital of the regulatory history of the Sagamore site according to documents on IDEM's Virtual Filing Cabinet, (Alvey Aff. ¶ 6), and launches into an a three-paragraph account of everything that "could" have been done to "likely" mitigate the contamination without identify any scientific principles, methods, sources, standards, research, or specific experience upon which he relied to arrive at these conclusions, let alone any knowledge of what Zurich would have done or what Zurich actually did do in other cases during that time frame.

The evidentiary rules Mr. Alvey needs to satisfy are well established. "[T]he requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Daubert v. Merrell Down Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993). There are no such indicia of reliability in Mr. Alvey's affidavit. "Unlike an ordinary witness, an expert

14

is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. Presumably, this relaxation of the usual requirement of firsthand knowledge—a rule which represents a most pervasive manifestation of the common law insistence upon the most reliable sources of information—is premised upon an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id*. at 592 (internal citations and quotations omitted).  The key, non-exhaustive questions identified by the Supreme Court in *Daubert* include: whether the method or principle has been tested, peer-reviewed and published; whether a potential rate of error is known; and whether it is generally accepted. *Id*. at 592-95.  Because Mr. Alvey failed to identify any such scientific principles or methods, this analysis is impossible, and his conclusions must be stricken.

While it is true that "[a] witness's own training and experience may be the foundation for an expert opinion . . . the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Westchester Fire Ins. Co. v. American Wood Fibers, Inc.*, 2006 WL 752584 at *6 (citing Fed. R. Evid. 702 (advisory committee's notes (2000 amendments))) (holding that the expert's reliance on the scientific principles of spontaneous combustion were sufficiently reliable).  Here, Mr. Alvey not only fails to provide scientific support for his conclusions, he fails to cite any scientific or non-scientific principles, methods, sources, standards, research, or specific experiences underlying his or related in any way to his conclusions.  "The burden of showing an expert's testimony to be relevant and reliable is with the proponent of the evidence." *Id*. (citing *Bradley v. Brown*, 852 F.Supp. 690, 697 (N.D. 1994)). Given the total absence of any support for Mr. Alvey's hypothetical conclusions, it is impossible

15

to assess whether he relied on permissible scientific principles or methods or whether he reliably applied those scientific principles and methods to the facts of this case under Rule 702.

Accordingly, the offending paragraphs of his affidavit cannot create any genuine issue of material fact.

### III.  Conclusion

WHEREFORE, Plaintiff Landis+Gyr Inc. respectfully requests that the Court strike and disregard paragraphs 5, 7, 8, 10, 11, 13 and 14 of Ms. Hairrell's affidavit, and paragraphs 13, 14, and 15 of Mr. Alvey's affidavit, and find that these paragraphs cannot create a genuine issue of material fact for purposes of Rule 56 of the Federal Rules of Civil Procedure.

Respectfully submitted,

*/s/Brent W. Huber*
Brent W. Huber (#16077-53)
Amy S. Berg (#32513-32)
*Attorneys for Plaintiff, Landis+Gyr Inc.*

ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN  46282-0200
(317) 236-2100

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 22${}^{nd}$ day of March, 2018, a copy of the foregoing was filed electronically. Service of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing though the Court's system.

Kyle A. Lansberry
Michael R. Giordano
LEWIS WAGNER, LLP
501 Indiana Avenue, Suite 200
Indianapolis, IN 46202-6150
klansberry@lewiswagner.com
mgiordano@lewiswagner.com

Renee J. Mortimer
HINSHAW & CULBERTSON LLP
322 Indianapolis Boulevard, Suite 201
Schererville, IN 46375
rmortimer@hinshawlaw.com

Michael M. Marick
James H. Kallianis
Timothy H. Wright
HINSHAW & CULBERTSON LLP
222 North LaSalle Street, #300
Chicago, IL 60601
mmarick@hinshawlaw.com
jkallianis@hinshawlaw.com
twright@hinshawlaw.com

        */s/ Brent W. Huber*
        Brent W. Huber

ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN 46282-0200
(317) 236-2100