# EXHIBIT B

## Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

LANDIS+GYR INC.,    )
    )
    Plaintiff,   )
    )
    vs.    ) Case No.
    ) 4:16-cv-000082
ZURICH AMERICAN INSURANCE  )
COMPANY,     )
    )
    Defendant.   )
------------------------ )

PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED 30(b)(6) DEPOSITION OF ZURICH AMERICAN
INSURANCE COMPANY BY CHERISH HAIRRELL
Lisle, Illinois
Tuesday, February 20, 2018

Reported by:
RACHEL F. GARD, CSR, RPR, CLR, CRR
REF NO. 49905

## Page 2

    February 20, 2018

    9:03 a.m.

    Videotaped 30(b)(6) deposition of ZURICH
AMERICAN INSURANCE COMPANY BY CHERISH HAIRRELL, at
the offices of Ice Miller, 2300 Cabot Street,
Suite 455, Lisle, Illinois, pursuant to notice
before Rachel F. Gard, Illinois Certified Shorthand
Reporter, Registered Professional Reporter,
Certified LiveNote Reporter, Certified Realtime
Reporter.

## Page 3

1    A P P E A R A N C E S:
2      ICE MILLER
       Attorneys for Plaintiff
3        One American Square
         Suite 2900
4        Indianapolis, indiana 46282
         Phone:  317.236.2100
5        Email:  brent.huber@icemiller.com
                 amy.berg@icemiller.com
6      BY: BRENT W. HUBER, ESQ.
           AMY BERG, ESQ.
7
       HINSHAW & CULBERTSON, LLP
8      Attorneys for Defendant
         222 North LaSalle Street
9        Suite 300
         Chicago, Illinois 60601
10       Phone:  312.704.3698
         Email:  twright@hinshawlaw.com
11     BY: TIMOTHY WRIGHT, ESQ.
12           and
13     LEWIS & WAGNER
       Attorneys for Defendant
14       501 Indiana Avenue
         Suite 200
15       Indianapolis, Indiana 46202
         Phone:  317.453.8668
16       Email:  klansberry@lewiswagner.com
       BY: KYLE A. LANSBERRY, ESQ.
17
18
19     ALSO PRESENT:  GABRIEL MARTIN, Videographer
20
21
22
23
24
25

## Page 4

           I N D E X
WITNESS                          PAGE
CHERISH HAIRRELL
    Examination by Mr. Huber         9

         E X H I B I T S

DEPOSITION EXHIBIT                      PAGE

Exhibit 1   Notice of deposition         11

Exhibit 2   Letter dated September 16,   58
            2014
Exhibit 3   Letter dated September 25,   59
            2014
Exhibit 4   Letter dated October 17,     60
            2014
Exhibit 5   Notes from the claim         61
            system
Exhibit 6   Emails and letters           63

Exhibit 7   Letter dated September 27,   69
            2016
Exhibit 8   Letter dated September 24,   77
            2015
Exhibit 9   Letter dated September 5,    79
            2017
Exhibit 10  Email                        85
Exhibit 11  Email                        91
Exhibit 12  Email                        93
Exhibit 13  Email                        101
Exhibit 14  Email string                 103

Page 5

E X H I B I T S

| | DEPOSITION EXHIBIT | PAGE |
|---|---|---|
| 1 | E X H I B I T S | |
| 2 | DEPOSITION EXHIBIT | PAGE |
| 3 | Exhibit 15  Email | 106 |
| 4 | Exhibit 16  Email | 109 |
| 5 | Exhibit 17  Printout of the notes in | 112 |
| | the eZACCESS claim system | |
| 6 | for the Sagamore claim | |
| 7 | Exhibit 18  Information from Zurich's | 130 |
| | claim file concerning | |
| 8 | Sagamore | |
| 9 | Exhibit 19  Email | 144 |
| 10 | Exhibit 20  Letter dated September 22, | 148 |
| | 2017 | |
| 11 | | |
| | Exhibit 21  Letter dated September 25, | 150 |
| 12 | 2017 | |
| 13 | Exhibit 22  Zurich's records-retention | 155 |
| | policy effective 6/1/85 | |
| 14 | | |
| 15 | Exhibit 23  Records-retention policy | 167 |
| | excerpt | |
| 16 | Exhibit 24  Retention schedule for the | 170 |
| | period 2/1/91 | |
| 17 | | |
| | Exhibit 25  Retention schedule for May | 172 |
| 18 | 1992 | |
| 19 | Exhibit 26  Retention schedule for | 173 |
| | September 1993 | |
| 20 | | |
| | Exhibit 27  Retention schedule for | 174 |
| 21 | August 1994 | |
| 22 | Exhibit 28  Policy inventory list | 175 |
| 23 | Exhibit 29  Interoffice memorandum | 181 |
| | dated January 14, 1994 | |
| 24 | | |
| 25 | Exhibit 30  Interoffice memorandum | 188 |
| | dated January 25, 1994 | |

Page 6

E X H I B I T S

| | DEPOSITION EXHIBIT | PAGE |
|---|---|---|
| 1 | E X H I B I T S | |
| 2 | DEPOSITION EXHIBIT | PAGE |
| 3 | Exhibit 31  Interoffice memo dated | 189 |
| | May 20, 1994 | |
| 4 | | |
| 5 | Exhibit 32  Interoffice memo dated | 202 |
| | June 8, 1994 | |
| 6 | Exhibit 33  Claims update produced by | 204 |
| | Zurich dated 6/17/94 | |
| 7 | | |
| 8 | Exhibit 34  Interoffice memo dated | 205 |
| | September 1, 1994 | |
| 9 | Exhibit 35  Interoffice memo dated | 206 |
| | June 19, 1995 | |
| 10 | | |
| 11 | Exhibit 36  The Zurich Way Claims Best | 209 |
| | Practices Mass Litigation | |
| | and Pollution Claims | |
| 12 | Department, January 2015 | |
| 13 | Exhibit 37  Best practices for the | 213 |
| | environmental claims group | |
| 14 | as of January 2016 | |
| 15 | Exhibit 38  Best practices for | 213 |
| | environmental claims group | |
| 16 | as of June 2016 | |
| 17 | Exhibit 39  Environmental Units | 214 |
| | Principal | |
| 18 | Responsibilities/ | |
| | Accountabilities | |
| 19 | | |
| | Exhibit 40  Letter dated October 1, | 219 |
| 20 | 1987 | |
| 21 | Exhibit 41  Letter | 220 |
| 22 | Exhibit 42  Letter dated November 12, | 222 |
| | 1987 | |
| 23 | | |
| | Exhibit 43  Letter dated November 30, | 224 |
| 24 | 1987 | |
| 25 | | |

Page 7

E X H I B I T S

| | DEPOSITION EXHIBIT | PAGE |
|---|---|---|
| 1 | E X H I B I T S | |
| 2 | DEPOSITION EXHIBIT | PAGE |
| 3 | Exhibit 44  Letter dated January 23, | 229 |
| | 1995 | |
| 4 | | |
| | Exhibit 45  Letter dated November 7, | 232 |
| 5 | 1996 | |
| 6 | Exhibit 46  Screen print from the | 233 |
| | claim system | |
| 7 | | |
| | Exhibit 47  Zurich-produced document | 236 |
| 8 | dated January 15, 1996 | |
| 9 | Exhibit 48  Interoffice memo dated | 237 |
| | January 15, 1996 | |
| 10 | | |
| | Exhibit 49  Letter dated October 4, | 240 |
| 11 | 1996 | |
| 12 | Exhibit 50  Memo to file dated | 241 |
| | November 5, 1996 | |
| 13 | | |
| 14 | Exhibit 51  Letter dated March 1, 1991 | 242 |
| 15 | Exhibit 52  Letter dated July 13, 1982 | 244 |
| 16 | Exhibit 53  Affidavit | 245 |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 8

1    THE VIDEOGRAPHER:  This begins the deposition
2  of Cherish Hairrell taken in the matter of
3  Landis+Gyr Inc., et al., versus Zurich American
4  Insurance Company, et al., pending in the United
5  States District Court, Northern District of Indiana,
6  Lafayette Division, Case No. 4:16-cv-000082-JTM-APR.
7       This deposition is being held at Ice
8  Miller, LLP, 2300 Cabot Drive, Lisle, Illinois.
9       My name is Gabriel Martin.  I am the
10  videographer.  The court reporter is Rachel Gard.
11  We both are representing Connor Reporting.  Today is
12  February 20, 2018, and the local time is 9:03 a.m.
13       For the record, please, Counsel, introduce
14  yourself and who you represent.
15    MR. HUBER:  Hi.  I'm Brent Huber with Ice
16  Miller for the plaintiff Landis+Gyr.
17    MS. BERG:  Amy Berg with Ice Miller for the
18  plaintiff Landis+Gyr.
19    MR. WRIGHT:  I'm Tim Wright for the defendant
20  Zurich American Insurance Company.  I'm of Hinshaw &
21  Culbertson.
22    MR. LANSBERRY:  Kyle Lansberry, Lewis Wagner
23  LLP in Indianapolis, and I also represent Zurich
24  American Insurance Company.
25    THE VIDEOGRAPHER:  Now the court reporter is

Page 9

1  going to swear the witness.
2          (Witness sworn.)
3  WHEREUPON:
4          CHERISH HAIRRELL,
5  called as a witness herein, having been first duly
6  sworn, was examined and testified as follows:
7          EXAMINATION
8  BY MR. HUBER:
9      Q.  Could you state your name and spell it,
10  please.
11     A.  Cherish Hairrell.  C H E R I S H.
12  H A I R R E L L.
13     Q.  Great.  May I call you Ms. Hairrell?
14     A.  Yes.
15     Q.  My name is Brent Huber.  I'm here for
16  Landis+Gyr, the plaintiff.  Have you been deposed
17  before?
18     A.  Yes.
19     Q.  How many times?
20     A.  Approximately eight or nine.
21     Q.  I want to cover a couple of rules first
22  before we get started.
23          If you could wait until I finish my
24  question, sometimes I speak slowly and witnesses are
25  inclined to jump in.  So will you be able to do

Page 10

1  that?
2      A.  Yes.
3      Q.  You understand you need to answer out
4  loud?
5      A.  Yes.
6      Q.  And if you don't understand a question,
7  would you agree to say so and explain your
8  misunderstanding?
9      A.  Yes.
10     Q.  The eight or nine times you've been
11  deposed, what kinds of cases were those?
12     A.  Environmental cases over my time that I've
13  been with Zurich.
14     Q.  Were those insurance coverage cases?
15     A.  Some, some of them are.
16     Q.  And who were you testifying on behalf of
17  in those cases?
18     A.  Testified as the claim handler for Zurich.
19  I've testified as the 30(b)(6) witness for Zurich.
20     Q.  Any types of deposition experience where
21  you were not testifying in an environmental matter
22  for Zurich?
23     A.  No.
24     Q.  Are you taking anything today that would
25  prevent you from testifying accurately?

Page 11

1      A.  No.
2      Q.  And do you understand you're under oath
3  today?
4      A.  Yes.
5      MR. HUBER:  Let's give her Exhibit 1.
6          (Deposition Exhibit Number 1
7          marked for identification.)
8  BY MR. HUBER:
9      Q.  You have in front of you Exhibit 1.  Have
10  you seen that before?
11     A.  Yes.
12     Q.  And are you here testifying on behalf of
13  Zurich as to the topics identified in that notice,
14  subject to your counsel's objections?
15     A.  Yes.
16     Q.  And you're here to testify about all the
17  topics with the exception of the underwriting
18  topics; is that fair?
19     A.  Correct.
20     Q.  If you look at the request for documents
21  at the very end, Exhibit B, do you see that?
22     A.  Yes.
23     Q.  And if you look at the last item, Item
24  No. 6, it requests:  All documents not yet produced
25  on which you rely in preparing for the deposition or

Page 12

1  on which you may rely in answering the questions
2  posed in the deposition.
3          Do you have any documents responsive to
4  that topic to produce today?
5      A.  No.
6      Q.  So you understand you're testifying on
7  behalf of Zurich, the company, not just yourself
8  today?
9      A.  Yes.
10     Q.  How many times have you actually done
11  that, where you've testified as a 30(b)(6) witness?
12     A.  Three, maybe four times.
13     Q.  I'd like to ask you a couple of questions
14  about your background, education, and expertise.
15          Where did you go to high school?
16     A.  Rockville High School in Rockville,
17  Connecticut.
18     Q.  Did you graduate there?
19     A.  Yes.
20     Q.  And did you go to college?
21     A.  Yes.
22     Q.  Where did you go to college?
23     A.  At Loyola University, Chicago.
24     Q.  Did you graduate there?
25     A.  Yes.

Page 13

1    Q.  What kind of degree did you have?
2    A.  A Bachelor of Science with a major in
3  psychology.
4    Q.  Any post college education?
5    A.  Yes, I graduated from Chicago Kent College
6  of Law.
7    Q.  When did you graduate from that law
8  school?
9    A.  2002.
10    Q.  And are you admitted to the bar in any
11  states?
12    A.  Illinois, yes.
13    Q.  When were you admitted, if you recall, to
14  Illinois?
15    A.  2002.
16    Q.  Did you have any employment in private
17  practice after law school?
18    A.  I worked for Peterson & Ross for
19  approximately a year.
20    Q.  What kind of firm is that?
21    A.  Insurance.
22    Q.  What type of insurance?
23    A.  Coverage, insurance coverage work.
24    Q.  Approximately what timespan would that
25  have been?

Page 14

1    A.  2001.  I started before finishing law
2  school and left there in 2002.
3    Q.  Where did you go after that in 2002?
4    A.  To Zurich.
5    Q.  Had you also had the opportunity to work
6  for Zurich when you were at Peterson & Ross?
7    A.  No.
8    Q.  Did you work for other insurance
9  companies?
10    A.  At Peterson & Ross or prior?
11    Q.  As clients.
12    A.  We had several different insurance company
13  clients, yes.
14    Q.  Was Zurich one of those?
15    A.  I didn't handle any Zurich matters.  I'm
16  not certain what the firm customer population was.
17    Q.  Okay.  Had you worked for an insurance
18  company before that when you were in private
19  practice for Peterson & Ross?
20    A.  Yes.
21    Q.  Can you tell me about that?
22    A.  I worked for -- prior to Peterson & Ross, I
23  was with American Continental Life Insurance Company
24  in Deerfield, Illinois.
25    Q.  How long were you there?

Page 15

1    A.  From 1994 through 2001.
2    Q.  When did you graduate from high school?
3    A.  1984.
4    Q.  I skipped over a bit there.  Can you tell
5  me what you were doing between '84 and working for
6  that life insurance company?
7    A.  I worked for Aetna Life & Casualty as a
8  medical claim adjuster.
9    Q.  And after that?
10    A.  I worked for Connecticut National Life
11  Insurance Company.
12    Q.  What were you doing for Connecticut Life?
13    A.  I was a supervisor/medical claim handler.
14    Q.  What are medical claims?
15    A.  Healthcare, claims under medical insurance
16  policies, both group and individual-issued policies.
17    Q.  Okay.  How long were you with Aetna Life
18  and then Connecticut National?
19    A.  I was with Aetna I'd say almost 2 years.
20  Connecticut National, I'd say 3 years.
21    Q.  And where were you employed with Aetna
22  Life and Connecticut National?
23    A.  Aetna was in Enfield, Connecticut; and
24  Connecticut National was in Simsbury, Connecticut.
25    Q.  And what happened after your time at

Page 16

1  Connecticut National?
2    A.  I moved here to Illinois and I worked for
3  trust mark insurance.
4    Q.  What is trust mark?  What kind of carrier?
5    A.  Health benefits.
6    Q.  And what did you do for trust mark?
7    A.  I was a supervisor of medical claim
8  handling.
9    Q.  For how long?
10    A.  About 3 years.
11    Q.  What was your next job after that?
12    A.  That was when I went to American
13  Continental.
14    Q.  And what kind of work were you doing at
15  American Continental?
16    A.  That was handling medical excess
17  reinsurance programs.
18    Q.  Well, let's jump back to Zurich.  When did
19  you start with Zurich?
20    A.  2002.
21    Q.  And where were you employed by Zurich in
22  2002?
23    A.  In our mass litigation claims.
24    Q.  Was that here in Illinois?
25    A.  Yes.

Page 17

```
 1    Q.   Where?
 2    A.   Schaumburg.
 3    Q.   What did you do while in that area, mass
 4  litigation claims?
 5    A.   I handled claims involving multiple policy
 6  periods, latent injuries, class actions.
 7    Q.   Were those environmental claims or not
 8  necessarily?
 9    A.   They could be.  They were not pollution
10  related.  That's a separate division.
11    Q.   So how long were you employed by Zurich
12  here in Schaumburg relating to mass litigation
13  claims?
14    A.   That was about 4 years.
15    Q.   So from 2002 until when, approximately?
16    A.   2006.
17    Q.   Okay.  What happened in 2006 with your
18  employment?
19    A.   I moved to the reinsurance department.
20    Q.   And what is that?
21    A.   That was ceded reinsurance.  We would
22  notice and bill the reinsurance claims to the
23  treaties and facultative programs.
24    Q.   And how long did you do that?
25    A.   That was until 2012.
```

Page 18

```
 1    Q.   And what did you do in 2012?
 2    A.   I moved to pollution claims.
 3    Q.   And what is that?
 4    A.   That's handling cleanups mostly and ...
 5    Q.   Liability claims?
 6    A.   Mostly, yes.
 7    Q.   If you could describe what kinds of claims
 8  are handled by the pollution claims area at Zurich,
 9  that would be helpful.
10    A.   It would be any kind of pollution cleanups
11  or spills, which could be auto rollover cases, you
12  know, traditional CERCLA-type actions, Superfund
13  sites.  We do handle some first-party property
14  claims.  There's some garage operations.  So
15  anything to do with cleanup of pollution.
16    Q.   And is that the same area where you are
17  today?
18    A.   Yes.
19    Q.   Okay.  What was your title in 2012 when
20  you started at Zurich?
21    A.   Environmental --
22    Q.   -- in this area?
23    A.   -- claims specialist.
24    Q.   And what does an environmental claims
25  specialist do?
```

Page 19

```
 1    A.   Handle environmental claims.
 2    Q.   Is that like the first level?  Is that a
 3  supervisory role?  Or how would you describe that
 4  position, environmental claims specialist?
 5    A.   It's a senior-level adjuster.
 6    Q.   So did you have direct policyholder
 7  contact in doing that?
 8    A.   Yes.
 9    Q.   And has your job changed at all since 2002
10  when you were an environmental claims specialist
11  dealing directly with policyholders?
12    A.   Yes.  In 2014, I was promoted to the team
13  manager.
14    Q.   What is that?
15    A.   It's overseeing the pollution,
16  environmental claim adjusters.
17    Q.   And when in 2014 were you promoted?
18    A.   I believe it was March 1st.
19    Q.   And what does that role entail, team
20  manager of environmental claims?
21    A.   It's overseeing the team of adjusters
22  approving their reports and reserve recommendations,
23  discussing cases and resolution strategy.  Pretty
24  much overseeing the handling of the claims.
25    Q.   And how many people would you oversee in
```

Page 20

```
 1  that position since 2012?
 2    A.   Currently there's seven adjusters.
 3    Q.   I said 2012.  Is that accurate, or was it
 4  2014?
 5    A.   Oh, 2014 was when I became the team
 6  manager.
 7    Q.   Okay.  So in 2012, how many adjusters were
 8  you supervising?
 9    A.   Well --
10    Q.   I'm sorry.  I did it again.
11        In 2014, how many adjusters were you
12  supervising in the team manager role?
13    A.   It would be a similar number, six or seven.
14    Q.   And how about today?  How many are you
15  supervising?
16    A.   Seven currently.
17    Q.   Is there any intermediate positions
18  between the team manager role and the claims handler
19  who has the direct contact in communicating with the
20  policyholder?
21    A.   No.
22    Q.   And is there someone to whom you would
23  report in this position as team manager in this
24  unit?
25    A.   Yes.
```

Page 21

```
 1      Q.  Who is that?
 2      A.  The vice president of latent and
 3  environmental claims.
 4      Q.  And who is that?
 5      A.  Bob Koscielniak, K O S C I E L N I A K.
 6      Q.  And what does he do?
 7      A.  He's the vice president for latent and
 8  environmental.
 9      Q.  Latent and environmental claims, meaning
10  what?
11      A.  He has teams in mass litigation, pollution,
12  and construction.
13      Q.  For those who might not follow the
14  terminology, what does it mean, a latent claim?
15      A.  It's a claim that may not arise immediately
16  and may occur over a period of time.
17      Q.  If a policyholder had a pollution claim
18  dealing with soil and groundwater contamination, is
19  there any other claims unit that would handle the
20  claim other than the pollution claim unit that you
21  described?
22      A.  Yes.  We also have an office in New York
23  that handles pollution under pollution policies.
24      Q.  And what is the difference between the
25  types of policies that you're describing?
```

Page 22

```
 1      A.  The New York unit handles claims that are
 2  specifically written to provide coverage for
 3  pollution events.
 4      Q.  Would those be claims-made policies?
 5      A.  Generally, yes.
 6      Q.  And the other types of policies we're
 7  talking about would be occurrence-based policies?
 8      A.  The occurrence-based would be handled in
 9  Schaumburg and our pollution team.
10      Q.  And the occurrence-based policies would
11  involve latent environmental claims, for instance?
12      A.  Yes.
13      Q.  Is there someone that the vice president,
14  Bob Koscielniak, reports to?
15      A.  Yes.
16      Q.  Who is that?
17      A.  That would be John Mahoney.
18      Q.  Okay.  And who is he?
19      A.  He's senior vice president of claims.
20      Q.  Who would be the senior-most person at
21  Zurich who has signed off on any decisions with
22  respect to Landis+Gyr claims?
23      A.  That would be Bob.
24      Q.  Has there been any discussion with John
25  Mahoney about the Sagamore site and the Landis+Gyr
```

Page 23

```
 1  matter?
 2      A.  I'm not sure.  I have not had any
 3  discussions.
 4      Q.  Do you consider yourself an expert in any
 5  fields?
 6      A.  I'm not sure.
 7      Q.  Do you intend to give any expert opinions
 8  today?
 9      A.  No.
10      Q.  Do you feel like you would be qualified to
11  give any kind of expert opinion in a case like this?
12      A.  I really don't know.
13      Q.  What offices or branches within the Zurich
14  organization have been involved with the Sagamore
15  claim that Landis+Gyr made since September of 2014?
16      A.  Just the Schaumburg office.
17      Q.  When would you, Ms. Hairrell, first be in
18  a position to have personal knowledge with respect
19  to how Zurich handles claims?  What would be the
20  first date?
21      A.  I guess it would be when I started handling
22  claims in 2002.
23      Q.  And you were handling what kind of claims
24  then in 2002?
25      A.  That's my firsthand knowledge would be in
```

Page 24

```
 1  2002.
 2      Q.  Okay.
 3      A.  That would be December when I started.
 4      Q.  I'd like to ask you a couple questions
 5  about how you prepared for your deposition.  Did you
 6  do anything to prepare for this deposition?
 7      A.  Yes.
 8      Q.  Can you tell me about that?
 9      A.  Yes.  I reviewed the claim files involved.
10  I met with the claim handler.
11      Q.  Who was that?
12      A.  Julie York.
13          And I met with counsel.
14      Q.  Who was that?
15      A.  Timothy Wright of Hinshaw, Kyle Lansberry,
16  and my internal counsel for -- at Zurich.
17      Q.  Who is that?
18      A.  Ted.  I can't think of his last name.
19      Q.  Is he based in Schaumburg?
20      A.  Yes.
21      Q.  And what is his role?
22      A.  He's claims legal counsel for Zurich.
23      Q.  What is claims legal counsel?  I've seen
24  that referred to in some of the documents that we'll
25  get to later.  Just curious, what is that role?
```

Page 25

1    A.  They are the resource for the claim
2  department to discuss legal issues that arise on
3  claims.  They handle declaratory judgment actions.
4    Q.  Did you do anything other than that to
5  prepare for the deposition?  Meeting with Ted,
6  counsel of record in the case, talking with Julie
7  York, reviewing claims files.
8    A.  I've reviewed the documents presented, the
9  produced documents and the documents of the coverage
10  action.
11    Ted May.  His last name is May.
12    Q.  May, M A Y?  Great.  Our apologies to
13  Mr. May.
14    A.  He's newer with the company, so it's my
15  first time working with him.
16    Q.  What would be his background, if you know?
17  What did he do before he became claims legal
18  counsel?
19    A.  I believe he was with CNA and private
20  practice.
21    Q.  Do you know what firm?
22    A.  I do not.
23    Q.  Back to the deposition prep, could you
24  give me an estimate as to how much time you spent
25  preparing for the deposition?

Page 26

1    A.  I'd say a couple hours here and there over
2  the last few weeks and then a full day after that.
3  So maybe two days total.
4    Q.  Okay.  And how many meetings did you have
5  total?
6    A.  Three or four.
7    Q.  Did you talk with anyone at Zurich other
8  than Mr. May or Julie York at Zurich proper?
9    A.  No.  I just notified my boss of my
10  whereabouts and schedule.
11    Q.  And who is that again?
12    A.  Bob Koscielniak.
13    Q.  So you did not talk to him in order to
14  prepare for the deposition?
15    A.  No.
16    Q.  In preparing for the deposition, you
17  mentioned you reviewed documents.  Did you review
18  any documents other than the documents that have
19  been produced in the case?
20    A.  Just like the pleadings and the documents
21  for the coverage action.
22    Q.  Nothing else?
23    A.  Not that I recall, no.
24    Q.  Did you or anyone else create any
25  documents to assist in the preparation for the

Page 27

1  deposition?
2    A.  No.
3    Q.  Did you take any notes regarding any of
4  the meetings that you had to prepare for the
5  deposition?
6    A.  Early on I believe I had some notes around
7  record retentions and things of a general nature.
8    Q.  Any other notes other than notes about
9  record retention?
10    A.  No.
11    Q.  How long has Julie York been employed by
12  Zurich?
13    A.  Probably 2 and a half years.
14    Q.  Mr. May, how long has he been employed?
15    A.  I think less than a year.
16    Q.  And how about your boss?  Do you know how
17  long he's been employed with Zurich?
18    A.  He's over 20 years.
19    Q.  So in order to prepare for your
20  deposition, did you talk to anyone who had worked at
21  Zurich prior to 2000?
22    A.  I don't believe so.
23    Q.  Now, with respect to the Sagamore claim
24  that Landis+Gyr is making, who has handled that
25  claim at Zurich?

Page 28

1    A.  It was originally assigned to Dave Olson.
2  And then when Dave left the department, it was
3  reassigned to Julie York.
4    Q.  Did you talk to Dave Olson in order to
5  prepare for the deposition?
6    A.  No.
7    Q.  What happened to Dave Olson?
8    A.  He accepted a position in underwriting and
9  then later left the company.
10    Q.  Do you know where he is now?
11    A.  I do not.
12    Q.  Is there a way we could find out how to
13  reach Dave Olson?  Would you have like a last-known
14  address or something like that?
15    MR. LANSBERRY:  I believe it's been provided to
16  you.  I'll check, but I'm pretty sure we provided
17  contact information for him.
18  BY MR. HUBER:
19    Q.  Julie York is still employed with Zurich
20  here in Schaumburg?
21    A.  Yes.
22    Q.  Did Zurich make any mistakes in the
23  handling of the Sagamore claim?
24    A.  Not that I'm aware.
25    Q.  Was anyone fired as a result of the

Page 29

```
 1        handling of the Sagamore claim?
 2        A.  No.
 3        Q.  Was anyone demoted?
 4        A.  No.
 5        Q.  Was anyone disciplined in any way
 6   regarding the handling of the Sagamore claim?
 7        A.  No.
 8        Q.  Has Zurich changed any of its guidelines,
 9   standards, or procedures as a result of the Sagamore
10   claim?
11        A.  No.
12        Q.  Did Zurich violate any of its guidelines,
13   standards, or procedures regarding the handling of
14   the Sagamore claim?
15        A.  Not that I'm aware.
16        Q.  And if there had been some sort of
17   discrepancy or violation or mistake, is that
18   something that you would likely know about given
19   your position?
20        A.  I review the files periodically.  So, I
21   mean, I don't see every transaction in every file.
22   But I do see the claim handler's work through audits
23   and discussions.  So it's probable I would see it,
24   but I definitely don't see every transaction.
25        Q.  To the best of your knowledge, there has
```

Page 30

```
 1   been no violation or mistake by Zurich regarding the
 2   handling of the Sagamore claim?
 3        A.  Correct.
 4        Q.  Did Zurich make any mistakes regarding
 5   document retention or handling of documents with
 6   respect to the Sagamore claim?
 7        A.  No.
 8        Q.  To your knowledge, has Zurich made any
 9   mistake or error regarding Landis+Gyr's submission
10   of the claim, handling of documents, handling of
11   policies, or anything like that?
12        MR. WRIGHT:  Objection.  Compound question.  If
13   you could break it up.
14   BY MR. HUBER:
15        Q.  Do you understand the question?
16        A.  I'm not aware of any errors or problems
17   with any of the handling of the claim.
18        Q.  Are you aware of any errors or problems or
19   mistakes regarding the maintaining of documents,
20   meaning the claims file, policies, or other records
21   that would relate to Landis+Gyr?
22        A.  No.
23        Q.  And again, is that something that you
24   would likely know about if there had been a problem
25   or mistake?
```

Page 31

```
 1        A.  Well, for this case, I have reviewed the
 2   entire file pretty thoroughly, so I would know if
 3   there was something missing or something that wasn't
 4   handled appropriately.
 5        Q.  Are there separate groups within the
 6   pollution claims unit that you've been working in
 7   since 2012?
 8        A.  No, there's not separate groups.
 9        Q.  And how many employees total would be
10   responsible for handling these types of
11   environmental claims within Zurich?
12        A.  Currently there's seven in the pollution
13   department.
14        Q.  And that would include all environmental
15   claims across the Continental U.S.?
16        A.  Yes.
17        Q.  How many claims are there currently, if
18   you know, that are being handled by this claims
19   unit, the pollution claims unit?
20        A.  I would estimate approximately 500.
21        Q.  There's a reference in some of the
22   documents to the environmental large exposure
23   committee.  Can you tell me about that?
24        A.  There's a large claim committee that
25   reviews any claims that are expected to be like the
```

Page 32

```
 1   largest exposures to the company.  I'm not aware of
 2   an environmental committee.
 3        Q.  What does the large claim committee do?
 4        A.  They review the very large claims and
 5   provide authority in reserving approval.
 6        Q.  Is there a minimum threshold that needs to
 7   be crossed in order to be reviewed or, you know, go
 8   to this committee?
 9        A.  I'm not sure on an exact amount.  I would
10   estimate somewhere in the $10 million range.
11        Q.  So did that committee have anything to do
12   with the Landis+Gyr claim at issue here?
13        A.  No.
14        Q.  How many people are a part of that
15   committee?
16        A.  I do not know.
17        Q.  Do you know any of the people who are on
18   that committee?
19        A.  No.
20        Q.  Is it a secret committee, or is it known
21   within the organization as to who's on that
22   committee?
23        A.  The claims staff don't have interaction
24   with the large claim group.  It would be senior
25   management that would work with the claims committee
```

Page 33

1   to present any claims or receive feedback.
2       Q.   So if you had a pollution claim in your
3   claim unit on behalf of a policyholder and the claim
4   exceeded $10 million, is there any committee that
5   you would need to go to or report to?
6       A.   My boss, Bob Koscielniak, would handle any
7   type of interaction with the large claim group.
8       Q.   And why did you not speak with him in
9   order to prepare for your deposition?
10      A.   I don't believe he has any information that
11  would be helpful to this particular matter.
12      Q.   Okay.  You have to keep your voice up a
13  little bit.
14      A.   Okay.
15      Q.   You kind of tail off, and so I'll try to
16  help with that.
17          Let me change the subject.  I'd like to
18  understand, Ms. Hairrell, if I could, what happens
19  when a claim comes in.  Suppose there is a pollution
20  claim from a Zurich policyholder, notice is given.
21  What does Zurich typically do in order to respond to
22  that type of notice?
23      A.   So there's an intake from telephone or from
24  mail that would enter the claim into our computer
25  system.  And then they would assign it to the group

Page 34

1   that handles that particular kind of claim.
2       Q.   And who makes that decision?
3       A.   It's a triage center that looks at the type
4   of claim, the policy, and determines which group
5   would handle that kind of loss.
6       Q.   Okay.  And if it's an environmental claim
7   like we've been talking about here regarding the
8   Sagamore site, what group does it get assigned to?
9       A.   It gets assigned to pollution in
10  Schaumburg.
11      Q.   And what does that group do with that type
12  of claim?
13      A.   The manager would receive the new claim and
14  assign it to one of the adjusters.
15      Q.   And would you be the manager?
16      A.   Yes.
17      Q.   And did you make the decision in this case
18  regarding the assignment regarding the Sagamore
19  claim in 2014?
20      A.   Yes.
21      Q.   So would you be the person that assigned
22  it to David Olson?
23      A.   Yes.
24      Q.   Okay.  After that assignment, what is
25  Zurich's regular practice regarding claims?  What is

Page 35

1   the next step after the assignment to the primary
2   claim handler?
3       A.   The handler would contact the insured, get
4   some information about the claim.  And they would
5   discuss next steps and provide their contact
6   information.
7       Q.   And with respect to a liability case where
8   there's a request for a defense, how would Zurich
9   handle that typically in your unit?
10          MR. WRIGHT:  Can you specify the time period?
11  BY THE WITNESS:
12      A.   Since I've been manager?
13      Q.   Sure.
14      A.   The handler would determine if there was
15  any immediate action needed, if there was -- say
16  there was an answer due or something that needs an
17  immediate retention of counsel, would review those
18  things with the insured to decide what needs to be
19  done right away and what information is needed.
20  And the handler would investigate and decide, you
21  know, what is needed next on the claim.
22      Q.   Is there any kind of expectation on the
23  part of Zurich as to how long these steps should
24  take?
25      A.   Really specific to the particular claim.

Page 36

1   We handle a lot of different kinds of situations
2   from a flip and spill where someone is on the side
3   of the road to excess claims where it's just notice
4   and no action needed at the current time.  So it
5   depends really on what kind of situation we're
6   looking at.
7       Q.   So are you saying there's really no
8   expectation on Zurich's part as to how long it might
9   take to decide whether to make a decision regarding
10  a request for defense?
11      A.   No.  I'm saying it depends on the
12  circumstances involved.
13      Q.   And what is Zurich's expectation or goal
14  with respect to how soon a decision should be made
15  with respect to a request for a defense in a
16  liability case?
17      A.   I mean, if there's immediate steps needed
18  to protect the insured, then that would be, you
19  know, it might be acceptable to take a day.  It
20  might be acceptable to take a week.  It might be
21  acceptable that there's no action needed and there
22  isn't any urgency about proceeding forward in cases
23  where there isn't something needed by now, so it
24  really does vary a lot.
25      Q.   What would be some examples of situations

Page 37

1    where there would be need to make a decision
2    regarding the defense as opposed to when there is no
3    urgency in making a decision about the defense?
4        A.  Say there's an answer due in a lawsuit
5    that's time sensitive that we need to get counsel
6    involved, defend the insured, you know, ensure there
7    isn't defaults or anything that could occur.  You
8    know, if there's a spill that's happened, we get a
9    consultant involved to review with the insured, you
10   know, notifying authorities, getting steps in place
11   to mitigate the damages, to start a cleanup, get
12   contractors involved.  Those would be situations
13   where something is needed like right away.
14       Q.  And who makes the decision as to whether
15   or not something is needed right away?
16       A.  The claim handler.
17       Q.  And is the claim handler in your claim
18   unit expected to follow any kind of guidelines or
19   procedures regarding the handling of claims?
20       A.  Yes.
21       Q.  And what are those?
22       A.  We have best practices that set forth, you
23   know, different kinds of time frames for different
24   kind of claim situations.
25       Q.  Has Zurich's process for handling

Page 38

1    liability claims with respect to pollution or
2    environmental matters, has that changed if you
3    looked at it in 2012 as opposed to the way Zurich
4    handled it in the 1980s or '90s?
5        A.  I don't know if there's -- I mean, there's
6    definitely been changes as far as processes and
7    systems involved.  But as far as the actual handling
8    of the claim, the best practices, they get updated
9    every year but they're substantially similar from
10   year to year.  Just nuances of processes and systems
11   usually get updated.
12       Q.  Would you agree that the fundamentals have
13   stayed the same since the '80s and '90s to today
14   with respect to these kind of issues?
15       A.  Overall I'd say yes.
16       Q.  Those are the similarities.  What are the
17   differences as to how it's clearly different today
18   in the way Zurich handles an environmental or
19   pollution claim from the way Zurich handled it in
20   the '80s and '90s?
21       A.  Well, I mean, I'd say technology has made a
22   big difference.  Now we do a lot by email where
23   originally it was all by mail and telephone call.  I
24   think mostly those kind of procedural things are the
25   things that I think of that changed the most.

Page 39

1        Q.  So technological changes that affect the
2    communication between Zurich and the policyholder,
3    for instance?
4        A.  Yes.
5        Q.  Any other changes regarding the way Zurich
6    handles environmental or pollution claims now as
7    opposed to the way it handled them in the '80s and
8    '90s, other than how the communication would
9    actually take place?
10       A.  I don't believe so.  The systems and the
11   technology are the main differences.
12       Q.  When you refer to "systems," what are you
13   referring to?
14       A.  The technology has expanded so, you know,
15   there's more and more we can do without paper, you
16   know, that we don't have to, you know, print a
17   letter and put it in the mail.  We can, you know,
18   store it in the system.  We can send it
19   electronically.  We can just utilize those
20   advancements more than in the past.
21       Q.  In looking at this case where you have an
22   allegation of notice being made a long time ago and
23   you're trying to verify whether you agree with that,
24   have you identified any changes with respect to how
25   Zurich handles claims now as opposed to the way it

Page 40

1    handled claims in the '80s or '90s with respect to
2    claim handling, communicating, keeping records,
3    keeping the policies, or keeping the claims file?
4        MR. WRIGHT:  Objection.  Compound question.
5    BY THE WITNESS:
6        A.  Only what I mentioned.
7        Q.  So you can't point to any other changes
8    with respect to anything about the way Zurich
9    handles these matters today versus then other than
10   the communication and the systems involved?
11       A.  That's correct.
12       Q.  How about the way Zurich kept records in
13   the '80s and '90s as opposed to how it keeps records
14   now, have there been any changes?
15       A.  I mean, technology is the only thing that's
16   changed.  Some of the policies are stored online now
17   where before they were only stored on a paper, you
18   know, in storage.  Just the technology differences.
19   I mean, we still have the same storage facility that
20   we had in the '80s.  The records are all kept there
21   if they're paper, and there's I guess just more
22   records kept online than there were in the '80s.
23       Q.  When did these changes take place with
24   respect to things going more online where hard
25   copies did not need to be kept?

Page 41

1      A.  It would be gradual depending on what
2  process you're looking at.  We had -- we got the
3  ability to store more, like, claim documents and
4  things over the past 15 years than we had in the
5  past.  Like large voluminous items we could not
6  store in our claims system, where now it's virtually
7  limitless on how much paper, how many pages we can
8  store.  Nothing's like CDs.  We used to have to
9  store in the original format.  Now we can store them
10  in our claims system.
11      The policies depending on the business unit
12  and where they're issued, they have varying
13  different times where they automated their
14  processes.  We have a warehouse that stores our
15  policies now where pretty much all the business
16  units keep the policies that they issue.
17      Q.  Is there a process for assigning claims,
18  claim numbers when a claim comes in to Zurich?
19      A.  The triage group that enters the claims set
20  up the claim numbers at that time.
21      Q.  And are those claim numbers, is there any
22  kind of code or information conveyed by the numbers
23  themselves?
24      A.  There's some.
25      Q.  Can you explain that?

Page 42

1      A.  Generally the general liability claims that
2  are being made under general liability policies
3  would start with a 9.  First-party property claims
4  generally start with a 5.  There's some exceptions,
5  but like auto is a 4.  Workers' comp is a 2 series
6  claim.
7      Q.  What about the other digits after that?
8      A.  Sometimes they refer to the office number.
9  Like we're office 12 for pollution in Schaumburg, so
10  our claims generally start with 912.
11      Q.  And what other numbers would there be if
12  it's not 12?
13      A.  There's lots of offices.  I mean,
14  there's -- Zurich has a lot of claim offices, so
15  they all have an office number.
16      Q.  So the other digits would refer to the
17  office involved?
18      A.  Yeah, yes.
19      Q.  Okay.  What about numbers that follow that
20  code?
21      A.  They're just sequential.
22      Q.  We've been going about 50 minutes, so we
23  can take a break now.
24      A.  Okay.
25      THE VIDEOGRAPHER:  We are going off the record

Page 43

1  at 9:53 a.m.
2      (A short break was taken.)
3      THE VIDEOGRAPHER:  We're back on record at
4  10:04 a.m.
5  BY MR. HUBER:
6      Q.  Ms. Hairrell, would you agree that Zurich
7  had a duty to be fair and reasonable to Landis+Gyr?
8      MR. WRIGHT:  Objection.  Calls for a legal
9  conclusion.
10  BY MR. HUBER:
11      Q.  Go ahead.
12      A.  Yes.
13      Q.  You would agree that Zurich had a duty to
14  be fair and reasonable in its communications with
15  Landis?
16      MR. WRIGHT:  Objection.  Calls for a legal
17  conclusion.
18  BY THE WITNESS:
19      A.  Zurich has a duty to treat their insureds
20  fairly, I would agree with that.
21      Q.  And to pay covered claims in a reasonable
22  way?
23      A.  Yes.
24      Q.  Within a reasonable time frame?
25      A.  Yes.

Page 44

1      Q.  Would you agree that Zurich would need to
2  respond claims of its policyholders in a reasonable
3  way?
4      A.  Yes.
5      Q.  In a reasonable time frame?
6      A.  Yes.
7      Q.  Would you agree in a liability case that
8  Zurich would need to issue a reservation of rights
9  letter within a reasonable time?
10      A.  We wouldn't necessarily issue a reservation
11  of rights letter.  I mean, if we were going to issue
12  one, I would say we would issue it in a reasonable
13  period of time.
14      Q.  And in what liability cases would Zurich
15  believe that it doesn't need to issue an ROR letter,
16  or reservation of rights letter?
17      A.  Some cases, we just proceed and pay the
18  claim.  If there's no issue with coverage and -- or
19  we'll review and issue payment on the claim.
20      Q.  And in other cases, would you agree that
21  Zurich would have a duty to issue a reservation of
22  rights letter, especially with respect to the
23  request for a defense and request for indemnity
24  within a reasonable time?
25      MR. WRIGHT:  Objection.  Calls for a legal

Page 45

1  conclusion. Compound question.
2  BY THE WITNESS:
3      A. I don't agree we would ever have a duty to
4  issue a reservation. I mean, that's based on the
5  circumstances.
6      Q. Okay. Would you agree that Zurich has a
7  duty to issue a coverage determination within a
8  reasonable time in a liability case?
9      MR. WRIGHT: Objection. Calls for a legal
10  conclusion.
11  BY THE WITNESS:
12      A. Yes.
13      Q. Would you agree that Zurich's claims
14  handlers have a duty to document activities in the
15  claims file?
16      A. Yes.
17      Q. And in handling a liability claim, would
18  you agree that Zurich has a duty to give as much
19  weight and consideration to the policyholder's
20  interests as Zurich's?
21      MR. WRIGHT: Objection. Calls for a legal
22  conclusion.
23  BY THE WITNESS:
24      A. Can you repeat that?
25      Q. In the handling of a liability claim,

Page 46

1  would you agree that Zurich has a duty to give as
2  much weight and consideration to the policyholder's
3  interests as Zurich's?
4      A. I don't understand the question.
5      Q. Does Zurich have any duty at all to give
6  weight and consideration to the interests of its
7  policyholder?
8      A. Zurich would handle claims under the policy
9  terms. I'm not sure what the interests would mean.
10      Q. Does Zurich have a duty to give any weight
11  or consideration to the interests of its
12  policyholder in a liability case?
13      A. I just don't understand the question.
14      Q. At any time --
15      A. Zurich has a duty to fairly administer its
16  policy. I'm not sure what the interests of the
17  policyholder are.
18      Q. So when Zurich is fairly administering the
19  policy, does it consider anyone's interests other
20  than Zurich's?
21      A. I don't understand what -- how Zurich has
22  an interest in the policy that's issued to the
23  policyholder. Zurich handles the claims made by the
24  insured under the terms of the policy. That's their
25  duty and obligation.

Page 47

1      Q. Does Zurich have any duty, in your view,
2  to give some weight to what the policyholder is
3  wanting and what is in the best interest of the
4  policyholder?
5      A. Zurich has a duty to handle the claims that
6  are covered under the policy.
7      Q. But does it have any duty to consider the
8  interests of the policyholder in administering a
9  liability claim?
10      MR. WRIGHT: Objection. Asked and answered.
11  BY THE WITNESS:
12      A. Yeah, I just don't understand what that
13  means.
14      Q. Have you ever been instructed or taught or
15  seen anyone at Zurich advise claims handlers that
16  they had a duty to consider the interests of the
17  policyholder in evaluating how to handle and adjust
18  a liability claim?
19      A. Zurich would handle claims that are covered
20  under the policy. I don't know why there's any
21  difference there in what someone's interests would
22  be. It would be handling the liability claim under
23  the terms of the policy.
24      Q. And one set of interests Zurich would
25  evaluate and consider, I assume, is Zurich's

Page 48

1  interest, right?
2      A. I don't know why Zurich has an interest in
3  an insured's liability claim.
4      Q. So would you agree that Zurich has a duty
5  to be reasonably prompt and thorough in its
6  investigation of a liability claim?
7      A. Yes.
8      Q. And why is that?
9      A. Because under our policy, we have an
10  obligation to represent the insured to provide a
11  defense and indemnity. So in order to do that
12  properly, we have to know all the facts and basis
13  for liability that's being presented against the
14  insured so that we can properly defend and resolve
15  claims that the insured has under their policy.
16      Q. Has Zurich reached a coverage
17  determination with respect to the Sagamore site and
18  the Landis claim regarding the Sagamore site?
19      A. I understand that our position was
20  expressed in the litigation.
21      Q. So other than the pleadings that have been
22  filed by the lawyers, has Zurich reached a coverage
23  determination with respect to the Sagamore liability
24  claim?
25      A. Not outside the litigation, no.

Page 49

1    Q.   And why not?
2    A.   We never received the information that we
3    needed to determine coverage on the claim.
4    Q.   What information was that?
5    A.   Information showing that it was timely
6    noticed to Zurich.
7    Q.   Anything else?
8    A.   I mean, that was the initial information
9    that was needed to determine whether conditions of
10   the policy were met.
11   Q.   Is there any other information Zurich has
12   been waiting on other than information on timely
13   notice?
14   A.   I mean, there's decades of time that went
15   by on this claim before the notice was made.  So, I
16   mean, we have very little information on the facts
17   and the agreements that were made and payments and
18   the status of the overall claim.
19   Q.   Anything other than that?
20   A.   Not that I can think of right now.
21   Q.   So is it Zurich's contention and
22   determination in this case that notice was not given
23   in a timely way by Landis+Gyr regarding the Sagamore
24   site?
25   A.   Yes.

Page 50

1    Q.   Why didn't Zurich just deny coverage on
2    that basis, then?
3    A.   Because the insured's attorney represented
4    that there was more information that they were going
5    to provide to show that the notice had been timely
6    made under the policy.  So the adjusters waited
7    several years upon continuing updates that the
8    information was forthcoming.
9    Q.   And what kind of information would Zurich
10   consider sufficient regarding notice?
11   A.   It could be a variety of things.  You know,
12   a tender letter, correspondence between Zurich and
13   the insured.  There could be a whole number of
14   things.  Broker communications.  A claim number that
15   Zurich had set up to handle the matter.
16   Q.   Well, short of an actual letter or email
17   or written document, is there anything that would
18   satisfy Zurich regarding timely notice concerning
19   the Sagamore case?
20   A.   I mean, it's very situation specific.  I
21   think it would depend on what was provided.  But
22   something with the details of the notice would
23   certainly be needed in order to establish that it
24   was timely made.
25   Q.   Would it be sufficient to have testimony

Page 51

1    with someone with personal knowledge?
2    A.   Perhaps.  If there was sufficient detail,
3    I'd say yes.
4    Q.   What kind of details are you looking for?
5    A.   Who the claim was noticed to, was it, you
6    know, a home office, a field office, was it sent
7    under certain policies or, you know, the list I
8    guess of the policies it was noticed under.  The
9    date that the notice was made.  Any adjuster
10   assigned, any type of information that I guess the
11   broker would have, is generally the claims -- the
12   broker being involved in any notices or tenders
13   made.
14   Q.   So you've identified a couple of things:
15   which policies coverage was requested under, the
16   date, and which office was involved.  Why would it
17   matter which office was involved with respect to
18   when Zurich would have to make a coverage
19   determination?
20   A.   Just we would know where the information
21   was sent and how it was transmitted to our office.
22   Q.   Why would it matter which policies were
23   implicated, if at least one policy was noticed?
24   A.   Just that the details of how the notice was
25   provided.  I mean, that would be important to trace

Page 52

1    back that the notice was made and it was made
2    appropriate under the policy that would be provided
3    coverage.
4    Q.   And why would the specific date and year
5    and month matter?
6    A.   Because the policy has terms and conditions
7    as far as when the notice has to be made for the
8    coverage to apply.
9    Q.   Is there any way for a policyholder to
10   satisfy those obligations that you've articulated in
11   your view short of providing a written notice with a
12   specific letter and date and time?
13   A.   I can't really answer that.  I would think
14   perhaps there's more than one way that they could
15   satisfy that to provide that documentation.
16   Q.   Like what?
17   A.   You'd have to review it case by case to
18   decide what was sufficient and ...
19   Q.   Well, in this particular case which we're
20   talking about, Landis+Gyr's claim regarding
21   Sagamore, what would Zurich find sufficient
22   concerning proof regarding notice if the files are
23   lost or misplaced?
24   A.   I guess mostly something that can allow us
25   to trace back where we would have set up a claim.

Page 53

1    If it's a policy number, we can find all the claims
2    attached to a policy. If it's a claim number, we
3    can trace back claims that way. If there's a date,
4    we might, you know, be able to narrow things down
5    that way, to try to find where the claim was noticed
6    so we can trace that back in our records.
7        Q.  And it's your view today as you sit here
8    that all the information Landis+Gyr has provided
9    with respect to notice is not sufficient?
10       A.  That's correct.
11       Q.  And why is that?
12       A.  Because it, first of all, it doesn't say
13   specifically Zurich was noticed. There's no
14   indication Zurich was noticed, that a particular
15   office was noticed, that there was a time frame
16   narrowed down on when the notice was made, that a
17   particular policy was noticed.
18       Q.  Is there anything else Landis+Gyr would
19   need to do in order to get a coverage determination
20   from Zurich other than those things that you just
21   identified?
22       A.  To get a determination at this point in
23   time?
24       Q.  Yes.
25       A.  Since there's coverage litigation, any kind

Page 54

1    of communications would be handled through the
2    coverage litigation.
3        Q.  Is it your view that if there's coverage
4    litigation, there's no obligation that lives on to
5    communicate, advise the insured, respond to the
6    insured's request, even if the liability case is
7    still pending?
8        A.  If we can't establish coverage, there's
9    nothing further we can do on handling of the
10   underlying.
11       Q.  Has Zurich ever issued a reservation of
12   rights letter to Landis+Gyr regarding the Sagamore
13   claim after the notice was given in September
14   of 2014?
15       A.  No. I believe there was a general
16   acknowledgment that was issued, and not any specific
17   coverage or reservation was issued.
18       Q.  Did Zurich do anything to investigate the
19   claim after it was first notified in 2014, the
20   Sagamore claim?
21       A.  I mean, the investigation was with the
22   insured.
23       Q.  So did Zurich do anything to investigate
24   other than send letters to the insured?
25       A.  Zurich requested the information they

Page 55

1    needed to compile to determine whether the claim
2    would be covered. The policy provides for Zurich to
3    handle and defend claims. It doesn't provide
4    coverage to reimburse for claims. So in this
5    situation, I mean, the insured was looking for,
6    like, retroactive coverage of something that it
7    didn't have any information about providing to us
8    previously.
9        Q.  Did Zurich ever send anyone to the
10   Sagamore site to investigate it?
11       A.  No.
12       Q.  Did Zurich hire anyone to go to the
13   Sagamore site to investigate it?
14       A.  No.
15       Q.  Did Zurich interview any employees about
16   the Sagamore site?
17       A.  No.
18       Q.  Has Zurich hired any consultants to
19   investigate the facts regarding the contamination on
20   and around the site, the Sagamore site?
21       A.  I know we have retained experts. I'm not
22   sure that whole scope of what they're reviewing at
23   this time.
24       Q.  Has Zurich hired anyone to sample the soil
25   or groundwater regarding the Sagamore site?

Page 56

1        A.  I don't believe so, no.
2        Q.  Has Zurich made any effort to contact
3    witnesses regarding the activities that took place
4    historically at the Sagamore site?
5        A.  No.
6        Q.  What has Zurich done to investigate the
7    Sagamore site?
8        A.  Request information from the insured. I
9    know the handler reviewed information about the
10   site, the information available from IDEM and what
11   was the status and kind of a general history.
12       Q.  Do you believe that Zurich has a duty to
13   independently investigate a claim, a liability
14   claim?
15       A.  Zurich has a duty to handle covered claims,
16   so generally the investigation would be part of
17   handling and defending the claim.
18       Q.  So yes?
19       A.  In the case where we're being asked to
20   handle and defend a claim, yes, we would definitely
21   have a duty to fully investigate all portions of the
22   facts of the claim.
23       Q.  Did you understand that in 2014 when
24   Landis+Gyr requested coverage, defense, and
25   indemnity regarding the Sagamore claim, that the

Page 57

1     site had not yet been closed?
2         A.   I understood the tender to refer to the
3     wrap-up and completing the remediation of the
4     site but that it had not been closed yet.
5         Q.   And, indeed, there were costs being
6     incurred from 2014 until closure?
7         A.   I'm not aware of any specifics, no.
8         Q.   So Zurich wasn't aware, in your view, that
9     there were any costs incurred from the date of
10    the notice in September 2014 until the site was
11    closed?
12        A.   Not specifics of the costs or the
13    remediation plan or -- just that it was wrapping up.
14    That was the information we got.
15        Q.   Do you have any explanation as to how an
16    insured would wrap up closure for a period of some
17    3 years without incurring any costs?
18        A.   We weren't involved in any portion of the
19    claim, so I can't say whether the site was just
20    waiting for a signoff from the authorities or what
21    the status of wrapping up the site meant.
22        Q.   What did Zurich do with the information
23    that Landis+Gyr provided after September of 2014?
24        A.   With what information?
25        Q.   The information that was communicated to

Page 58

1     Zurich by Landis+Gyr.
2         A.   The tender letter?
3         Q.   Let's look at a specific letter here.  It
4     might be helpful.
5             MR. HUBER:  Exhibit 2.
6                 (Deposition Exhibit Number 2
7                 marked for identification.)
8     BY MR. HUBER:
9         Q.   Handing you what's been marked as
10    Exhibit 2, it's a letter dated September 16, 2014.
11    Do you see that?
12        A.   Yes.
13        Q.   Is this a letter that Zurich received?
14        A.   Yes.
15        Q.   Regarding the Sagamore Lafayette, Indiana,
16    site?
17        A.   Yes.
18        Q.   On behalf of Landis+Gyr?
19        A.   Yes.
20        Q.   And who received this letter at Zurich?
21        A.   I see that Holly Trigger in the pollution
22    department was copied, and I recall seeing that she
23    received a copy.  It looks like it also went to the
24    triage center, so they would have set up a claim.
25        Q.   And the triage center is where?

Page 59

1         A.   It's in the home office that sets up the
2     claims for the -- new claims that are assigned out
3     to the teams.
4                 (Deposition Exhibit Number 3
5                 marked for identification.)
6     BY MR. HUBER:
7         Q.   Ms. Hairrell, I'm handing you what's been
8     marked as Exhibit 3.  Is that a true and accurate
9     copy of a letter dated September 25, 2014, that
10    Zurich received regarding the Sagamore site?
11        A.   I assume so.
12        Q.   And did David Olson, the fellow that you
13    testified about earlier, did he receive this
14    information?
15        A.   Yes.
16        Q.   And what did Mr. Olson do with this
17    information that was provided by Landis+Gyr in
18    response following the September 25, 2014 letter?
19        A.   I believe that he had discussed the tender
20    of the claim and the information that was needed
21    with Landis+Gyr's counsel.  There was requests for
22    some information that Dave provided.
23        Q.   If you look at the bottom of the first
24    page, do you see the last sentence that's recorded
25    there, quote:  We have also requested Zurich's

Page 60

1     coverage position?
2             Do you see that?
3         A.   Yes.
4         Q.   Did Zurich believe it had an obligation to
5     respond to that request at the time?
6         A.   Not unless we have all the information we
7     need to determine coverage; then it's not possible
8     for us to respond on that.
9         Q.   Did Zurich believe it had an obligation to
10    provide the claims file and policies issued and
11    underwriting materials that were requested in the
12    sentence above?
13        A.   I mean, I believe we provided what was
14    available at the time.
15        Q.   So did Zurich do anything else other than
16    what you've identified to respond, take further
17    action, what have you with respect to the
18    September 25, 2014 letter?
19        A.   I believe we responded to everything that
20    was asked that we were able to provide.
21                (Deposition Exhibit Number 4
22                marked for identification.)
23    BY MR. HUBER:
24        Q.   What is Exhibit 4?
25        A.   It looks like a letter from Dave Olson

Page 61

1    responding on the status of the claim investigation.
2         Q.   Does that appear to be a true and accurate
3    copy of a letter Mr. Olson sent around October 17,
4    2014?
5         A.   Yes.
6              (Deposition Exhibit Number 5
7                marked for identification.)
8    BY MR. HUBER:
9         Q.   What is Exhibit 5?
10        A.   It looks like notes from the claim system.
11        Q.   Is this a document that Zurich produced
12   bearing a Bates label ZUR2496?
13        A.   Yes.
14        Q.   And did this come out of the claims file
15   for the Sagamore site?
16        A.   I believe so, yes.
17        Q.   And is it a true and accurate copy of
18   these communications, one to you and one to -- or
19   from Mr. Richard Tunis?
20        A.   Yes.
21        Q.   To take a little detour here, we haven't
22   really talked much about Richard Tunis.  Who is he?
23        A.   He's internal legal counsel.
24        Q.   What has his role been, if any, on the
25   Sagamore claim?

Page 62

1         A.   We consulted with Rick on the claim
2    initially, and then Ted had taken over from Rick.
3         Q.   Who is Rick?
4         A.   Richard Tunis.
5         Q.   Got you.  So when did Ted May take over
6    for Richard Tunis on the Sagamore claim?
7         MR. WRIGHT:  Objection.  Mischaracterizes the
8    witness' testimony.
9    BY THE WITNESS:
10        A.   I'm not sure when Ted became our contact
11   person for this claim.
12        Q.   You said "recently" in your earlier
13   testimony.
14        A.   Yes.
15        Q.   Like, when did that transition happen?
16        A.   I can't be certain on the date.
17        Q.   A couple months or years or ...
18        A.   It was last -- I believe it was last year
19   sometime.
20        Q.   So sometime in 2017?
21        A.   Yes.
22        Q.   So why would David Olson be sending an
23   email or communicating with Richard Tunis back at
24   this time frame?
25        MR. WRIGHT:  To the extent that the question

Page 63

1    calls for the witness to divulge information that's
2    privileged by the attorney-client privilege, I'm
3    going to instruct the witness not to answer.
4    BY THE WITNESS:
5         A.   We would seek advice on claims.  If we had
6    a question on, you know, handling and just a general
7    legal interpretation of the policy, then we would
8    reach out to our legal staff for advice.
9              (Deposition Exhibit Number 6
10               marked for identification.)
11   BY MR. HUBER:
12        Q.   Take a moment to look at that.  Does
13   Exhibit 5 appear to be a true and accurate copy of
14   some emails and letters to and from Julie York that
15   bear Bates Numbers ZURICH924 through and including
16   ZURICH940.
17        A.   It's Exhibit 6.
18        Q.   Yes.
19        A.   I think you said 5.
20             Yes.
21        Q.   So does Exhibit 6 contain communications
22   to and from Julie York --
23        A.   Yes.
24        Q.   -- regarding the Sagamore claim?
25        A.   Yes.

Page 64

1         Q.   And during what time frame?
2         A.   2016.
3         Q.   So what was Ms. York doing generally
4    during this time frame in 2016 that's reflected and
5    memorialized in Exhibit 6?
6         A.   It looks like she's trying to review and
7    understand the history on the file and to, looks
8    like, correspond with The Hartford on what they had,
9    and kind of pull together information and respond
10   back to Landis' counsel.
11        Q.   And is this information, information that
12   Julie would have recorded in the claims file?  Is
13   that what this is?
14        A.   The emails?  Oh, yes, yes.
15        Q.   Do you recall approximately when Julie
16   York became involved taking over for David Olson?
17        A.   It was around November of 2015.
18        Q.   And is this a printout of the emails
19   themselves, or is it a printout of some sort of
20   document management system that Zurich has, this
21   particular exhibit, Exhibit 6?
22        A.   It would be from the claim file.
23        Q.   And are they just, you know, hard copies
24   sitting at the computer hitting print to print the
25   email, or is it in some kind of document management

16 (Pages 61 to 64)

Page 65

1    system?
2        MR. WRIGHT:  Objection.  Compound question.
3    BY THE WITNESS:
4        A.  The documents are in like a list, and you
5    pull them up and you can see the documents or you
6    can print them.
7        Q.  I don't see any -- you've referred to this
8    eZACCESS system.  Now might be a good time to
9    describe what that is.  What's the eZACCESS system?
10       A.  That's our claims system.
11       Q.  Okay.  Is Exhibit 6 a printout from the
12   eZACCESS system?
13       A.  It's from the documents in that system, so
14   there's a document storage function that's part of
15   the claims system.  And this would be from that
16   section of the system.
17       Q.  And what is the eZACCESS system?
18       A.  That's where we retain all our claim data.
19       Q.  And is this the system that would house
20   the claims file for the period September 2014 to the
21   present?
22       A.  Yes.
23       Q.  And do Zurich claims handlers like
24   Mr. Olson or Ms. York have a duty to record what
25   they're doing in the regular course on this claim

Page 66

1    system?
2        A.  They're expected to do that, yes.
3        Q.  And does it appear that they, in fact, did
4    do that in this particular case based on your
5    review?
6        A.  Yes.
7        Q.  Was Ms. York doing anything else to
8    advance the claim made by Landis+Gyr in the time
9    frame reflected in Exhibit 6, other than what is
10   recorded in Exhibit 6?
11       A.  These are just the email correspondence.
12   So, I mean, you'd have to review the notes and
13   documents besides just the email to see what she was
14   working on on the claim at any particular time.
15       Q.  So are you saying Exhibit 6 only includes
16   the emails that Ms. York was generating or
17   receiving?
18       A.  There's a letter also.
19       Q.  What is the earliest and the latest time
20   frame here reflected?
21       A.  Can you repeat that?
22       Q.  What is the earliest and latest time frame
23   depicted in Exhibit 6?
24       A.  Oh.  Looks like January 2016 through
25   August 1st, 2016.

Page 67

1        Q.  Does Exhibit 6 contain all of the written
2    communications that Ms. York had outside Zurich's
3    offices during that time frame, January 2016 to
4    August 2016?
5        A.  I assume so.
6        Q.  As you sit here, are you aware of any
7    written communications that she had with anyone else
8    during that time frame that would not be contained
9    in Exhibit 6?
10       A.  No.
11       Q.  Was there a particular reason why the
12   claim was transferred to Julie York from David
13   Olson?
14       A.  Yes.  David took a different position in
15   the company, so he left the claim -- the pollution
16   claim department.
17       Q.  Was that his decision, or was it Zurich's
18   decision?
19       A.  It was his decision.
20       Q.  On Page 932 of Exhibit 6 --
21       A.  Okay.
22       Q.  -- does that refer to a communication
23   between Julie York and Paige at Hartford?
24       A.  Yes.
25       Q.  Paige Rymer, R Y M E R?

Page 68

1        A.  Yes.
2        Q.  What's your understanding as to why
3    Ms. York was referring to Paige Rymer or talking to
4    Paige Rymer at this time frame?
5        A.  I believe that the insured's counsel had
6    asked for Zurich's coverage position because
7    The Hartford was requesting that position, so she
8    was following up at some point with The Hartford to
9    let them know of the status of our coverage
10   investigation.
11       Q.  And what did Zurich and Ms. York learn in
12   that communication with The Hartford?
13       A.  I believe there wasn't enough information.
14   Zurich hadn't issued coverage because we didn't have
15   enough information.
16       Q.  Was Hartford also asking for Zurich to
17   make a coverage determination?
18       A.  I'm not sure.  I'm not sure what -- if they
19   contacted Julie directly on her coverage position.
20       Q.  Would it have made a difference to Zurich
21   if The Hartford had said, hey, are you making a
22   coverage determination?  Are you going to make a
23   coverage determination?  Would that have changed
24   anything from Zurich's standpoint?
25       A.  No.

Page 69

```
 1     Q.  Why not?
 2     A.  Because we didn't have enough information,
 3  so it didn't matter whether they inquired or not
 4  about coverage.
 5     Q.  And what additional information did Zurich
 6  believe it needed at that point?
 7     A.  Information on the notice of the claim.
 8     Q.  Anything else?
 9     A.  That was the threshold matter to
10  investigate.
11          (Deposition Exhibit Number 7
12          marked for identification.)
13  BY MR. HUBER:
14     Q.  Ms. Hairrell, I'm handing you what's
15  marked as Exhibit 7.  Is that a true and accurate
16  copy of a letter dated September 27, 2016 that was
17  sent to Julie York regarding the Sagamore claim?
18     A.  It looks to be so.
19     Q.  And to your knowledge, did Ms. York
20  receive this letter?
21     A.  I believe so.
22     Q.  If you look on Page 2, there's a reference
23  to a CD.  Do you see that?
24     A.  Yes.
25     Q.  What did Ms. York do with the CD?
```

Page 70

```
 1     A.  I believe she had some trouble accessing
 2  the CD but eventually did get the information that
 3  was provided on the CD and was able to review the
 4  information that was provided to her.
 5     Q.  And what did she do, if anything, after
 6  she reviewed the information that was provided to
 7  her?
 8     A.  I think she noted some of the information
 9  that was in the CD, and I think that was all she
10  really had at the time was some of the background
11  information on the claim being made.
12     Q.  If you look on Page 2, second-to-last
13  paragraph, do you see that?
14     A.  Yes.
15     Q.  Do you see a reference to the VFC, the
16  Virtual Filing Cabinet?
17     A.  Yes.
18     Q.  Do you know if Ms. York went to the VFC to
19  look up information?
20     A.  She indicates that she did.
21     Q.  When did she do that?
22     A.  I discussed the file with her in my review,
23  and she said that she reviewed some of the documents
24  and information on the background of the case.
25     Q.  And what did she learn from that?
```

Page 71

```
 1     A.  Just general information on the history and
 2  the status of the case.
 3     Q.  Did she print out information off of the
 4  VFC?
 5     A.  I don't believe so.
 6     Q.  Do you know why not?
 7     A.  Generally we would not do that.  I don't
 8  know why she would print off information that was
 9  online.
10     Q.  If the letter was sent September 27, 2016,
11  do you know how long thereafter Ms. York reviewed
12  the VFC, Virtual Filing Cabinet?
13     A.  I believe it was around the time where she
14  had the information on where to find historic
15  documents for the case.
16     Q.  And did Ms. York, to the best of your
17  knowledge, put this letter and the CD and any
18  information she gleaned from the VFC in the claims
19  file?
20     A.  Yes.
21     Q.  That would be something she's supposed to
22  do?
23     A.  If there's, yeah, information received, she
24  should put it into the claims file, yes.
25     Q.  Change of subject a little bit.
```

Page 72

```
 1     Does Zurich have a bonus or incentive plan
 2  for claims handlers or employees generally?
 3     A.  There's a short-term incentive plan for all
 4  employees, yes.
 5     Q.  And what is that?
 6     A.  It's a plan that all employees are eligible
 7  to participate where the company sets forth goals
 8  for the year; and if those targets are achieved,
 9  there's additional bonus, I guess, paid out to the
10  employees.
11     Q.  Do you participate in that?
12     A.  Yes.
13     Q.  Does Ms. York?
14     A.  Yes.
15     Q.  Do all the other employees who touch the
16  Landis+Gyr Sagamore claim participate in that plan?
17     A.  Yes.
18     Q.  Do you know how far back in time this
19  incentive plan was utilized?
20     A.  I'd say 20 years, of my knowledge.  It
21  could be longer.
22     Q.  So how does that plan work?
23     A.  There's high-level goals that are set by
24  senior management that they want to achieve for the
25  year across various business lines and different
```

Page 73

1  types of business. And then at the end of the year,
2  the results are measured against those targets.
3      Q. What kind of goals are they that are set?
4      A. They could be all different kinds of growth
5  of certain kinds of business or certain lines of
6  coverage, different premium. They might want to
7  increase premium for certain types of business or
8  it's just specific high-level goals that are set for
9  the company to achieve throughout the year.
10     Q. Are they financial goals?
11     A. Yes.
12     Q. To what extent are those goals impacted by
13 claims and payments?
14     A. I mean, they're somewhat impacted by
15 claims. Depending on what the target and goals are,
16 sometimes they're just around increasing premiums or
17 market shares or, other times, they're on
18 profitability. Or, you know, they're -- generally
19 there's some claim impact but depending on --
20     Q. What percentage of the compensation by
21 Ms. Olson -- Mr. Olson, Ms. York, or yourself would
22 be made up by this incentive plan?
23     A. What percentage of compensation?
24     Q. Like, is it 50 percent? Is it 10 percent?
25 5 percent?

Page 74

1      A. It varies from year to year. But claim
2  handlers in general could receive around 10 percent.
3      Q. So were the incentives that you just
4  described, were those in place during the time when
5  claims handlers were handling the Sagamore claim for
6  Zurich?
7      A. Yes.
8      MR. WRIGHT: Objection. Mischaracterization of
9  the witness' testimony.
10 BY MR. HUBER:
11     Q. Are there any other incentives that are
12 unique to the claims department that are set or
13 outlined?
14     A. No.
15     Q. Are there any other kinds of goals set for
16 your claims unit given that you have 500 claims and
17 seven employees, approximately?
18     A. There's no specific goals. I mean, no,
19 there's nothing specific.
20     Q. Is there any advantage to a claims handler
21 to process one of those 500 claims any more quickly
22 or more slowly?
23     A. No.
24     Q. Is there any incentive to claims handlers
25 to close files in a timely manner or any more

Page 75

1  quickly or slowly?
2      A. I mean, the claim handlers are expected to
3  close the file when it comes to completion and to,
4  you know, see it through to completion. I guess
5  there would be some performance issue if they didn't
6  close completed files. That's all I could really
7  think of.
8      Q. Is the performance of the pollution unit
9  that you supervise, is it measured or tracked in any
10 way?
11     A. The performance?
12     Q. Yes.
13     A. We have quality reviews that are tracked.
14 We have a quality assurance department that reviews
15 our claims and provides a score.
16     Q. Who does that?
17     A. Quality assurance department.
18     Q. And what are they measuring? What
19 metrics?
20     A. They're measuring that the claim was
21 appropriately handled, that payments were made
22 accurately and correctly and timely.
23        They also measure that the customer was
24 notified and, you know, that the service provided by
25 the handler was considered to be meeting the

Page 76

1  standards for our company.
2      Q. How do they measure those metrics?
3      A. There's a form that they have with
4  questions.
5      Q. And were the claim handlers who handled or
6  touched the Sagamore claim, were they also reviewed
7  by the quality assurance department?
8      A. We're reviewed as a department, so we
9  have -- their review is part of our department
10 should their claims be pulled in the sample.
11     Q. So is it just a random sample of claims?
12     A. Yes.
13     Q. So of the 500 claims that your unit is
14 handling, how many would be sampled for review by
15 the quality assurance department?
16     A. It's about -- I'd say about 20 per quarter.
17     Q. So 20 of the 500 per quarter?
18     A. Yes.
19     Q. So if a file is pulled, one of those 20
20 during a quarter, describe how that quality
21 assurance department would review the matter.
22     A. I mean, they review our claims over the
23 course of the quarter. And then they provide us the
24 form that has the responses on the questions that
25 they looked at. And if there's any question that

Page 77

1   has a comment by the quality assurance department,
2   we would look at those and then respond based upon
3   the comments.  And then we would get a score at the
4   end.
5       Q.  Do you know if the Landis+Gyr Sagamore
6   claim was ever the subject of a review by this
7   department?
8       A.  I'm not sure.
9       Q.  How would we find that out?
10      A.  I would think the quality assurance group
11  could look up what their prior reviews were.
12      MR. HUBER:  Let's take a break.  They need to
13  update the tape, I think, so let's go off the
14  record.
15      THE VIDEOGRAPHER:  We're going off the record
16  with the end of tape 1 at 10:59 a.m.
17          (A short break was taken.)
18      THE VIDEOGRAPHER:  We are back on record at the
19  beginning of tape 2 at 11:11 a.m.
20          (Deposition Exhibit Number 8
21           marked for identification.)
22  BY MR. HUBER:
23      Q.  Ms. Hairrell, I'm handing you what's been
24  marked as Exhibit 8. I'll represent to you that
25  that's a true and accurate copy of a letter dated

Page 78

1   September 27, 2015 to Kyle Lansberry.
2       A.  February 24th.
3       Q.  Sorry. February 24, 2017.
4       A.  Okay.
5       Q.  Have you seen that before?
6       A.  I'm not certain.
7       Q.  I believe you said you've seen the
8   attachment --
9       A.  Yeah.
10      Q.  -- to the February 27, 2016 letter to
11  Julie York, right?
12      A.  Yes.
13      Q.  On Exhibit 8, there's a reference to Kyle
14  Lansberry of Lewis & Wagner?
15      A.  Yes.
16      Q.  Is that Zurich's counsel?
17      A.  Yes.
18      Q.  One of them?
19      A.  Yes.
20      Q.  There's a reference to the CD.  Do you
21  have any idea why Mr. Lansberry would not have had a
22  copy of the CD that was provided to Ms. York back in
23  September of 2016?
24      A.  I'm not sure.  I assume he would have
25  requested a copy of the claim file.  I'm not sure

Page 79

1   why he wouldn't have the CD.
2       Q.  Did Zurich lose the CD?
3       A.  I don't believe so.  I saw the documents
4   that go with the CD.
5       Q.  Did you see a CD in your review of the
6   file?
7       A.  I didn't see a CD, physical CD.  I saw
8   copies of the CD.
9       Q.  Do you have any idea why Mr. Lansberry
10  would not know about or have the CD in February
11  of 2017?
12      MR. WRIGHT:  To the extent that the question
13  requires the witness to disclose attorney-client
14  privileged information, I would instruct the witness
15  not to answer.
16  BY MR. HUBER:
17      Q.  Go ahead.
18      A.  I don't know why he wouldn't have it, no.
19          (Deposition Exhibit Number 9
20           marked for identification.)
21  BY MR. HUBER:
22      Q.  I've handed you what's been marked as
23  Exhibit 9. It's a September 5, 2017 letter to Kyle
24  Lansberry regarding the Sagamore site.
25          Do you see that?

Page 80

1       A.  Yes.
2       Q.  I believe you've already seen the
3   attachments to this letter; is that right?
4       A.  Yes.
5       Q.  Was Mr. Lansberry still your counsel in
6   September 2017, September 5, 2017?
7       A.  Yes.
8       Q.  Did Zurich take any particular action in
9   response to this letter?
10      MR. WRIGHT:  To the extent that the question
11  requires the witness to disclose attorney-client
12  privileged information, I'm going to instruct the
13  witness not to answer.
14  BY THE WITNESS:
15      A.  Yeah, I don't know about communications
16  with our counsel.
17      Q.  Has Zurich ever assessed whether or not
18  the American Guaranty policy applies to the Sagamore
19  site?
20      MR. WRIGHT:  Same instruction.
21  BY THE WITNESS:
22      A.  I'm not sure which policy that refers to.
23      Q.  Are you aware of the policies that insure
24  Landis+Gyr?
25      A.  I'm aware there are numerous policies for

Page 81

1  Landis+Gyr.
2      Q.  Some of those are primary policies, right?
3      A.  Yes.
4      Q.  Some of those are umbrella or excess
5  policies?
6      A.  Yes.
7      Q.  Has Zurich analyzed whether or not the
8  umbrella or excess policies issued to Landis+Gyr
9  apply in this situation?
10     MR. WRIGHT:  Same instruction.
11 BY THE WITNESS:
12     A.  Only through the litigation.  There has not
13 been a coverage position issued.
14     Q.  Did Zurich analyze whether the umbrella or
15 excess policies would apply to the Sagamore claim
16 prior to the lawsuit?
17     A.  We had requested the information to
18 determine the notice and did not receive that
19 information, so there was not a determination made.
20     Q.  Did Zurich handle or analyze its
21 obligations under the umbrella or excess policies
22 that Zurich and American Guaranty issued any
23 differently than its obligations under the primary
24 policies?
25     A.  No.

Page 82

1      Q.  Why not?
2      A.  Because we would review coverage under both
3  policies or all policies at one time when we had the
4  information to review coverage.
5      Q.  Does Zurich intend to ever issue a
6  coverage determination regarding the Sagamore claim?
7      A.  I believe it's all handled through the
8  litigation.
9      Q.  So aside from whatever your litigation
10 attorneys may say or not say, Zurich is not planning
11 to do anything on its own with respect to the
12 Sagamore claim in deciding whether there's coverage?
13     A.  I don't know what -- how far the litigation
14 will proceed.  That would be dependent on counsel's
15 recommendations.
16     Q.  So at this point, Zurich's not planning to
17 do anything with respect to the Sagamore claim other
18 than what its coverage litigation attorneys tell it
19 to do; is that fair?
20     MR. WRIGHT:  Objection.  I'm going to instruct
21 the witness not to answer to the extent the answer
22 requires disclosure of attorney-client privileged
23 information.
24 BY THE WITNESS:
25     A.  For a claim in litigation, we rely on our

Page 83

1  counsel's recommendations on how to proceed.
2      Q.  Does Zurich ever believe that it has a
3  duty to the policyholder that lives on,
4  notwithstanding the existence or non-existence of
5  coverage litigation?
6      A.  That would be situation specific.
7      Q.  Well, when would Zurich believe in a
8  liability case that it has a duty to the
9  policyholder that lives on, notwithstanding coverage
10 litigation?
11     A.  We have cases where there's issues being
12 litigated for coverage and yet we're still defending
13 and handling the underlying claim.  Then the duty
14 would continue to handle the underlying claim in
15 that case.
16     Q.  What about that duty to the policyholder
17 in a liability case in this context, the Sagamore
18 case, why hasn't Zurich done anything with respect
19 to that duty?
20     MR. WRIGHT:  Objection to the extent the answer
21 calls for a legal conclusion.
22 BY THE WITNESS:
23     A.  There's been no duty established or
24 coverage established for this claim, so there isn't
25 any action for Zurich to be taking at this time.

Page 84

1      Q.  So it is your view that there is no duty
2  to the policyholder until you make a coverage
3  determination?
4      MR. WRIGHT:  Objection.  Calls for a legal
5  conclusion.
6  BY THE WITNESS:
7      A.  The duty arises from the coverage under the
8  policy, so there would have to be coverage before
9  there would be an obligation.
10     Q.  So in your view, is there a duty to the
11 policyholder prior to making a coverage
12 determination?
13     MR. WRIGHT:  Objection.  Calls for legal
14 conclusion.
15 BY THE WITNESS:
16     A.  I guess it depends on what you're
17 considering a coverage determination.  If there's a
18 potential for coverage, the claim would be handled
19 accordingly.
20     Q.  And was there a potential for coverage for
21 the Sagamore site prior to the coverage lawsuit?
22     A.  We're investigating whether there would be
23 a potential for coverage or not.
24     Q.  If there hadn't been any coverage
25 litigation, how long would Zurich have investigated

Page 85

1  before it issued a coverage determination regarding
2  the Sagamore site?
3      A.  Until it got the information it needed to
4  make a determination.
5      Q.  So indefinitely?
6      A.  If the policyholder isn't providing the
7  information to show there's coverage for the claim,
8  there's nothing more that we can do.
9          (Deposition Exhibit Number 10
10             marked for identification.)
11  BY MR. HUBER:
12      Q.  Take a look at Exhibit 10.
13      A.  Okay.
14      Q.  What is Exhibit 10?
15      A.  It's email, internal between David,
16  the claim handler, and Anna in admin ops, who is
17  searching for the policies.
18      Q.  And are these communications to and from
19  David Olson?
20      A.  Yes.
21      Q.  Does Exhibit 10 appear to be a true and
22  accurate copy of emails to and from David Olson
23  bearing Zurich Bates Number 2501 through and
24  including 2506?
25      A.  Yes.

Page 86

1      Q.  And are the dates on this exhibit
2  accurate?
3      A.  I assume so.
4      Q.  If you look on the second page, it's
5  marked ZURICH2502.  Do you see that?
6      A.  Yes.
7      Q.  What is going on here in this email
8  exchange?
9      A.  It looks like Dave and Anna discussing the
10  policy search.
11      Q.  And who is Anna?
12      A.  She's in the administrative operations
13  area.
14      Q.  What is her last name?
15      A.  Fronimos.
16      Q.  F R O N I M O S?
17      A.  Yes.
18      Q.  And what is her role here?
19      A.  She would be the administrative support for
20  claims.
21      Q.  And what was she doing for David?
22      A.  She was trying to locate copies of all the
23  policies.
24      Q.  Here's a reference to ZDW.  Do you see
25  that?

Page 87

1      A.  Yes.
2      Q.  What is ZDW?
3      A.  That's the Zurich Document Warehouse.
4      Q.  And what is that?
5      A.  That's our current system that houses the
6  policy copies.
7      Q.  And when is that warehouse used?
8      A.  It links to the claim system.  So when we
9  have a claim attached to a particular policy, we can
10  view the policy online.
11      Q.  Is it an electronic warehouse?
12      A.  Yes.
13      Q.  There's a reference to a policy drawer on
14  that same page.  Do you see that?
15      A.  Yes.
16      Q.  What are the policy drawers?
17      A.  That is a collection of the policies that
18  we've compiled that were from our storage.  If we
19  have a claim and we need to search in storage to
20  recover a copy, we keep a copy in our area and then
21  we send the original back to storage.
22      Q.  So why is it that, as it states here, none
23  of the Landis+Gyr policies were in the policy
24  drawers and only parts of them were in the Zurich
25  Document Warehouse?

Page 88

1      A.  Well, the document warehouse came into
2  effect, I don't know exactly the date, but it was
3  not as early as the policies that would be at issue
4  here.  And the drawers only have the policies that
5  have been compiled from previous claims for policies
6  that predate the document warehouse.  So those are
7  the first places that someone would check to find if
8  the copy is easily accessible to us.
9      Q.  When did the Zurich Document Warehouse go
10  into effect, approximately?
11      A.  I'm not sure exactly.  Different business
12  units started utilizing the document warehouse at
13  different times.  I'd say around 2000, most business
14  units were using the document warehouse at that
15  time.
16      Q.  As you sit here today, do you know for a
17  fact when your business unit, the pollution claim
18  unit, started using the Zurich Document Warehouse?
19      A.  We're not a business unit.  We're a claim
20  department.  So the business units would be like
21  commercial markets, middle markets, global
22  corporate.  It would be kind of marketing units.
23      Q.  So did the pollution claim unit ever use
24  the Zurich Document Warehouse?
25      A.  That's used by the underwriting group.  So

Page 89

1   the underwriters put the policies when they
2   underwrite them into their underwriting system that
3   goes to the document warehouse, and then we can
4   access them in claims.
5       Q.  Is Zurich supposed to keep policies for
6   its policyholder indefinitely?
7       A.  I know Zurich has historically kept all
8   their policies.  I believe there's different
9   retention requirements for different states and
10  types of policies.  But Zurich historically has kept
11  policy copies.
12      Q.  And in this case for the Landis+Gyr
13  policies that may or may not apply to the Sagamore
14  site, was Zurich supposed to keep those
15  indefinitely?
16      A.  I'm not sure what the retention
17  requirements would be for any particular policy that
18  was issued.
19      Q.  So are you able to say one way or the
20  other whether Zurich was supposed to keep the
21  Landis+Gyr policies at issue here in this case?
22      A.  I'm not sure what the requirements would
23  be.
24      Q.  What would be your best explanation given
25  your review and preparation as to why some of the

Page 90

1   Zurich policies were in the Zurich warehouse but
2   none of them were in the policy drawers?
3       A.  The warehouse was newer, so if old
4   policy -- policies that predated the warehouse are
5   located, there is a possibility to have them loaded
6   into the document warehouse.  Somebody might have
7   had portions that were located, put into the
8   warehouse.
9       Q.  Do you have any idea why some would be
10  loaded here and not others?
11      A.  I don't know specifically.
12      Q.  How many claims had Landis+Gyr made
13  against those policies?
14      A.  The primary policies ...
15      MR. WRIGHT:  Objection.  That's outside the
16  scope of this deposition.
17      THE WITNESS:  Should I answer anyway?
18      MR. WRIGHT:  You don't need to answer.  It's
19  outside the scope.
20      MR. HUBER:  I'll ask her to answer on her own
21  personal knowledge.
22  BY MR. HUBER:
23      Q.  How many claims had Landis+Gyr made
24  against these policies?
25      A.  I mean, I don't know how many claims.  I

Page 91

1   know there's erosion reports that list claims that
2   were made that were produced.
3       Q.  Do you recall how many?
4       A.  No.
5       Q.  To give some sense of this, how big of a
6   customer was Landis+Gyr for Zurich historically in
7   the '80s and '90s, given the number of policies
8   that, you know, we've located or everyone believes
9   were issued to Landis+Gyr in this case?
10      MR. WRIGHT:  Objection.  That's outside the
11  scope of the topics to which we've agreed for this
12  30(b)(6) deposition.
13  BY MR. HUBER:
14      Q.  Go ahead.
15      A.  I don't know.
16          (Deposition Exhibit Number 11
17           marked for identification.)
18  BY MR. HUBER:
19      Q.  Exhibit 11 is an email copy, also bears
20  Zurich Bates Number 2512.  Can you tell me what it
21  is?
22      A.  It's an email to Dave Olson from Landis'
23  counsel.
24      Q.  And what does it say?
25      A.  Do you want me to read it?

Page 92

1       Q.  Yes, that would be good.  It's kind of
2   hard to read.
3       A.  It's kind of hard to read.  David, in your
4   letter attached, you said you would have a coverage
5   decision in 30 days.  It is now January 2015, so we
6   wanted to follow up.  Thanks.
7       Q.  Was it Mr. Olson's intent to give a
8   coverage determination in 30 days when he stated so?
9       A.  Yes.  Our practice is to issue within
10  30 days of receiving all the information you need to
11  make a determination.
12      Q.  And did Mr. Olson intend to give a
13  coverage determination in 30 days?
14      A.  Yes.
15      Q.  And why didn't he?
16      A.  He didn't receive the information that was
17  requested and promised to be provided.
18      Q.  And what information was that?
19      A.  The information on the noticing of the
20  claim.
21      Q.  And if Mr. Olson was waiting on additional
22  information, would you expect him to ask for that?
23      A.  Yes.
24      Q.  And document that in the notes in the
25  claims file?

23 (Pages 89 to 92)

Page 93

```
 1      A.  Yes.
 2          (Deposition Exhibit Number 12
 3            marked for identification.)
 4   BY MR. HUBER:
 5      Q.  Is Exhibit 12 a true and accurate copy of
 6   an email to Brenda Speer and David Olson from a Rosa
 7   Nares, N A R E S, dated 9/25/2014?
 8      A.  Yes.
 9      Q.  What's going on in September 2014?
10      A.  This is a request to pull a claim file from
11   storage at Iron Mountain.
12      Q.  What is Iron Mountain?
13      A.  That's where Zurich stores claims and
14   policy records.
15      Q.  Is that an electronic warehouse or
16   hard-copy warehouse?
17      A.  It's hard copy.
18      Q.  And it stores both hard copies -- I'm
19   sorry.  It stores both claims and policy
20   information?
21      A.  Yes.
22      Q.  Is it stored indefinitely?
23      A.  I was informed from discussions at Zurich
24   that there's never been any records destroyed out of
25   the storage facility, so they have retained all the
```

Page 94

```
 1   records.
 2      Q.  Where is this Iron Mountain located?
 3      A.  I understand there's more than one
 4   facility.
 5      Q.  Where are they?
 6      A.  I'm not sure.
 7      Q.  Who told you that they never destroy files
 8   at Iron Mountain?
 9      A.  That was my discussions with the -- I can't
10   think of their name.  One of the departments that's
11   in charge of records and storage that I wanted to
12   update you on that I had recalled that I did have a
13   discussion where I indicated I kept some notes on
14   general policies such as record retention.  And that
15   was the regulatory group that I met with that
16   handles the storage and policies regarding that.
17      Q.  Do you recall the person's name?
18      A.  There's Joel Robinette.
19      Q.  How do you spell that?
20      A.  I'm not sure.
21      Q.  Where does Joel Robinette work?
22      A.  In Schaumburg at Zurich.
23      Q.  And what did he tell you?
24      A.  He was the one that had confirmed that
25   there's a records-retention policy that has dates
```

Page 95

```
 1   that records must be retained up till but that
 2   Zurich has never actually destroyed any documents
 3   and has just kept them all.
 4      Q.  Forever?
 5      A.  He went back quite a ways.  I believe he
 6   said the first documents went there in the '80s, in
 7   like 1980.
 8      Q.  So you would expect all of Landis+Gyr's
 9   policies to be at this Iron Mountain location?
10      A.  The different underwriting offices use
11   different storage locations, but they'd be at one of
12   the storage locations where they were sent.
13      Q.  So why are there missing policies?
14      A.  Yeah, I don't know.
15      Q.  All right.  Where are the Iron Mountain
16   locations, if you know?
17          MR. WRIGHT:  Objection.  Asked and answered.
18   BY THE WITNESS:
19      A.  I don't recall.
20      Q.  Do you know what determines whether or how
21   and when documents are placed into the Iron Mountain
22   warehouse?
23      A.  There's the policy that requires records to
24   be kept onsite for a certain period of time, and
25   then they're sent off to storage after closure.
```

Page 96

```
 1      Q.  Does the Iron Mountain warehouse maintain
 2   copies of all underwriting files as well?
 3      A.  Yes.
 4          MR. WRIGHT:  Objection.  Questions about
 5   underwriting files are outside the scope of this
 6   30(b)(6) deposition.  We have not designated this
 7   witness on topics related to the underwriting files
 8   in question.
 9   BY MR. HUBER:
10      Q.  If all of these documents are supposed to
11   be kept at the Iron Mountain warehouse, why has
12   Zurich had such a problem finding documents and why
13   hasn't it produced all of the documents that it
14   knows exists -- i.e., the policies?
15      A.  That's I think the underwriting designee
16   can fill in a lot more details on how the records
17   are kept on those.
18          MR. WRIGHT:  We've designated the underwriting
19   designee on the underwriting, the completeness of
20   the policies, and the contents of the policies.
21   BY MR. HUBER:
22      Q.  If you know, Ms. Hairrell, for what types
23   of documents and files has Zurich actually searched
24   the Iron Mountain system and warehouse?
25      A.  We've done several searches of the Iron
```

Page 97

1    Mountain facility, specifically for policies.  We've
2    searched for claim files, searched for underwriting
3    files.
4         Q.   And when did that take place?
5         A.   The initial policy search was referenced
6    here with the emails when the claim was tendered in
7    2014.  There was a policy search initiated, which
8    included the storage facility, as well as several
9    other places like the document warehouse and the
10   other places cited.  There was also the search for
11   the -- there was a claim file identified that might
12   be related to the Sagamore site, so that was pulled
13   out of storage and reviewed.
14        Q.   So how many searches of the Iron Mountain
15   warehouse took place after the initial search here
16   reflected in this Exhibit 12 at the Iron Mountain
17   facility?
18        MR. WRIGHT:  To the extent that the question
19   requires the witness to disclose attorney-client
20   privileged information, I will instruct the witness
21   not to answer.
22   BY THE WITNESS:
23        A.   The claim file search, I'm not sure if that
24   was before or after the -- this policy search was
25   concluded.  And there was an underwriting file

Page 98

1    search subsequent.  And then I understand that there
2    was additional searches after the litigation was
3    initiated.
4         Q.   So you've identified this Iron Mountain
5    facility and the Zurich Document Warehouse, which
6    you said was an electronic warehouse.  Are there any
7    other repositories of documents or information that
8    Zurich has searched other than those two?
9         A.   Yes.  There's a due-diligence policy search
10   that's completed that includes several sources.
11   There's a lot of different places where we've
12   searched for evidence of a policy, including the
13   premium systems that we have, the -- we have a whole
14   Maryland Casualty data section that's searched in
15   case there were any policies issued by affiliated
16   companies.  There's some manual records that we kept
17   of old claims predating the computer system.  So
18   each of those sources is searched when we're
19   completing a policy search.
20        Q.   And notwithstanding those searches, there
21   are still some Landis+Gyr policies that can't be
22   located; is that right?
23        A.   I understand the policies are not complete,
24   yes.
25        Q.   And what's your best understanding as to

Page 99

1    why that is?
2         MR. WRIGHT:  Objection.  Asked and answered.
3    BY THE WITNESS:
4         A.   Yeah, I think the underwriting witness
5    could provide more detail than I could on that
6    issue.
7         Q.   This due-diligence policy search that you
8    mentioned, how was that different from the Zurich
9    Document Warehouse and the Iron Mountain facility?
10        A.   Those are all included in the search.  And
11   the due diligence form I know was provided in the
12   document production, which lists out each of the
13   sources that was searched.  And it includes the
14   document warehouse, Iron Mountain, Cesar and CIID,
15   which is premium and policy record systems.  There's
16   IRDN cards that were backed up into the system.
17        Q.   Back up.  Spell some of these new terms.
18   Cesar and CIID and IRDN cards?
19        A.   C E S A R is Cesar
20        Q.   That's one.  What was the next thing you
21   mentioned?
22        A.   CIID is C I I D.
23        Q.   And then?
24        A.   There's IRDN cards, which I'm not sure what
25   the --

Page 100

1         Q.   So what are these three things, Cesar,
2    CIID, and IRDN cards?
3         A.   Cesar is where the premium information is
4    kept.
5         Q.   Anything other than premium info kept on
6    Cesar?
7         A.   That's all that I know of.  I don't use
8    that system regularly.  It's more of an underwriting
9    system.
10        Q.   Is it electronic system?
11        A.   Yes.
12        Q.   Do you know how long it's been in effect?
13        A.   Since 1986, I believe.
14        Q.   What is the CIID system?
15        A.   That keeps the policy records, not the
16   actual policies, just the policy numbers and the
17   terms, the effective dates.
18        Q.   Is that an electronic system?
19        A.   Yes.
20        Q.   And how long has that been in place?
21        A.   The same.
22        Q.   1986?
23        A.   Yes.
24        Q.   And what are IRDN cards?
25        A.   Those were -- underwriting had completed

Page 101

1    those for certain kinds of policies.
2        Q.  Is this an electronic system?
3        A.  No, that's paper.
4        Q.  How long has that system been used?
5        A.  I really don't know.  Again, more of an
6    underwriting question.
7            (Deposition Exhibit Number 13
8                marked for identification.)
9    BY MR. HUBER:
10       Q.  Handing you what's marked Exhibit 13, it's
11   a document bearing Zurich Bates label 2518.  And
12   it's an email from Rosa Nares, N A R E S, to David
13   Olson dated 9/25/14.
14       Do you see that?
15       A.  Yes.
16       Q.  Are the dates correct?
17       A.  I believe so.
18       Q.  Is that a true and accurate of an email
19   that was sent to David?
20       A.  It appears to be.
21       Q.  Why would she ask whether or not this was
22   an electronic file?
23       A.  I'm not sure.
24       Q.  What would make the difference?  And what
25   was happening at the point this email was sent?

Page 102

1        A.  It looks like they were trying to locate
2    the file, an old claim file, and it's possible the
3    claim system will archive a claim if it's been
4    closed for a period of time.  So I could speculate
5    that maybe she didn't see it in the system, if it
6    was in the archive.
7        Q.  What system was she checking?
8        A.  eZACCESS is what I'm guessing she's
9    referencing.
10       Q.  What is eZACCESS?
11       A.  The claim system.
12       Q.  Is that an electronic system?
13       A.  Yes.
14       Q.  How long has that been used?
15       A.  Since 1986.
16       Q.  Back to my question regarding the last
17   exhibit, before we get to that one, do you know for
18   a fact why Rosa would have been asking whether the
19   file was electronic or not?
20       MR. WRIGHT:  Objection.  Asked and answered.
21   BY MR. HUBER:
22       Q.  You gave me what you said you would
23   speculate would be the answer.  Do you know for a
24   fact why Rosa would be asking David whether this
25   particular claim file was electronic or not when she

Page 103

1    was searching the eZACCESS system?
2        A.  Because she was trying to locate where the
3    file would be stored, so she would look on the claim
4    system, try to get information.  She'd probably look
5    in our onsite storage and then look in offsite
6    storage.  I think she was just trying to get a lead
7    of where that file, where she might look to find it.
8    I guess if it was solely electronic, it wouldn't
9    have a paper file, so maybe she was trying to get at
10   that.
11       Q.  Why would a claim be solely kept
12   electronically as opposed to hard copy?
13       A.  Our newer claims, like in the past 5 years,
14   I'd say most of them are only electronic.  There
15   would only be a paper file set up if there was
16   something that couldn't be stored online or if it
17   was just too difficult to store online.  Sometimes
18   we'll get big binders of information that we'll just
19   put the claim number on and store it in the file
20   room.
21           (Deposition Exhibit Number 14
22               marked for identification.)
23   BY MR. HUBER:
24       Q.  Let's look at our next exhibit there.
25   What was that?  Exhibit 14.

Page 104

1        Is that a true and accurate copy of a
2    series of emails sent to and from David Olson in
3    October of 2014?
4        A.  Yes, it appears so.
5        Q.  And is the Bates label at the bottom right
6    ZURICH2540?
7        A.  Yes.
8        Q.  Anna is saying there she's waiting for a
9    policy from Iron Mountain.  Why would she have to
10   wait?
11       A.  She would order the information to be
12   delivered to the office so ...
13       Q.  How long does it take?
14       A.  Generally 2 to 3 days.
15       Q.  And how does that search system work at
16   Iron Mountain?  Does Anna literally go out there and
17   look at the warehouse, or how does it work?
18       A.  There's an index, so they can search the
19   index to see if there's anything related to the
20   policy or the insured.
21       Q.  And this index would contain what
22   information?
23       A.  It contains -- it depends on what kind of
24   records are being stored.  For the policies, it
25   would contain the policy number.  For claims, it

Page 105

1  would have the claim number. The insured name would
2  be in the index.
3      Q.  So is the index organized in any other way
4  other than the insured's name and a claim number and
5  a policy number?
6      A.  I'm not sure all the fields that they have
7  that they can search on. It's electronic, so they
8  can put in search terms. And I know that they'll
9  use different ways to search for information, like
10  the insured name and the policy number to see if
11  there's anything that comes up on one search versus
12  the other. But I'm not certain all the terms you
13  can search on.
14     Q.  Have you ever seen the index yourself?
15     A.  I've seen printouts of the index because
16  they will provide -- the admin staff will provide us
17  copies of what they found when they typed the terms
18  in the index.
19     Q.  Are there records of the searches that
20  have been made in this case of the Iron Mountain
21  repository?
22     A.  I believe that the storage printouts were
23  with the due diligence form, but I'm not certain.
24     Q.  Is there any other information that was
25  stored at Iron Mountain other than policy info and

Page 106

1  claims info?
2      A.  I believe that there's other company
3  records that are also stored there. I'm not sure of
4  the details.
5      Q.  What other types of information would be
6  stored there regarding Landis+Gyr other than its
7  policies and claims information, if any?
8      A.  I don't believe there would be anything
9  else that's related to specific insureds.
10         (Deposition Exhibit Number 15
11          marked for identification.)
12  BY MR. HUBER:
13     Q.  I'm handing you what's been marked as
14  Exhibit 15. It appears to be an email to which you
15  were a party dated in September 2014.
16         Do you see that?
17     A.  Yes.
18     Q.  Does it appear to be a true and accurate
19  copy of an email between you and Mr. Olson?
20     A.  Yes.
21     Q.  And what is going on here at this point in
22  time in 2014?
23     A.  This looks like the claim had been assigned
24  to Dave, and we're discussing the location of the
25  original notice. There was a file that was noted

Page 107

1  that was an Indiana pollution loss that was found
2  for Landis+Gyr.
3      Q.  And how was that found?
4      A.  In eZACCESS.
5      Q.  And what is eZACCESS again?
6      A.  The claim system.
7      Q.  So how are claims entered into eZACCESS?
8      A.  The claims are entered by the triage staff.
9      Q.  And are they entered by claim number, or
10  are they given a claim number?
11     A.  They assign a claim number, correct.
12     Q.  And what information is saved in eZACCESS?
13     A.  The information relating to the claim,
14  which would be the claim number, the insured name,
15  policy number. There's like a summary of the loss,
16  the loss location, the basic details of the claim,
17  and then the handler would update with
18  correspondence and documents.
19     Q.  There's a redaction here on this page,
20  ZURICH2579. Do you know why that was redacted?
21     MR. WRIGHT:  Objection to the extent that the
22  answer calls for attorney-client privileged
23  information, I'm going to instruct the witness not
24  to answer. We've produced a privilege log in this
25  matter.

Page 108

1  BY MR. HUBER:
2      Q.  Do you have an understanding yourself as
3  to why that was redacted?
4      A.  I don't know.
5      Q.  Your privilege log says: Work product,
6  analysis of coverage issue, redacted.
7         Are you in the business of dealing with
8  David Olson in the ordinary course on other
9  pollution claims in this time frame?
10     A.  Yes.
11     Q.  Can you explain what it is about whatever
12  was redacted that makes it work product?
13     MR. WRIGHT:  Same objection. Same instruction
14  not to answer to the extent that it discloses
15  attorney-client privileged information.
16  BY THE WITNESS:
17     A.  I don't know what was redacted in this
18  case.
19     Q.  Were you talking to another coverage
20  lawyer at this point in time on or around
21  September 19, 2014?
22     A.  I know that the claim was received by the
23  corporate legal department for some reason, so there
24  was some communications with them.
25     Q.  And are there communications with

27 (Pages 105 to 108)

Page 109

```
 1   corporate legal all the time, or what makes it
 2   necessary to have a communication with corporate
 3   legal regarding a pollution liability claim?
 4       A.   I saw reference to a subpoena.  I'm not
 5   sure in this case why it looked like a copy was
 6   routed to our corporate legal area.
 7       Q.   Do you know what lawyer you might have
 8   been consulting with, or do you know for a fact
 9   whether you were consulting with a lawyer in the
10   September 19, 2014 time frame?
11       A.   I don't know for sure.
12       Q.   Are you able to provide any other
13   information that would shed light on whether or not
14   this is, in fact, protected work product, the
15   redaction?
16       A.   No.
17            (Deposition Exhibit Number 16
18             marked for identification.)
19   BY MR. HUBER:
20       Q.   I'm handing you what's been marked as
21   Exhibit 16.  It's a copy of a couple of emails to
22   and from Mr. Olson on or around September 26, 2014.
23            Do you see that?
24       A.   Yes.
25       Q.   Is that a true and accurate copy of those
```

Page 110

```
 1   emails?
 2       A.   It appears so.
 3       Q.   And did these come out of the claims file?
 4       A.   Yes.
 5       Q.   And does the exhibit bear label ZURICH2599
 6   at the bottom?
 7       A.   Yes.
 8       Q.   There's a reference at the top of the page
 9   to:  I am recalling this file from Retrievex/Access
10   storage.  Retrievex is spelled R E T R I E V E X.
11       A.   Yes.
12       Q.   What is that?
13       A.   That's a storage facility that was used by
14   Zurich.
15       Q.   How is that different or similar from the
16   other systems or facilities that you've described so
17   far?
18       A.   Zurich's utilized several different
19   facilities for storage over the years, different
20   locations and different facilities that would be
21   searched when looking for any information.  Iron
22   Mountain is the main one, but there's other
23   locations and facilities that were also used.
24       Q.   Do you know what specific file David was
25   asking Brenda to find at Iron Mountain?
```

Page 111

```
 1       A.   It was the claim file that we identified
 2   earlier.  Yeah, it was the file that we had located
 3   when we were trying to find the notice of the claim.
 4       Q.   And which file was that?
 5       A.   That was that 9120051141.
 6       Q.   And how do you refer to that claim?
 7       A.   It was a claim that looked like it was for
 8   a pollution cleanup in Indiana.
 9       Q.   The Lakeland matter?
10       A.   Yes.
11       Q.   So the Lakeland file was not at the Iron
12   Mountain facility?
13       A.   No.
14       Q.   But it was found in the retrieval --
15   sorry, Retrievex/Access storage system?
16       A.   Yes.
17       Q.   And why was that?  Why was it in one place
18   and not the other?
19       A.   I guess a period of time, that's where the
20   storage was conducted.
21       Q.   What period of time are you referring to?
22       A.   The period after the claim was closed.
23       Q.   So why wasn't that particular Lakeland
24   claim file that you gave us, why wasn't that found
25   in all of the other systems, the eZACCESS or Iron
```

Page 112

```
 1   Mountain or the Zurich Document Warehouse?
 2       MR. WRIGHT:  Objection.  Mischaracterizes the
 3   witness' testimony.
 4   BY THE WITNESS:
 5       A.   The claim was found in eZACCESS.
 6       Q.   How was it found at Iron Mountain before
 7   it was found in eZACCESS?
 8       MR. WRIGHT:  Objection.  Mischaracterizes the
 9   witness' testimony.
10   BY THE WITNESS:
11       A.   The claim was found in eZACCESS.  That's
12   how we got the claim number when we searched when
13   the tender was made.  And then we used that claim
14   number to trace it back to storage.
15            (Deposition Exhibit Number 17
16             marked for identification.)
17   BY MR. HUBER:
18       Q.   Handing you a long exhibit, Ms. Hairrell,
19   regarding --
20       MR. LANSBERRY:  Is this 17?
21   BY MR. HUBER:
22       Q.   It's Exhibit 17.  At the bottom it has
23   Bates label ZURICH941 through and including
24   ZURICH959.
25            Could you tell me what that is?
```

Page 113

1    A.  This would be a printout of the notes in
2  the eZACCESS claim system for the Sagamore claim.
3    Q.  And what is the Sagamore claim number that
4  Zurich assigned?
5    A.  This would be 9120123277.
6    Q.  Take a moment to look at that.  Does that
7  appear to be a true and accurate copy of the claim
8  notes on the Sagamore file?
9    A.  Yes.
10    Q.  And what time period is spanned by the
11  claim notes in Exhibit 17?
12    A.  It's September 19, 2014 through October 19,
13  2016.
14    Q.  So are there also notes from the eZACCESS
15  system that could have been printed for the time
16  period after that, October 19, 2016 to the present?
17    A.  There may be, sure.
18    Q.  Do these notes in Exhibit 17 appear to
19  span the entire time from the notice in September
20  of 2014 until approximately the time the lawsuit
21  ensued?
22    A.  Yes.
23    Q.  Is it kind of in reverse order where the
24  earliest page is at the back?
25    A.  Yes.

Page 114

1    Q.  And do you believe that this is a true,
2  accurate, and complete record of all of the claims
3  activity of Mr. Olson and Ms. York during that time
4  frame?
5    A.  It was the activity that was noted by the
6  handler or handlers.
7    Q.  Can you point to any claims activity,
8  investigation, analysis, communication, anything
9  like that that these claims handlers performed that
10  would not be included in Exhibit 17?
11    A.  I mean, there may be documents or other
12  correspondence like we looked at earlier that would
13  be in the document section of the claim file.
14    Q.  Such as things that would refer to them
15  looking for either a claims file or a policy?
16    A.  Yes.
17    Q.  Aside from those two categories of
18  information, would you expect Exhibit 17 to include
19  everything else that was going on with respect to
20  the Sagamore file?
21    A.  Not necessarily.
22    Q.  Why not?
23    A.  I mean, there were emails and other
24  correspondence in the documents that may or may not
25  be included in the notes.

Page 115

1    Q.  And why is that?
2    A.  Because it's redundant.
3    Q.  So what would determine whether or not
4  that would be included in the printout or not?
5    A.  The printout would be the notes.  The
6  handler wouldn't necessarily note communications
7  that were memorialized in a document in the claim
8  file.
9    Q.  If you would look at page ZURICH943, do
10  you see that?
11    A.  Yes.
12    Q.  There's a reference to some things that
13  are underlined?
14    A.  Yes.
15    Q.  Did you underline that, or who underlined
16  that?
17    A.  No, I did not underline that.
18    Q.  That underline portion says:  Notice was
19  tendered in 1987 pertaining to an unrelated landfill
20  site, paren, Lakeland Disposal Site, that's spelled
21  L A K E L A N D, end parentheses, and possibly other
22  sites.
23        What was referenced there, "and possibly
24  other sites"?
25    A.  That was pertaining to the investigation

Page 116

1  where we pulled the files out of storage for any
2  file that was previously tendered to us that looked
3  like there could be some relationship to the current
4  claim, where we were looking for a prior notice.
5    Q.  Such as the Sagamore site?
6    A.  Right.  We were looking for any notice of
7  the Sagamore site that could have been contained in
8  other prior claims handled by Zurich.
9    Q.  And whose language was this, "and possibly
10  other sites"?
11    A.  Who was the author?  Julie York.
12    Q.  She wrote this at what date or time?
13    A.  It was October 18, 2016.
14    Q.  If you could go to page ZURICH948 --
15    A.  Okay.
16    Q.  -- the bottom of the page, there's a
17  reference to, quote:  Preparing an early-warning
18  memo.
19        Do you see that?
20    A.  Yes.
21    Q.  What is an early-warning memo?
22    A.  That would be a report advising the claim
23  management that there's a claim presented that could
24  be a million dollars or larger.
25    Q.  And who wrote that?

Page 117

1    A.  Julie York.
2    Q.  Was that on October 14th, 2016?
3    A.  Yes.
4    Q.  And did she prepare an early-warning memo?
5    A.  I assume so.
6    Q.  Did she prepare a memo before October 2016
7    regarding an early warning, or is this the first
8    one?
9    A.  I'm not sure.
10   Q.  So what is meant here when Ms. York wrote
11   that previous CP, is that a reference to David
12   Olson?
13   A.  Yes.
14   Q.  Entered a policy No. 88-82246 in eZACCESS.
15   However, this policy was not located in ZDW.  Is
16   that the Zurich Document Warehouse?
17   A.  Yes.
18   Q.  Or via the policy search in CID.  What's
19   CID?
20   A.  That's CIID that we referred to earlier
21   with the policy numbers and policy effective dates
22   that are online.
23   Q.  Okay.  And CIID gives a status of, quote,
24   pre-registered period, end quote.  What does that
25   mean?

Page 118

1    A.  The current policies, the system would have
2    a status that would be either booked, canceled.  It
3    could say submission received.  It would give you
4    the status of the policy issuance.  But the really
5    old policies, the status isn't populated so it just
6    says pre-registered.
7    Q.  Do you have any idea why there are
8    redactions on this page, ZURICH949?
9    A.  I see reference --
10   MR. WRIGHT:  Objection to the extent the answer
11   requires the witness to disclose attorney-client
12   privileged information, I'd instruct the witness not
13   to answer.
14   BY THE WITNESS:
15   A.  I just see V. Russell noted, who I know is
16   in claims legal.
17   Q.  Where is she noted?
18   A.  On the last, I guess, 10/11/2016 note.
19   Q.  Is that Vicky Kaiser, K A I S E R,
20   Russell?
21   A.  I believe so.  I don't know her middle name
22   or her typed name.
23   Q.  What is her role?
24   A.  She's the manager in the claims legal
25   department.

Page 119

1    Q.  Is she a lawyer?
2    A.  Yes.
3    Q.  What's her relationship to, if any,
4    Richard Tunis?
5    A.  She's her -- she's his manager.
6    Q.  So do you know why Ms. York would have
7    been communicating with Mr. Tunis and/or Ms. Russell
8    in this time frame?
9    A.  It looks like it's in regard to coverage
10   counsel.
11   Q.  Do you know whether Zurich retained
12   coverage counsel outside the company prior to the
13   lawsuit?
14   A.  I'm not sure.
15   Q.  Did Zurich ever retain outside counsel to
16   get a coverage opinion before the lawsuit?
17   A.  I don't know for sure.
18   Q.  Has Zurich ever retained coverage counsel
19   to get a coverage opinion about the Sagamore claim,
20   to your knowledge?
21   A.  It looks like there are coverage
22   discussions with our internal claims legal
23   department.  This is the first indication that
24   they're looking at retaining counsel.
25   Q.  And my question was:  To your knowledge,

Page 120

1    has Zurich ever retained coverage counsel to get a
2    coverage opinion about the Sagamore claim?
3    MR. WRIGHT:  Asked and answered.
4    BY THE WITNESS:
5    A.  We consulted our internal counsel.
6    Q.  Did you ever consult with outside counsel
7    about coverage issues and get a coverage opinion?
8    A.  This looks like the first indication that
9    they were discussing outside counsel, and that would
10   be retained by claims legal.
11   Q.  Has Zurich ever obtained a coverage
12   opinion regarding the Sagamore claim from any law
13   firms other than the two represented here, Lewis &
14   Wagner and Hinshaw?
15   A.  No.
16   Q.  Did Zurich obtain a coverage opinion from
17   any of its in-house lawyers regarding the Sagamore
18   claim?
19   A.  I understand we requested coverage advice.
20   Q.  But did Zurich ever obtain a coverage
21   opinion from any of its in-house lawyers regarding
22   the Sagamore claim?
23   A.  I see reference to the request of several
24   different coverage opinions.
25   Q.  Opinions or advice?

Page 121

1    A.  I'm not sure what the difference would be.
2    Q.  Have you ever seen a letter from any
3  in-house Zurich lawyer saying coverage opinion or
4  here's my opinion or anything like that?
5    A.  Generally it's done informally, like there
6  might be an email or phone call with internal
7  coverage counsel.  There was no formal letter.
8    Q.  Is it your testimony that there have been
9  coverage opinions given by Zurich's internal counsel
10  regarding the Sagamore claim?
11    A.  Yes.
12    Q.  During what time frame were those coverage
13  opinions or advice given by Zurich's internal
14  counsel?
15    A.  I'd say after the tender of the claim and
16  continuing.
17    Q.  Well, that's about a 3-year time period.
18    A.  Yes.
19    Q.  So was it continuous, or was it episodic
20  or once or twice or what?
21    A.  I'd say as needed as anything changed in
22  the claim.  If there was legal advice needed, we
23  would reach out to our internal counsel.
24    Q.  Do you recall how many times Zurich's
25  internal coverage counsel was sought out for

Page 122

1  questions or advice between September 2014 and the
2  lawsuit?
3    A.  I mean, I see a couple of references in the
4  notes.  That would be -- so I'd say two or three
5  times.
6    Q.  Is Zurich relying on advice of counsel in
7  the case?
8    A.  No.
9    Q.  Why not?
10    A.  I mean, in the coverage action we're
11  certainly relying on our counsel.  But for the claim
12  handling, the claim department handles the handling
13  of the claim.
14    Q.  So with respect to your unit and the
15  claims handling of the Sagamore claim, it would be
16  your testimony that Zurich is not relying on advice
17  of counsel?
18    A.  Yes.
19    MR. HUBER:  Let's go off the record.
20    THE VIDEOGRAPHER:  We're going off the record
21  at 12:24 p.m.
22        (A lunch break was taken.)
23    THE VIDEOGRAPHER:  We are back on record with
24  the beginning of tape 3 at 1:16 p.m.
25  BY MR. HUBER:

Page 123

1    Q.  Ms. Hairrell, did you have a good lunch?
2    A.  Yes, very good.
3    Q.  Great.  We were talking about Exhibit 17.
4  Do you have that in front of you?
5    A.  Yes.
6    Q.  If you could look at page ZURICH951, do
7  you see that?
8    A.  Yes.
9    Q.  Now, the time frame here is in June
10  of 2016, and Julie York is handling the Sagamore
11  claim; is that right?
12    A.  Yes.
13    Q.  What was she doing, in your understanding,
14  in the June 2016 time frame regarding the Sagamore
15  claim?
16    A.  I understood she was trying to gather the
17  information to wrap up the coverage issues and to
18  try to get an understanding of the site and status
19  and costs and things.
20    Q.  In the middle of the page there, it says:
21  Upon review of the claim file Z notes and other file
22  documentation.  Do you see that?
23    A.  Yes.
24    Q.  What are the claim file Z notes?
25    A.  That would be these notes.

Page 124

1    Q.  So this same exhibit?
2    A.  Yes.  These are the claim Z notes.
3    Q.  And then there's a bunch of redacted
4  information.  Do you see that?
5    A.  Yes.
6    Q.  And then there's a reference to claims
7  legal?
8    A.  Yes.
9    Q.  Do you know who that person was, the
10  claims legal person?
11    A.  It was likely Rick Tunis, but I don't know
12  for certain.
13    Q.  On the privilege log, there's a reference
14  to attorney-client privilege and work product.  I
15  understand Mr. Tunis is a coverage counsel.  But
16  what kind of work product would Ms. York be
17  generating or reviewing or repeating in this exhibit
18  on that page?
19    MR. WRIGHT:  Objection.  I'm going to instruct
20  the witness not to answer to the extent that the
21  answer would disclose attorney-client privileged
22  information or information protected by the work
23  product protection doctrine.
24  BY MR. HUBER:
25    Q.  Go ahead.

Page 125

```
 1        A.  I don't recall exactly what was removed
 2   there, but I would surmise it's discussions that she
 3   had with the claims legal area to get an
 4   understanding of what was happening with the file or
 5   discussions that were had on this file.
 6        Q.  At this point in time, was Mr. Tunis
 7   looking and acting like a coverage lawyer or a
 8   claims handler?
 9        MR. WRIGHT:  Objection to the extent that calls
10   for a legal conclusion.  Instruct the witness not to
11   answer to the extent that the answer would divulge
12   any information protected by the attorney-client
13   privilege or work product protection doctrine.
14   BY MR. HUBER:
15        Q.  Go ahead.
16        A.  Rick Tunis doesn't handle claims.  He would
17   only be -- his work would be with claims legal and
18   not claim handling.
19        Q.  Ms. Hairrell, you've been doing this kind
20   of thing for a while, right?
21        A.  Yes.
22        Q.  How would you understand the line between
23   something that's work product or coverage advice and
24   just handling of a claim?
25        MR. WRIGHT:  Objection.  This calls for a legal
```

Page 126

```
 1   conclusion.
 2   BY THE WITNESS:
 3        A.  My general understanding would be if she's
 4   seeking legal advice, interpretation of the policy
 5   or the jurisdiction involved, that that would be
 6   what her legal discussions that are privileged would
 7   be with our internal counsel.
 8        Q.  What else was Ms. York doing to
 9   investigate the claim at this point in time?
10        A.  I believe she was trying to get the
11   coverage information, the notice documents so that
12   she could complete the coverage evaluation.
13        Q.  Is that it?
14        A.  I mean, it looks like she was trying to
15   evaluate the underlying claim and get an
16   understanding of the site and what was going on and
17   kind of the history at the same time.
18        Q.  What makes you say that it looked like she
19   was trying to evaluate the underlying claim,
20   understanding of the site, and the site history?
21        A.  She references, you know, going to the IDEM
22   website to try to gather some information there.
23   She talks about gathering documentation regarding
24   the cleanup and invoices.
25        Q.  Bottom of page ZURICH951 and the top of
```

Page 127

```
 1   ZURICH952, it says:  But that we would like to move
 2   past it for now and further investigate coverage as
 3   resolving this matter informally is our desire as
 4   well.
 5        MR. WRIGHT:  Objection.  The question
 6   improperly characterizes the statement in the
 7   document.
 8   BY MR. HUBER:
 9        Q.  What's your understanding of Ms. York's
10   intention as of the writing of this phrase?
11        A.  It would seem to me that she's trying to
12   move the claim forward but has been waiting for a
13   long time to get the information needed to complete
14   the coverage investigation; and the information
15   hasn't been forthcoming so she was trying to figure
16   out, you know, if there was, you know, other
17   information that we could gather to try to get this
18   resolved.
19        Q.  When she says on the top of Page 952 "we
20   would like to move past it for now," the "it" there
21   refers to the notice issue; is that right?
22        A.  I believe so.
23        Q.  What did she do to move past the notice
24   issue and further investigate and resolve the matter
25   informally?
```

Page 128

```
 1        MR. WRIGHT:  Objection, again, to the extent
 2   the question improperly characterizes the complete
 3   statement in the document.
 4   BY THE WITNESS:
 5        A.  I mean, it looks like she had the plan of
 6   action to get more documentation regarding the
 7   cleanup, to obtain the invoices and reports and
 8   complete coverage to get -- it looks like she's
 9   trying to compile a reservation of rights to pursue
10   resolution and settlement as her goal in resolving
11   the claim.
12        Q.  The POA on that page, what does that refer
13   to?
14        A.  Plan of action.
15        Q.  The items listed there, No. 1, request
16   documentation regarding cleanup including invoices
17   and records; 2, complete coverage picture; 3, issue
18   supplemental ROR; No. 4, pursue informal resolution
19   settlement.
20        Do you see that?
21        A.  Yes.
22        MR. WRIGHT:  Objection to the extent the
23   question improperly describes the statement in the
24   document.
25        MR. HUBER:  I just read it.
```

Page 129

1      MR. WRIGHT:  "Reports" was not read.
2  BY MR. HUBER:
3      Q.  What was her plan of action, Ms. Hairrell,
4  at that point in time?
5      A.  I think that was what you just read.  She
6  was trying to move forward and see what other kinds
7  of records she could compile to continue
8  investigating the claim.
9      Q.  Did she, in fact, get invoices and
10 reports?
11     A.  I believe she did get some.
12     Q.  Did she complete the coverage picture?
13     A.  No.  She did not get enough information to
14 be able to do that.
15     Q.  Did she issue a supplemental reservation
16 of rights?
17     A.  No.
18     Q.  Did she pursue informal resolution or
19 settlement?
20     A.  It looked like there was discussion but
21 nothing further on that.
22     Q.  And if she really wanted more information,
23 would you expect her to request that from the
24 insured and document that in a letter and/or claim
25 file?

Page 130

1      A.  I believe that there was several requests
2  made for information that were documented in the
3  claim file.
4      Q.  And you would expect her to document in
5  the claim file?
6      A.  Yes.
7      Q.  She has a duty to do that, right?
8      A.  Any kind of claim record should be kept in
9  the claim file, yes.
10     Q.  Did you or someone else at Zurich stop
11 Julie York from completing her plan of action?
12     A.  No.
13         (Deposition Exhibit Number 18
14          marked for identification.)
15 BY MR. HUBER:
16     Q.  Handing you what's been marked as
17 Exhibit 18, pages ZURICH960 through ZURICH966 that
18 we received from Zurich, have you seen this before?
19     A.  Yes.
20     Q.  Is this information from Zurich's claims
21 file concerning the Sagamore site?
22     A.  Yes.
23     Q.  The first page, ZURICH960, are these notes
24 of David Olson?
25     A.  No.

Page 131

1      Q.  Whose notes are they?
2      A.  They're from Anna.
3      Q.  From who?
4      A.  Anna Fronimos.
5      Q.  How do you know that?
6      A.  It looks like she signs it at the bottom;
7  and it's regarding the policy search, which she
8  would have completed.
9      Q.  And who is Arlene, where it says Arlene
10 now in the middle?
11     A.  Arlene is the records manager in Maryland
12 for the Maryland Casualty policies.
13     Q.  Why would she be involved?
14     A.  When Zurich searches for coverage, we
15 search all companies that might have issued
16 coverage, including predecessor companies.
17     Q.  The first date is 10/1/14 records, is that
18 management?
19     A.  Yes.
20     Q.  What is that?
21     A.  That's where Arlene is in Maryland, the
22 records management group.
23     Q.  A second is 10/9/14.  What does that say,
24 resent to --
25     A.  I'm thinking it's records management again.

Page 132

1      Q.  And why did -- who was going back to
2  records management again?
3      A.  Anna.
4      Q.  Okay.  And where is Anna?
5      A.  She is the admin staff in Schaumburg.
6      Q.  So why did she have to go back 8 days
7  later?
8      A.  She's probably following up with Arlene,
9  and the records for Maryland are kept on microfilm
10 so it takes a little while to search all of those.
11     Q.  Those records in Maryland would have been
12 what type of records?
13     A.  Policy records.
14     Q.  And did Landis+Gyr have any policies
15 written on Maryland Casualty paper?
16     A.  I don't believe we found anything in the
17 Maryland records.
18     Q.  For the next entry, 10/9/14, I think, is
19 that right?
20     A.  Yes.
21     Q.  It says Iron Mountain.  What's going on
22 there?
23     A.  It looks like an Iron Mountain search.
24     Q.  And who was performing that search at that
25 time?

Page 133

1      A.  Anna would have been performing that.  I
2  mean, on the next page, it's got her Iron Mountain
3  record that matches where it says 10/9/14 and that
4  she had found a policy from Iron Mountain.
5      Q.  Okay.  And what is the second page there,
6  page number ZURICH961?
7      A.  That's the due diligence policy search that
8  the admin staff complete to show that all the
9  sources that they checked to find a policy copy.
10      Q.  And is this the same policy search due
11  diligence that you were talking about earlier in
12  your testimony?
13      A.  Yes.
14      Q.  So walk me through this process that Anna,
15  David, and others were following.  Was this to find
16  the policies; is that right?
17      A.  Yes.
18      Q.  So it had nothing to do with claim files?
19      A.  No, just to locate policy copies.
20      Q.  Okay.  And this was all happening in
21  October 2014, so kind of right away?
22      A.  Yes.
23      Q.  Walk me through this process, explaining
24  some of the acronyms, if you would, please.
25      A.  Sure.  So the first box, Anna would let

Page 134

1  Dave know she's handling the search.  The second box
2  is for CIID screens, which would be the policy
3  record online.  If there's anything that could be
4  printed from there, the admin staff would print it
5  out.  The coverage drawers, the copies that were
6  retrieved prior might be in the coverage drawers so
7  that staff would check there.
8      Q.  So what again are the coverage drawers?
9      A.  That --
10      MR. WRIGHT:  Objection.  Asked and answered.
11  BY THE WITNESS:
12      A.  That's where if we had had a claim in the
13  past for an insured and we had to find their
14  policies from storage, we'd retain a copy in our
15  location so we don't have to go through that search
16  again.  If there were continuing claims or new
17  claims, we retain a copy of those policies that we
18  find.
19      Q.  Just to clarify, it would be your
20  expectation because of the Lakeland claim, that
21  there should have been some Landis+Gyr policies in
22  the policy drawer?
23      A.  Perhaps.  I mean, it kind of -- it would
24  depend.  We would usually retain a copy if there
25  wasn't a copy retrievable from another source, like

Page 135

1  easily retrievable.  I don't know how long that was
2  the practice for the group to keep copies.
3      Q.  Okay.
4      A.  The copy -- there's thousands of copies of
5  the policies, so there's a lot of policies involved.
6      Q.  In the policy drawers?
7      A.  In the policy drawers, yes.
8      Q.  And are those hard copies?
9      A.  Yes.
10      Q.  The next item is:  Check ZDW.  Is that the
11  Zurich Document Warehouse?
12      A.  Yes.
13      Q.  And that's the electronic warehouse?
14      A.  Yes.
15      Q.  It says no policy there?
16      A.  Right.
17      Q.  What's the next box there?  That seems to
18  be something kind of new we haven't talked about.
19  ZARC Workbench, what is that?
20      A.  Those are some of the underwriting systems
21  that the admin staff can access to check and see if
22  there's a copy stored in one of the underwriting
23  systems.
24      Q.  And what was the result of that search?
25      A.  I'm not sure what that word is.  I'm not

Page 136

1  sure what that first word is.  It looks like it says
2  not completed.  Found maybe because ... it looks
3  like -- huh.
4      Q.  If you can't read it, that's fine.
5      A.  Yeah, it looks like maybe when it was found
6  by Iron Mountain, but that source wasn't checked
7  because that policy had been found.  10/11, yeah,
8  she found the policy on the 9th.  So it looked like
9  she didn't complete the search for ZARC or Workbench
10  due to her finding the policy at Iron Mountain.
11  That ZARC Workbench would have evidence of a policy
12  but generally not a full policy.
13      Q.  Business unit search is left blank.  Why
14  is that?
15      A.  That would be to contact the office where
16  the underwriting took place and see if they, for
17  some reason, had a copy or somewhere they could
18  search to see if they retained a copy of the policy.
19      Q.  And below that, it says:  Contact BU key
20  contact and request underwriting file, N/A.  Why did
21  she write N/A there?
22      A.  I'm thinking because when she already found
23  the policy, that she didn't pursue that source or
24  I'm not sure if the office wasn't perhaps operating
25  any longer.  I don't know what office would have

Page 137

1    written the policy.  Maybe it just wasn't an
2    applicable office to contact any longer.
3         Q.  The next line, it says:  Retrieve policy
4    from Iron Mountain.
5         A.  Yes.
6         Q.  Paren, if BU had them shipped?
7         A.  Yes.
8         Q.  Below that it says:  Retrieve policy from
9    Joyce Records if BU had them shipped.  Why is there
10   this reference to BU?  Is that business unit?
11        A.  Yes.
12        Q.  Okay.  Explain the difference then between
13   Iron Mountain and Joyce Records, J O Y C E.
14        A.  They're just different storage facilities
15   that may have been used over time by the different
16   business units.
17        Q.  The policy that was found at Iron
18   Mountain, was that complete?
19        A.  I'm not sure from this.  The admin staff
20   wouldn't know if the policy was complete or not.
21   They would forward to Dave whatever that they
22   retrieved.
23        Q.  So she found something?
24        A.  Yes.
25        Q.  The reference on 10/14 above or 10 -- what

Page 138

1    is the date on where it says found not completed?
2         A.  I think it's -- oh, yeah, is it -- I'm not
3    sure.  Is it the 14th or the --
4         Q.  10/1/14 perhaps?
5         A.  Yeah, it could be the 1st.
6         Q.  Does that indicate the Iron Mountain
7    policy was incomplete, or can you tell?
8         A.  Yeah, the staff wouldn't -- wouldn't say if
9    the policy was complete or not.  They would not know
10   that.  I mean, the search being completed or the
11   policy being complete, they would not know if what
12   they found was complete or just a partial copy.
13        Q.  Records Management, there's a box down
14   below where it says something is found 10/13/14.  Do
15   you see that?
16        A.  Yes.
17        Q.  There's two dates, 10/1/14 and 10/9/14.
18   Can you explain that?
19        A.  It looks like she was referring to her
20   followup where she contacted Records Management on
21   the 1st and again on the 9th.
22        Q.  What was Records Management?
23        A.  Oh, that was the Maryland, Maryland
24   Casualty records group.
25        Q.  So why would the Maryland Casualty group

Page 139

1    have a Landis+Gyr policy, if none of the Landis
2    paper was written on Maryland Casualty paper?
3         A.  Well, I guess there's a couple things.  We
4    always search there to make sure that we have a
5    complete idea of what kind of policies might have
6    been issued by any Zurich entity to an insured.
7             And then sometimes there's things found
8    that aren't responsive to the claim.  There might be
9    workers' compensation policies or auto policies or
10   there could be, you know, things that aren't
11   applicable that are found in their search and they
12   would forward to us the information that they found.
13   Or there could be nothing at all found or there
14   could be something responsive and they'd send us a
15   copy of the policy.
16        Q.  Whose signature is that at the bottom
17   where it says:  Signature of assigned support staff?
18        A.  That looks like Anna.
19        Q.  So is she signing saying a search for the
20   policy was completed?
21        A.  Yes.
22        Q.  And was it completed as of 10/22/14?
23        A.  Yes.
24        Q.  Had she found all of the Landis+Gyr
25   policies at that point?

Page 140

1         A.  I don't believe so.
2         Q.  But did she still and did Zurich still
3    consider the policy search completed?
4         A.  So the handler would review the due
5    diligence form and determine the next steps, if
6    there's anything additional that could be searched
7    or additional information that we might get from the
8    insured to help us to locate any additional coverage
9    information.
10        Q.  Did Zurich think it needed any more policy
11   information in order to advance the claim and make a
12   decision as of October 22, 2014?
13        A.  I would have to look at Dave's review to
14   see if anything additional was requested from the
15   support group or from any other group.
16        Q.  Based on your review of the file, do you
17   think anything else was needed to be located or
18   found with respect to the policies themselves as of
19   October 2014?
20        A.  I recall the earlier policies were
21   difficult to find, and I don't believe they were
22   found in the initial search.
23        Q.  Is it always essential to find absolutely
24   every single policy before you have enough
25   information to know what kind of policy forms were

Page 141

1    in place and what the coverage was?
2         A. I wouldn't say every time. It varies
3    depending on the circumstances of the search. I
4    mean, sometimes we find like incomplete copies that
5    are enough information that we can tell what the
6    coverage was.
7              Sometimes we find most of the policies but
8    there might be a year that's missing. We can piece
9    together what likely would have been -- you know, if
10   we have secondary evidence for that year, we can
11   kind of piece together what's missing from that. So
12   we generally take what we find from our search and
13   then evaluate whether or not we have enough to
14   decide what the coverage would have been.
15        Q. And in October of 2014, did Zurich believe
16   it had enough of Landis+Gyr's policies?
17        A. I believe that they kept searching to see
18   if there was anything additional that they could
19   find. I think some years were more complete than
20   other years.
21        Q. Well, let's look at the next page,
22   ZURICH963.
23        A. Okay.
24        Q. And is page ZURICH962 and 963 a true and
25   accurate copy of an email involving Anna?

Page 142

1         A. It appears to be, yes.
2         Q. So who's writing the email to whom at this
3    point?
4         A. It looks like Anna is writing to Records
5    Management.
6         Q. If you look down on page ZURICH962, do you
7    see the note where it says: Please note only
8    portions of some of these policies are in ZDW.
9              Why would that be again?
10        A. I mean, if portions of the policies were
11   located in the past, requests can be made to have
12   them added into ZDW so that they're stored online.
13   And that's likely why policies that predated ZDW
14   could be located there. In this case partially,
15   partial policies.
16        Q. Why would any policies be found in ZDW?
17        A. Well, that's the company's place to store
18   policies once that system took effect, so that's the
19   first place we would look to find a policy. We'd
20   look on the remote chance that a policy that
21   incepted before that system went into effect, that
22   somebody might have added it there if they were
23   handling a claim and they were able to get it
24   uploaded into that system.
25        Q. And that system, I think you said, went

Page 143

1    live in 2000?
2         A. Somewhere thereabouts. And different times
3    for different business units.
4         Q. So would that indicate that there had to
5    be some discussion about one of Landis+Gyr's
6    policies after 2000 for it to be found in ZDW?
7         MR. WRIGHT: Objection. Mischaracterizes the
8    witness' testimony.
9    BY THE WITNESS:
10        A. I'd say someone would have had to have
11   located it and had it uploaded into the system, yes.
12        Q. And why would they be doing that if there
13   wasn't some claim or discussion about the policy
14   with Landis+Gyr after 2000?
15        A. Generally it would be because of a claim
16   being made that somebody located policy documents so
17   had them stored in a place that they could be
18   retrieved later.
19        Q. And on the top of Page 963, why did Anna
20   write that there was a need to make a coverage
21   determination, David Olson is the claims handler?
22        A. I think she's trying to let Records
23   Management know that we need this information, you
24   know, as timely as possible because we have a
25   current claim that's being investigated for

Page 144

1    coverage.
2         Q. Was there a need to make a coverage
3    determination on the Sagamore claim as of October
4    2014?
5         A. The handler was trying to gather enough
6    information to make a coverage determination.
7         Q. So the answer is yes?
8         A. Yes.
9              (Deposition Exhibit Number 19
10                  marked for identification.)
11   BY MR. HUBER:
12        Q. I'm handing you what's been marked as
13   Exhibit 19. Is that a true and accurate copy of an
14   email from Julie York dated October 3, 2016?
15        A. It appears to be, yes.
16        Q. And you were copied on that?
17        A. Yes.
18        Q. And does it bear Zurich Bates Number 1306
19   through 1308?
20        A. Yes.
21        Q. What's going on here with respect to the
22   Sagamore matter?
23        A. It looks like Julie's notifying Bob that a
24   coverage action has been filed or noticed to Zurich.
25        Q. Why is she doing that?

Page 145

1    A.  It's required that the vice president be
2  notified of any coverage actions.
3    Q.  The reference at the bottom, it says:  A
4  previous claims legal opinion, and then a big red
5  action there?
6    A.  Yes.
7    Q.  Does that legal opinion pertain to the
8  Lakeland case or Sagamore case, do you recall?
9    MR. WRIGHT:  Objection to the extent the
10  question calls for witness to divulge
11  attorney-client privileged information or
12  information protected by the work product protection
13  privilege.  I instruct the witness not to answer.
14  BY THE WITNESS:
15    A.  It looks like it would apply to the current
16  claim, the Sagamore site.
17    Q.  Do you know for sure?
18    A.  I don't know for sure without seeing that
19  portion.
20    Q.  On the privilege log, it says it's
21  referring to legal advice provided by Zurich's
22  in-house counsel, Rick Tunis, as well as thoughts
23  and impressions of Zurich's potential liability.
24      Are you able to tell me and explain why?
25  Does the potential liability here refer to the

Page 146

1  Lakeland issue or the Sagamore case?
2    MR. WRIGHT:  I'm instructing the witness not to
3  answer to the extent that the answer would divulge
4  attorney-client privileged information or the
5  information protected by the work product immunity
6  doctrine.
7  BY THE WITNESS:
8    A.  I'm not sure what that refers to.
9    Q.  So the reference to possibly other sites,
10  do you see that in the email to Bob from Julie?
11    A.  Yes.
12    Q.  It says:  Notice was tendered in 1987
13  pertaining to an unrelated landfill site, the
14  Lakeland Disposal Site, and possibly other sites,
15  see 5, section below.  Do you see that?
16    A.  Yes.
17    Q.  Do you also see the reference below that
18  to other sites referred to in the complaints,
19  plural.  What is Zurich's understanding as to what
20  these other sites are and the complaints?
21    A.  I think this is Julie's note that we had
22  investigated and found that there were notice
23  provided for other -- the landfill site and a
24  reference to possibly other sites and any claim
25  files related to that were reviewed to determine

Page 147

1  whether there was any relevance to the current
2  claim.
3    Q.  If you turn the page to ZURICH1307, do you
4  see that?
5    A.  Yes.
6    Q.  It looks like there's a quote with a
7  No. 5.  Do you see that?
8    A.  Yes.
9    Q.  What is that, and where did that come
10  from?
11    A.  It looks like it came from correspondence
12  related to the Lakeland site.  She doesn't reference
13  what correspondence.
14    Q.  And does Zurich have an understanding as
15  to what the other complaints are and the other
16  sites?
17    A.  Yes.  We reviewed the Lakeland file and
18  understand the scope of what was handled under that
19  claim.
20    Q.  And what was the scope of the Lakeland
21  claim?
22    A.  It was the Lakeland landfill site.  There
23  were no other claims included in that claim number.
24    Q.  So why did Julie York use the phrase
25  "possibly other sites and complaints," plural, in

Page 148

1  her email?
2    A.  I think she was referring to her
3  investigation on what the scope of that prior notice
4  included and that I know there was a potential that
5  possibly other information could have been included
6  in that file besides Lakeland, so she had
7  investigated to determine if there was any other
8  sites noticed in that claim file.
9    Q.  And did she contact U.S. EPA?
10    A.  Did she request information from the EPA?
11    Q.  Yes.  As part of that investigation you
12  just described.
13    A.  No.
14    Q.  Did she contact anyone outside of Zurich
15  to ask?
16    A.  To ask if our claim file included notice
17  for multiple sites?
18    Q.  Yes.
19    A.  No.
20      (Deposition Exhibit Number 20
21        marked for identification.)
22  BY MR. HUBER:
23    Q.  Ms. Hairrell, I'm handing you Exhibit 20.
24  It's a copy of a letter from your counsel, Lewis &
25  Wagner, dated September 22, 2017.

37 (Pages 145 to 148)

Page 149

1    A.  Okay.
2    Q.  And it's from a Michael Giordano.  Do you
3  see that?
4    A.  Yes.
5    Q.  Is he one of the lawyers over at Lewis &
6  Wagner?
7    A.  Yes.
8    Q.  And did you or others at Zurich have input
9  into the search for information that is reflected in
10  this letter?
11    A.  Yes.
12    Q.  And who confirmed that the information in
13  the letter was accurate at Zurich?
14    A.  That would be the claim handler, Julie
15  York.
16    Q.  Did anyone else sign off on it?
17    A.  Possibly our internal legal group.
18    Q.  Did you sign off on it?
19    A.  No.
20    Q.  Were you involved in the search for claims
21  information and policy information that's discussed
22  in this letter?
23    A.  Not directly, no.
24    Q.  Let's get another exhibit here.  Keep that
25  open if you would, Ms. Hairrell.  We've got another

Page 150

1  exhibit coming right up.
2           (Deposition Exhibit Number 21
3            marked for identification.)
4  BY MR. HUBER:
5    Q.  Same series of questions.  Exhibit 21,
6  does that appear to be a true and accurate copy of
7  another letter from Mr. Giordano at Lewis & Wagner
8  regarding a search and information conveyed to
9  Landis+Gyr in a letter dated September 25, 2017?
10    A.  Yes.
11    Q.  So 3 days after the September 22 letter?
12    A.  Yes.
13    Q.  Feel free to toggle back and forth here as
14  you need to.
15    I'd like to refer you to question No. 7 on
16  Page 2 of the first letter.
17    A.  Okay.
18    Q.  Did Zurich, in fact, confirm that it had
19  produced the entire claims file for the Lakeland
20  Disposal site?
21    A.  Yes.
22    Q.  And did Mr. Giordano confirm that again in
23  the September 25 letter, Exhibit 21?
24    A.  Yes.
25    Q.  Is that what he meant there in the fourth

Page 151

1  paragraph down that's indented where he said:
2  Zurich has produced all claim files it has for
3  claims made by Landis+Gyr for environmental
4  contamination in Indiana.  This includes the entire
5  claim file for the Lakeland Disposal site and
6  Sagamore site which was referred to as David's files
7  in one of the notes.
8       Was that accurate as of September 2017?
9    A.  Was it accurate that we produced the claim
10  files?
11    Q.  Yes.  Did you produce all of the Lakeland
12  Disposal site file first?
13    A.  Yes.
14    Q.  And is it Zurich's contention the only
15  claim that Landis+Gyr made for environmental
16  contamination in Indiana was that Lakeland Disposal
17  site?
18    A.  Yes.
19    Q.  At the bottom of Exhibit 21 on the first
20  page, do you see the statement:  Zurich has not
21  split its file?
22    A.  Yes.
23    Q.  And was that accurate, that Zurich did not
24  and still has not split its file?
25    A.  Split in what regard?

Page 152

1    Q.  Do you understand what that means when an
2  insurance company splits or separates the claims
3  handling function from the coverage side of the
4  file?
5    A.  We don't split coverage and claim handling
6  at Zurich.
7    Q.  Never?
8    A.  No.
9    Q.  Okay.  Have you ever heard of the term
10  Cumis counsel, C U M I S?
11    A.  Yes.
12    Q.  What's your understanding of when Cumis
13  counsel is required?
14    MR. WRIGHT:  Objection.  Calls for a legal
15  conclusion.  Relevance.
16  BY MR. HUBER:
17    Q.  Or Peppers counsel in Illinois?
18    A.  Yes.
19    Q.  Okay.  Explain to us what is referred to
20  by Cumis counsel or Peppers counsel and why they are
21  required?
22    MR. WRIGHT:  Same objections.
23  BY THE WITNESS:
24    A.  In some instances, the insured has a right
25  to retain their own counsel, usually based on

Page 153

1    coverage reservations that the insurance company
2    might have and might assert on the claims so the
3    insured is able to retain their own counsel to
4    protect their interests in that case.
5         Q. Because of the conflict of interest
6    created by the coverage position, is that right,
7    that gives rise to this right?
8         A. Yes.
9         Q. So you are familiar with that concept?
10        A. Yes.
11        Q. Okay. Let me go back because I don't want
12   to fool you or trick you in any way. Is it your
13   testimony that Zurich has not done that and has
14   never done that where it separates its file because
15   of a conflict of interest?
16        MR. WRIGHT: Objection. Mischaracterizes the
17   witness' testimony.
18   BY THE WITNESS:
19        A. I don't want to answer for all of Zurich,
20   but the pollution claim department doesn't split
21   coverage and claim handling on their files.
22        Q. Even when it is providing a defense under
23   a reservation and that reservation creates a
24   conflict?
25        A. The conflict is created with the defense of

Page 154

1    the suit, which is what's resolved by the Cumis
2    counsel. So there isn't a conflict in the handling
3    of the claim.
4         Q. So in cases when Zurich does appoint Cumis
5    counsel, it does not split the file internally?
6         A. Zurich wouldn't appoint Cumis counsel. The
7    insured would select Cumis counsel.
8         Q. Right.
9         A. So then the insured has their own attorney
10   to protect their interests.
11        Q. So in cases when the policyholder picks
12   independent counsel, Cumis counsel or Peppers
13   counsel, it's Zurich's practice not to split the
14   file back at the office?
15        MR. WRIGHT: Objection. Relevance.
16   BY THE WITNESS:
17        A. Correct.
18        Q. So does Zurich believe it has a conflict
19   in the Sagamore case given its position in the
20   coverage?
21        MR. WRIGHT: Objection. Calls for legal
22   conclusion.
23   BY THE WITNESS:
24        A. There hasn't been a coverage determination,
25   so I don't see why there would be a conflict.

Page 155

1         Q. So it's your view you don't need to make
2    that decision at this point in time; is that fair?
3         A. Yes.
4         Q. Just to be clear, when Zurich found this
5    Lakeland file, the Landis+Gyr Lakeland Disposal
6    file, where did it find that file?
7         A. At the records facility. I think it was
8    Retrievex.
9         Q. And it did not find that Lakeland file at
10   Iron Mountain?
11        A. Correct.
12            (Deposition Exhibit Number 22
13             marked for identification.)
14   BY MR. HUBER:
15        Q. Handing you what's been marked as
16   Exhibit 22, do you have that?
17        A. Yes.
18        Q. And does Exhibit 22 contain Bates range
19   ZURICH1309 through and including ZURICH1339?
20        A. Yes.
21        Q. And is that a true and accurate copy of
22   Zurich's records-retention policy effective 6/1/85?
23        A. Yes.
24        Q. What is this?
25        A. It looks like the procedures for the

Page 156

1    records retention in 1985.
2         Q. For Zurich?
3         A. Yes.
4         Q. And does this pertain to policies, claims
5    files, and -- among other things?
6         A. Yes.
7         Q. If you look at the bottom of the first
8    page, you see two acronyms: ZAI and ZALIC. What
9    does that refer to?
10        A. I believe it would be Zurich American Life
11   Insurance Company, which at one point we had a life
12   insurance company.
13        Q. Yep. ZAI is?
14        A. Zurich American Insurance. We usually
15   refer to it as ZAIC, so I'm not positive.
16        Q. This is the old days.
17        A. Yeah. I'm not sure.
18        Q. Have you had much experience with this
19   records-retention policy from '85?
20        A. I mean, I've reviewed the records-retention
21   policies in the past. I'm familiar with the
22   document and the guidelines somewhat.
23        Q. Go to page ZURICH1312, if you would.
24        A. Okay.
25        Q. This is a reference to some kind of

Page 157

1    schedule for clerks.
2        A.  Yes.
3        Q.  Can you explain to me what was going on
4    here per this records-retention schedule?
5        A.  My general understanding is that there were
6    kind of some guidance on evaluating the time it took
7    to go through records to purge them at the purge
8    dates.  And my understanding from talking with the
9    records group was that it was kind of a
10   cost-benefit-type analysis where they weren't going
11   to spend a lot of money to purge records, that it
12   should at least be considered, you know, if there's
13   a lot of time and effort being taken to purge the
14   records, that that should be evaluated in the
15   decision.
16       Q.  Did you talk to anyone who was actually
17   around in 1985 who could give firsthand testimony
18   about this purging schedule for documents that were
19   purged, stored, retrieved, or destroyed?
20       A.  No.  I only talked to the records group
21   that's there now that understands more of the
22   history of how Zurich had handled the retention.
23       Q.  Who had you talked to at the records
24   group?
25       A.  That was the Joel Robinette that I

Page 158

1    mentioned earlier.
2        Q.  Did you talk to anyone other than Joel
3    Robinette at the records group?
4        A.  No.
5        Q.  How old is Joel Robinette, if you know?
6        A.  I would guess 50s.
7        Q.  Do you know if he was there in 1985?
8        A.  I don't believe he was.
9        Q.  Were you able to talk to anyone that was
10   actually there in the records group dealing with
11   records-retention issues in 1985?
12       A.  No.
13       Q.  Do you know how many people were doing
14   purging, destroying, and retrieval projects per this
15   retention policy in the 1980s?
16       A.  Joel's information was that there were some
17   Zurich documents that were purged but it didn't
18   involve any policies or claims.  So he said most of
19   the records were retained.  They were not purged.
20       Q.  And you say "Joel's information," where
21   did that come from?
22       A.  Historical management of the storage
23   facilities is one source that he keeps track of
24   where we have our records, the costs of that, and
25   just management over all of our historical records.

Page 159

1        Q.  Did he talk to someone else to get his
2    information about what was going on in 1985?
3        A.  I understand he's been with the company for
4    many years.  Not back to '85, but many years.  And
5    as part of his job, he understands what's retained
6    and what the history of the company is as far as
7    records retention.
8        Q.  Can you identify anyone that he talked to?
9        A.  Over the course of his employment?
10       Q.  No.  About this issue about what was
11   actually happening or not happening in 1985 or in
12   the '80s.
13       A.  And that's his role --
14       Q.  With respect to records retention?
15       A.  -- to know Zurich's policies and to manage
16   the records.  In the course of his job, that's his
17   knowledge.
18       Q.  Okay.  If there wasn't anyone he could
19   talk to, were there documents or papers that he
20   could look at that explained how the
21   records-retention policy was being applied at Zurich
22   in the '80s?
23       A.  I mean, I can just surmise over I
24   believe --
25       Q.  No, I don't want you to surmise.  I just

Page 160

1    want an answer to my question.
2        A.  He didn't research anything with regard to
3    this issue.  He shared his general knowledge of his
4    job with me on how the records are stored and
5    managed.
6        Q.  Okay.  And do you know where he got his
7    general knowledge?  Was he talking to someone who
8    was there before him, or was he looking at some
9    piece of paper other than the document-retention
10   policy that he had produced for the '80s?
11       A.  I imagine he gathered the information over
12   his many years of employment with Zurich.
13       Q.  Do you know for sure where he got his
14   information?
15       A.  I don't know, no.
16       Q.  On page ZURICH1313 --
17       A.  Okay.
18       Q.  -- if you look at the middle paragraph
19   where it says HO records storage and destruction, do
20   you see that?
21       A.  Yes.
22       Q.  The end of that section, it says:  The
23   destruction of claim files will be done according to
24   the most current retention procedure.
25           Is the retention procedure outlined in

Page 161

1  this document?
2      A.  Yes.
3      Q.  And are there different schedules that
4  apply to policies and different schedules that would
5  apply to claims files?
6      A.  Yes.
7      Q.  And the kinds of records that we're
8  talking about here, is it basically three things:
9  claims files, policy documents, and underwriting
10  files?  Or is there more or less?
11      A.  I believe that would apply to any
12  documents, so it could be general sort of documents
13  that don't fit in the categories of policies or
14  claims or underwriting.
15      Q.  Okay.  Go to page ZURICH1321.
16      A.  Okay.
17      Q.  Do you see the reference to the purge
18  audit schedule?
19      A.  Yes.
20      Q.  What's Zurich's understanding of the
21  purpose of this schedule?
22      A.  I think it's kind of similar to the
23  document we looked at before describing the process
24  and the time and cost versus for the purging of the
25  files and evaluating that.

Page 162

1      Q.  How many people were engaged in the job of
2  purging files per this schedule in the '80s?
3      A.  I don't know.
4      Q.  At times in this records retention
5  document, it almost suggests, like, everyone is
6  supposed to be purging files for a portion of their
7  workday.  I'm trying to understand is that really
8  accurate, or who actually does the purging?
9      MR. WRIGHT:  Objection.  Mischaracterizes the
10  document.  Compound question.
11  BY THE WITNESS:
12      A.  From my discussions with the records group,
13  I understand there was very little purging that was
14  done.  So I would think it would be a small project
15  involving documents other than policies and claim
16  files.
17      Q.  Again, this is your conversation with
18  Joel?
19      A.  Yes.
20      Q.  And do you have notes of that
21  conversation?
22      A.  Some.  I took some notes during that
23  conversation.
24      MR. HUBER:  We would like a copy of those
25  notes.

Page 163

1  BY MR. HUBER:
2      Q.  So are you able to tell me how you would
3  decide when the document-retention policy would call
4  for a file to be purged or destroyed?  Are you
5  familiar with this?  I'm looking at page ZURICH1323,
6  for instance, as just one example.
7      A.  Okay.
8      Q.  What kind of file is this page referring
9  to?
10      A.  This would be for different types of claim
11  claims.
12      Q.  Okay.  So if you have a bodily injury or
13  property damage, that would be a liability claims
14  file, right?
15      A.  This has claim series 5, which would be --
16      Q.  First party?
17      A.  Right.  Which is usually first party.  And
18  there's some limited claim series 5 that would be
19  casualty bodily injury for certain types of
20  policies.  Most general liability claims would be
21  under series 9.
22      Q.  Series 9, okay.  That would be page
23  ZURICH1325?
24      A.  Yes.
25      Q.  So there a file would be destroyed at what

Page 164

1  point in time according to the retention policy?
2  For claims series 9, liability other than
3  automobile.
4      A.  This looks like it would prescribe the
5  minimum time that the office would need to retain
6  the file, but it didn't require any destruction of a
7  file.  So it would tell the office that they had to
8  maintain it for the certain amount of time that was
9  specified.  In this case, 5 years after closing that
10  it would remain in storage, unless the statute was
11  longer.
12      Q.  And if you look at the statute of
13  limitations page, ZURICH1329 --
14      A.  Okay.
15      Q.  -- it looks like the shortest statute of
16  limitations is 6 years.  Is that your understanding?
17  Just for the states that are listed?
18      A.  Yeah.
19      Q.  And does that define when a file no longer
20  needs to be retained?
21      A.  Yeah.  The office would need to check the
22  statute to determine if 5 years met the statute or
23  if longer time was required.
24      Q.  And does it say anywhere in this document
25  that the policies are not supposed to be destroyed

1 after the retain-in-storage time frame has expired?
2     A. That they're not to be destroyed?
3     Q. Yeah. You mentioned earlier that the
4 files weren't destroyed, although that seems to be
5 the point of this retention policy.
6         Is there somewhere in this document that
7 it actually says that?
8     A. I don't believe so. I don't think it
9 requires destruction or retention just to the extent
10 that the guidelines are met to retain them for a
11 minimum amount of time.
12     Q. What about for insurance policies? How
13 are they treated under the document-retention policy
14 of Zurich in the '80s?
15     A. There was a section on the policy
16 retention. I guess it's broken out by different
17 underwriting divisions, business units. So there's
18 a section like commercial casualty underwriting,
19 property casualty underwriting, umbrella
20 underwriting.
21     Q. Uh-huh.
22     A. So it looks like there are different
23 guidelines for each group.
24     Q. Well, if we're talking about a general
25 liability policy that's an occurrence-based policy,

1 wouldn't it be important to keep those kind of
2 policies forever?
3     A. I think that's -- depending on the period
4 of time, the -- I mean, the retention policy is a
5 lot different now than it was back at this point in
6 time. But I think all the records are important to
7 retain. I think that's why Zurich has retained them
8 all to this point.
9     Q. I'm trying to understand what the
10 retention policy was in the '80s. You would agree
11 with me that an occurrence-based policy never really
12 expires, right?
13     A. The term expires. But, I mean claims can
14 be made as long as there was an occurrence.
15     Q. That's what a latent claim is, for
16 instance?
17     A. Yes.
18     Q. So given that these general liability
19 policies would be occurrence-based policies,
20 wouldn't it be important to keep policies forever?
21     A. We know that now, sure.
22     Q. Yet would you agree that the
23 records-retention schedule for policies in this
24 document, Exhibit 22, does allow Zurich to destroy
25 certain types of liability policies after a period

1 of time?
2     A. Yes.
3     Q. And short of having someone actually
4 watching the file room in the '80s, there would be
5 no way of knowing what types of documents were kept
6 and what types of documents might have been purged?
7     A. Well, we have records of the documents that
8 we retain that we currently in storage.
9     Q. Right. You know what you have.
10     A. Right.
11     Q. But my question pertains to what you don't
12 have and what may or may not have been destroyed per
13 your retention policy.
14     A. Yeah, I wouldn't -- I guess it's always
15 possible somebody throws something away.
16     Q. Let's go to the next exhibit here, this
17 one.
18     A. But even if they threw something away, we'd
19 still have a system record of that, either in the
20 index for our claim system or our storage records.
21 If something was destroyed, we would still have the
22 original policy or claim number.
23        (Deposition Exhibit Number 23
24        marked for identification.)
25 BY MR. HUBER:

1     Q. What is Exhibit 23?
2     A. It looks like part of the records-retention
3 policy.
4     Q. For which time period does this apply? Is
5 it 1990?
6     A. Yeah, it's dated 12/21/90.
7     Q. Do you know why this was issued following
8 the Exhibit 22, the 1985 records-retention policy?
9     A. It looks like it might supplement to
10 provide additional categories. I think there would
11 be a cover page with the context of what it was
12 from.
13     Q. One question I didn't ask you on
14 Exhibit 22, if you'll go back to that quick --
15     A. Okay.
16     Q. -- page ZURICH1319, do you have that?
17     A. Yes.
18     Q. In the middle there, there's a 1, 2, and a
19 3. Do you see that?
20     A. Yes.
21     Q. And in the Paragraph No. 2, there's a
22 reference to eligible for inactive storage. What
23 makes a file eligible for inactive storage?
24     A. I'm not sure. I'm not sure what that
25 refers to.

1    Q.   And do you know what the records-retention
2  policy would be for states such as Indiana where
3  there isn't a listed statute of limitations in the
4  retention schedule?
5    A.   For 1985?
6    Q.   Yes.
7    A.   For the 1985 period, it would be the
8  section that we looked at for the series 9, claim
9  series 9, on ZURICH1325.
10    Q.   That's what would apply to Indiana?
11    A.   Unless the statute was longer, it would
12  require retention for 5 years after closing.
13    Q.   Okay.  And if you look back to the page
14  that had a number of states listed, the longest
15  statute of limitations was 6 years, but Indiana was
16  not actually listed.
17        My question was:  Do you know how this
18  would have been applied to a claim or a file
19  relating to Indiana given that it's not listed on
20  this page, ZURICH1329?
21    A.   Yeah, I mean, it states that the person
22  that was going to purge would need to review the
23  statute of limitations to see if it had changed or
24  was correct here.  And then if there was nothing
25  requiring retention longer than the 5 years, then

1  there wasn't a requirement to retain that longer
2  than that period of time.
3    Q.   Okay.  And does Exhibit 23 pertain to
4  general liability claims?  Does it change anything
5  with respect to the retention policy that was in
6  effect in '85?
7    MR. WRIGHT:  Objection to the extent the
8  document is incomplete.
9  BY THE WITNESS:
10    A.   It doesn't say what it refers to here.
11    Q.   This appears to be incomplete.  It's only
12  two pages.  Does that mean there's more of the 1990
13  retention policy that is missing?
14    A.   I don't know if this was meant to update a
15  prior version.  It's definitely not a complete
16  manual.
17        (Deposition Exhibit Number 24
18         marked for identification.)
19  BY MR. HUBER:
20    Q.   Is Exhibit 24 a copy of the retention
21  schedule for the retention policy for the period
22  2/1/91, or February 1991?
23    A.   Yes.
24    Q.   If you look at page ZURICH1380 and 1381,
25  my question is:  Why is there a difference in the

1  retention schedule for first-party property claims
2  and third-party liability claims?
3    A.   I don't see the policy for third-party
4  liability.
5    Q.   The bottom of Page 1380, the question was:
6  Why is there a difference between the retention
7  schedule for claim series 4, third-party liability,
8  and claim series 5, first-party property?
9    A.   Oh, for auto claims?
10    Q.   Well, it doesn't say the word "auto" on my
11  copy on the bottom.
12    A.   Claims series 4 are auto claims.
13    Q.   Okay.  I think that is a good answer to
14  the question.
15        Let's go to claim series 9.  That's
16  blacked out.  Any idea why that's blacked out?
17    A.   No.
18    Q.   And your testimony is claim series 9 would
19  be what would apply to a Landis+Gyr CGL policy?
20    A.   Yes.
21    MR. HUBER:  Do you all know why that's blacked
22  out?
23    MR. WRIGHT:  We'll take a look at it.
24  BY MR. HUBER:
25    Q.   Ms. Hairrell, do you know was there

1  something wrong with the 1985 document-retention
2  policy and why is it being changed in 1991?
3    A.   The policy is updated constantly.
4    Q.   But why?  I mean, is there a particular
5  reason why it was updated?  I know it's no longer
6  1985, but what would be different?
7    A.   Usually it's updated depending on the kind
8  of the business that the company is writing and the
9  legal guidelines and requirements as they change
10  over time and the identified needs of the company.
11        (Deposition Exhibit Number 25
12         marked for identification.)
13  BY MR. HUBER:
14    Q.   All right.  Let's go to 1992.  Is that
15  Exhibit 25 that you have there?
16    A.   Yes.
17    Q.   Is Exhibit 25 a true and accurate copy of
18  the retention schedule for the Zurich retention
19  policy for the period May 1992?
20    A.   It looks like it is.  The page numbers are
21  in a strange order is all.
22    Q.   Would you agree this appears to be
23  incomplete, at least in part?
24    A.   It does.
25    Q.   Unlike the very first one, it doesn't seem

Page 173

1    to stand on its own?
2        A.   Correct.
3        Q.   If you look at page ZURICH1391, the last
4    page, do you see that?
5        A.   Yes.
6        Q.   Does that indicate that casualty policies,
7    including primary, excess, umbrella liability, are
8    not to be destroyed?
9        A.   Yes.
10       Q.   So they're to be kept indefinitely?
11       A.   Yes.
12           (Deposition Exhibit Number 26
13            marked for identification.)
14   BY MR. HUBER:
15       Q.   Do you have Exhibit 26 in front of you?
16       A.   Yes.
17       Q.   Does that appear to be a copy of an update
18   to the corporate records and Zurich retention manual
19   for the period September 1993?
20       A.   Yes.
21       Q.   Now, do these come out of some kind of a
22   manual or a three-ring binder or book?  Or how are
23   they kept?
24       A.   Historic records, policies, I don't know
25   how they're kept.  We have a current policy that's

Page 174

1    on our online ...
2        Q.   So we just went through a number of
3    retention schedules that have been updated, you
4    know, 1991, 1992, 1993, 1990.  Does that mean that
5    the rest of the retention policy from the 1985
6    retention manual, the more complete document that we
7    looked at, that that still applies at, that Exhibit
8    Exhibit 26 only replaces a portion of that original
9    manual?
10       MR. WRIGHT:  Objection.  Compound question.
11   BY THE WITNESS:
12       A.   I don't know how much is available on the
13   historic record-retention policies and how they're
14   stored.  I would assume it was the area I talked to
15   that maintains those.
16       Q.   So is it fair to say that this retention
17   policy is evolving at least from '85 through '93?
18       A.   It's updated all the time, yes.
19           (Deposition Exhibit Number 27
20            marked for identification.)
21   BY MR. HUBER:
22       Q.   Let's do '94.  Is Exhibit 27 a true and
23   accurate of an update to the document retention
24   schedule for Zurich for the period August 1994?
25       A.   It looks to be pages from it.

Page 175

1        Q.   Again, it looks like claim series 9 is all
2    blocked out.
3        MR. HUBER:  Tim, Page 1345.
4    BY MR. HUBER:
5        Q.   Is it still your testimony that that's a
6    category that would apply to a Landis+Gyr CGL
7    policy?
8        A.   To claims under a CGL policy, yes.
9        MR. HUBER:  We can take a break here.
10       THE VIDEOGRAPHER:  We're going off the record
11   at 2:47 p.m.
12           (A short break was taken.)
13       THE VIDEOGRAPHER:  We are back on record with
14   the beginning of tape 4 at 3:00 p.m.
15           (Deposition Exhibit Number 28
16            marked for identification.)
17   BY MR. HUBER:
18       Q.   I'm handing you what's been marked as
19   Exhibit 28, a policy inventory list.  Do you see
20   that?
21       A.   Yes.
22       Q.   Is that a true and accurate copy of a
23   policy inventory list produced by Zurich bearing
24   Bates label ZURICH1005?
25       A.   Yes.

Page 176

1        Q.   Do you know who prepared this?
2        A.   No, I do not.
3        Q.   Is this something that one of the claims
4    handlers or the records folks must have prepared
5    during the course of the investigation?
6        A.   I'm not sure.
7        Q.   What's the significance of the designation
8    at the bottom left corner, down here?
9        A.   I don't know.
10       Q.   Is this a document that Zurich prepared?
11       A.   I don't know where this came from, if it
12   was the claim file or other documents that we
13   provided.
14       Q.   There's a reference to a policy being
15   pre-registered.  Do you see that in the second box
16   from the bottom on Exhibit 28?
17       A.   Yes.
18       Q.   I believe this refers to policy
19   No. 88-82-246?
20       A.   Yes.
21       Q.   What does pre-registered mean?
22       A.   That means that the -- in the CIID system,
23   it doesn't have a designation of the status, so it's
24   listed as pre-registered.  Old policies wouldn't
25   have information on when they were booked or

Page 177

1  canceled or non-renewed. Any of those status
2  designations wouldn't be included, so they would be
3  listed as pre-registered.
4      Q. Based on your review of how Zurich
5  conducted its search for Landis+Gyr's policies, we
6  had two claims handlers, either David Olson or Julie
7  York, performing that search or directing others to
8  perform that search.
9      To the best of your knowledge, who would
10  have prepared this inventory list, Exhibit 28?
11     A. I don't know.
12     Q. Is it true that certain of the Zurich
13  policies were not located?
14     A. I believe certain were incomplete. I
15  wasn't aware there were some that were not located.
16     Q. Well, you would agree that under the
17  retention policy, Zurich was supposed to keep all of
18  Landis+Gyr's policies; is that fair?
19     A. There were specified time frames that
20  policies could be destroyed under the retention
21  policy for different periods of time.
22     Q. So was Zurich supposed to keep all of
23  Landis+Gyr's policies indefinitely, or was Zurich
24  permitted to destroy certain of Landis+Gyr's
25  policies under Zurich's retention policies?

Page 178

1      MR. WRIGHT: Objection. Compound question.
2  BY THE WITNESS:
3      A. Could you repeat the question?
4      Q. Under Zurich's retention policies, was
5  Zurich permitted to destroy certain of Landis+Gyr's
6  liability insurance policies?
7      A. The policy that we reviewed for I believe
8  it was 1985 had dates where Zurich was not required
9  to keep those policies, correct.
10     Q. Even though Zurich continued to sell
11  liability insurance policies to Landis+Gyr after
12  1985?
13     A. The policy in effect at the time, the
14  policy expired would govern whether Zurich was
15  required to keep those records or not. That spans a
16  lot of years, so it would seem to be several
17  policies in effect during the time period of the
18  Landis+Gyr policies.
19     Q. Do you know how long Zurich was supposed
20  to keep Landis+Gyr's liability policies under its
21  retention policy?
22     A. It would depend on the time period that the
23  policy was issued.
24     Q. How about for the 1977 policy? How long
25  was Zurich supposed to keep that one?

Page 179

1      A. I would have to review the retention policy
2  for that time period.
3      Q. Feel free to go ahead and do that. You
4  can look at the 1985 policy all the way up to
5  Exhibit 22, which is the most recent one.
6      A. So in 1977, I don't know. We don't have a
7  policy for that.
8      Q. How about the '77 to '78 and the '79 to
9  '80 Landis+Gyr policies? How long was Zurich
10  supposed to keep those?
11     A. I don't know.
12     Q. How long was Zurich supposed to keep the
13  1980 to '84 Landis+Gyr policies?
14     A. I don't know.
15     Q. How long was Zurich supposed to keep the
16  1984 to '88 Landis+Gyr policies?
17     A. I assume those would be covered with the
18  retention policies we reviewed earlier for 1985.
19  There are guidelines. It was 5 years after -- it
20  might have been claims. It would depend on the
21  category of the policies and which division wrote
22  the policy and which section of the retention policy
23  would apply.
24     Q. These particular policies were general
25  liability policies, right?

Page 180

1      A. Yes. There's sections for excess
2  umbrellas, for other commercial umbrella, general
3  liability umbrella. So yeah, it would depend what
4  section.
5      Q. It would depend on what?
6      A. On which section applied.
7      Q. Okay. Which section does apply?
8      A. It looks like there's a section for the
9  commercial general liability umbrella policies that
10  would be on the last page of the 1985
11  records-retention policy to retain indefinitely.
12     Q. So in that case, that type of policy
13  should not ever be destroyed, right?
14     A. Yes.
15     So I'm trying to find the section on the
16  primary policies.
17     Q. If you look at page ZURICH1339 --
18     A. Okay.
19     Q. -- what does that say there?
20     A. What does it say where? Umbrella
21  underwriting?
22     Q. Yes.
23     A. Okay.
24     Q. Does that indicate that general liability
25  umbrella policies should be retained indefinitely?

Page 181

1　　　　A.　Yes.
2　　　　Q.　Do you have an explanation as to how some
3　of Landis+Gyr's policies came to be destroyed,
4　purged, or misplaced?
5　　　　MR. WRIGHT:　Objection.　Mischaracterizes the
6　witness' testimony.
7　BY THE WITNESS:
8　　　　A.　That underwriting designee was going to
9　testify on that.
10　　　　Q.　That's something we should ask that
11　person?
12　　　　A.　Yes.　They were involved in the
13　underwriting.
14　　　　　　(Deposition Exhibit Number 29
15　　　　　　marked for identification.)
16　BY MR. HUBER:
17　　　　Q.　Okay.　I've handed you what's been marked
18　as Exhibit 29.　This is an interoffice memorandum
19　from Tom Lysaught, L Y S A U G H T, to all account
20　specialists produced by Zurich dated January 14,
21　1994.
22　　　　　Do you see that?
23　　　　A.　Yes.
24　　　　Q.　Is this a true and accurate of
25　Mr. Lysaught's memo regarding environmental claims

Page 182

1　controls?
2　　　　A.　Yes.
3　　　　Q.　What is the purpose of this kind of an
4　interoffice memo?
5　　　　A.　It looks like best practices.
6　　　　Q.　What was the purpose of this memo?
7　　　　A.　It looks like it's providing guidance to
8　the environmental claim department on claim handling
9　and authority.
10　　　　Q.　Do you know why it was sent?
11　　　　A.　The claim department has a best practices
12　and authority policy that provides guidance for us.
13　I assume it's part of that.
14　　　　Q.　Was there a particular problem or concern
15　that prompted this memo being sent in January of
16　'94?
17　　　　A.　Not that I'm aware.
18　　　　Q.　Who was Tom Lysaught?
19　　　　A.　He was a claim executive.　I'm not sure his
20　title in 1994.
21　　　　Q.　Is he still around?
22　　　　A.　No.
23　　　　Q.　Is he still living?
24　　　　A.　I believe so.
25　　　　Q.　Do you know where he's living?

Page 183

1　　　　A.　No.
2　　　　Q.　John Shane, who is that?
3　　　　A.　He is one of the Zurich executives.　I'm
4　not sure what his role is currently or at that time.
5　　　　Q.　Is he still around?
6　　　　A.　I believe so.
7　　　　Q.　Do you know what his title is?
8　　　　A.　I do not.　He's not in the claim
9　organization management structure, so I'm not sure
10　exactly what division he reports to.
11　　　　Q.　In 1994, what teams were there in
12　Baltimore and Schaumburg?
13　　　　A.　There were environmental teams in both
14　locations.
15　　　　Q.　Why was that?
16　　　　A.　Zurich had taken over Maryland Casualty,
17　and the Maryland Casualty building and facilities
18　were utilized.　And they handled a lot of the
19　Maryland Casualty environmental claims out of that
20　location.
21　　　　Q.　If it were shown that Landis+Gyr did, in
22　fact, give notice to Zurich in the '80s or '90s
23　regarding the Sagamore site, which office would most
24　likely handle a claim like that?
25　　　　A.　Schaumburg would handle Zurich-issued

Page 184

1　policies.
2　　　　Q.　Okay.　And are we sure that all of the
3　Landis+Gyr policies are Zurich policies as opposed
4　to Maryland Casualty?
5　　　　A.　The policies that we located were.　That's
6　why we searched both sources to see if there were
7　any Maryland Casualty policies issued.
8　　　　Q.　There's a reference to MAS.　What does
9　that refer to?　Is that managing account
10　specialists?
11　　　　A.　I see that above, yes.
12　　　　Q.　And is that different than a claims
13　handler?
14　　　　A.　I believe it's the same but maybe not.　In
15　the new accounts paragraph, it refers to the
16　managing account specialist and then the account
17　specialist assigned.
18　　　　Q.　So who is the audience of this memo?　All
19　account specialists?
20　　　　A.　Yes.
21　　　　Q.　And who are they?
22　　　　A.　I'm thinking they're the claim handlers.
23　　　　Q.　That's another term for claims handlers?
24　　　　A.　Yes.
25　　　　Q.　On Page 2, there's a reference to

|  | Page 185 |
|---|---|

```
 1    hazardous waste.  Do you see that?
 2        A.  Yes.
 3        Q.  Who was the director at the time?
 4        A.  I don't know.
 5        Q.  Below that it has a section called
 6    authority.  Can you explain in your own words what
 7    authority refers to when it says maximum levels of
 8    authority?  Authority of what or to do what?
 9        A.  It would be to post reserves on a
10    particular claim, to make a settlement of that
11    claim, and to make a payment, defense or indemnity
12    payment on that claim.
13        Q.  Were there different levels of settlement
14    authority for pollution or environmental claims as
15    opposed to other types of claims?
16        A.  Each specialist has their own authority
17    depending on their level with the company.
18        Q.  If you go to page ZURICH1277 --
19        A.  Okay.
20        Q.  -- do you see the paragraph Account
21    Reporting and the references there to reserves?
22        A.  Yes.
23        Q.  What is meant by a $7 expense reserve,
24    paren, Let Rest files -- L E T, space, R E S T,
25    capital L and capital R.  What does that mean?
```

|  | Page 186 |
|---|---|

```
 1        A.  That would usually be claims provided for
 2    notice only but a claim wasn't being made.  That's
 3    usually what Let Rest would designate.
 4        Q.  How about $1 indemnity?  What does that
 5    mean?  Is that also a Let Rest code?
 6        A.  It could be.
 7        Q.  And is there a different reporting
 8    requirement for Let Rest files?
 9        A.  Yes.
10        Q.  Why is that?
11        A.  Because there isn't a claim.  Generally
12    it's notice being made of an incident but a claim
13    hasn't been made against the insured.
14        Q.  So why do you have to report on it at all?
15        A.  It would depend.  I mean, sometimes we set
16    up a claim and then we might close the claim but
17    keep, you know, the claim numbers, the record that
18    the claim was reported.  Or in other cases, the
19    insured might feel the claim is imminent at some
20    point, so they're telling us and we'll open it and
21    wait for the actual claim to be made against the
22    insured.
23        Q.  And is this memo stating in the first
24    sentence that you don't have to do the 180-day
25    status report in a case where the Let Rest reserve
```

|  | Page 187 |
|---|---|

```
 1    is set?
 2        A.  Yes.
 3        Q.  And has that practice continued at Zurich,
 4    the use of those kind of codes?
 5        A.  We do have the -- they call them factor
 6    reserves that would designate the status of the
 7    file.
 8        Q.  What are those?
 9        A.  The current ones?  They've changed over
10    time.  There's a list of them.  Depending like
11    currently if there's a 1 and 7, it designates that
12    coverage is under investigation.
13        Q.  So does that mean it's exempt from
14    reporting requirements?  You don't have to report on
15    it if coverage is under investigation?
16        A.  There's a list of requirements for
17    reporting, so it would depend on whether -- which
18    requirements were -- which criteria would apply to
19    any particular claim.  So just because it's 1 and 7
20    does not mean it would or would not be reported.  It
21    would depend on other factors.
22        Q.  Was the eZACCESS system being used in
23    1994?
24        A.  Yes.
25        Q.  Why is there no mention of that here?
```

|  | Page 188 |
|---|---|

```
 1        A.  I mean, the 1 and 7 would be in eZACCESS.
 2        Q.  What kind of system did Zurich have in
 3    place before eZACCESS?
 4        A.  There was a system with basic claim
 5    recording prior to 1986 where there was a claim
 6    number and some basic information captured, but the
 7    process was more manual up until that point.
 8        Q.  Could you still set a $1 and $7 reserve on
 9    that older system?
10        A.  I don't think so.
11        Q.  What was that older system called?
12        A.  I don't know if it had a name.  It was like
13    a keypunch system.
14        Q.  That type of information you wouldn't have
15    any personal knowledge of; you would have to get
16    that from someone else?
17        A.  Yes.
18            (Deposition Exhibit Number 30
19             marked for identification.)
20    BY MR. HUBER:
21        Q.  I'm handing you what's been marked as
22    Exhibit 30.  Is this a true and accurate copy of an
23    interoffice memo from Zurich dated January 25, 1994
24    from Tom Lysaught and John Shane?
25        A.  Yes.
```

47 (Pages 185 to 188)

Page 189

1    Q. And does it have Bates numbers ZURICH1280
2  through 1281?
3    A. Yes.
4    Q. Why was this memorandum needed?
5    A. It looks like it's clarifying what's
6  expected in the reporting on claims by the claim
7  department to management.
8    Q. Was there a particular problem that was
9  attempted to be addressed here?
10    A. Not that I'm aware.
11    Q. At what point do you have to have a major
12  case memo?
13    A. I don't know that they had a dollar
14  threshold like we do now with the early-warning
15  memo, but I would believe it's similar to that.
16       (Deposition Exhibit Number 31
17        marked for identification.)
18  BY MR. HUBER:
19    Q. Okay. Let's go to the next one. Handing
20  you what's been marked as Exhibit 31, is that a true
21  and accurate copy of a Zurich interoffice memo dated
22  May 20, 1994, from Tom Lysaught and others?
23    A. Yes.
24    Q. Does that have Bates numbers ZURICH1282
25  through and including 1288?

Page 190

1    A. Yes.
2    Q. What was the purpose of this memo?
3    A. It looks like it's describing the functions
4  of the environmental claims department.
5    Q. And why was there a need to do that?
6    A. It looks like it was just relaying the
7  information to underwriting.
8    Q. What were some of the capabilities of the
9  environmental claims unit?
10  MR. WRIGHT: Objection. Vague.
11  BY THE WITNESS:
12    A. As far as the communication in the memo,
13  relays that the environmental claims department has
14  specialized handlers to handle the management of
15  environmental claims for pollution and mass
16  litigation.
17    Q. On the top of Page 2, page ZURICH1283,
18  what is meant by the reference to the term
19  "consistent" or "consistency"? Consistent
20  application of national environmental coverage
21  positions across all environmental claims.
22       Is that something that was important to
23  Zurich in 1994?
24    A. I think it refers to the complexity of the
25  application of coverage and ensuring that it be

Page 191

1  reviewed by the same team so that the same result
2  would be reached.
3    Q. And why is it important that the same
4  result be reached or that it be consistent
5  nationwide?
6    A. So that we provide the proper coverage
7  that's available under the policy to the insureds
8  that are in similar situations in jurisdictions.
9    Q. Bottom of Page 1283, there's a reference
10  to 150 Superfund national priority sites. Do you
11  see that?
12    A. Yes.
13    Q. Is that a reference to CERCLA cases?
14  C E R C L A?
15    A. Yes.
16    Q. And did this claims unit also have
17  experience handing RCRA claims? R C R A.
18    A. Yes.
19    Q. Are you familiar with the term RCRA,
20  Resource Conservation and Recovery Act?
21    A. Yes.
22    Q. Did this claims unit in the 1990s have
23  experience handing RCRA and CERCLA claims?
24    A. It appears that they had experience with
25  all pollution matters that were pertinent at the

Page 192

1  time.
2    Q. Did they have that experience in RCRA and
3  CERCLA back in the '80s as well, at least from '84
4  to '92?
5    A. Yes.
6    Q. On Page 2, there's a reference to Kathie,
7  K A T H I E, Goetsch, G O E T S C H. Is she still
8  around?
9    A. I don't believe so.
10    Q. She's no longer at Zurich or passed on
11  or ...
12    A. I don't recognize her name.
13    Q. If you look at Page 3, it's labeled
14  ZURICH1284. Do you see that?
15    A. Yes.
16    Q. Do you see the section: Mission of
17  Environmental Claims?
18    A. Yes.
19    Q. The reference there, environmental claims,
20  is that another way of referring to the
21  environmental claims unit?
22    A. Yes.
23    Q. That had been created back in the '80s,
24  according to the memo?
25    A. Yes.

Page 193

1    Q.  And was it its mission to provide Zurich
2  with highly specialized claims and litigation
3  management expertise?
4    A.  Yes.
5    Q.  It says:  Also directed at achieving
6  superior results in the resolution of environmental
7  claims.
8        What is meant by superior results?  What
9  does that mean?
10    A.  Getting the best defenses and damages
11  settlements on behalf of the insured under their
12  policy.
13    Q.  Does that refer to what is best for Zurich
14  or what is best for the policyholder?
15    A.  It would be what would be the best result
16  for the policyholder, which I suppose would also be
17  the best result for Zurich.
18    Q.  Looking down to the bullet point, there's
19  a reference to flexible and creative claim
20  disposition and cost-containment skills.  What is
21  meant by the term "cost-containment skills"?
22    A.  There's a variety of things we try to do in
23  our claims to keep costs low, including, you know,
24  finding opportunities to resolve claims faster than
25  letting them drag on and accumulate costs.  We have

Page 194

1  specialized vendors that we might be able to get
2  involved to find more effective ways to manage a
3  site or to have kind of state-of-the-art cleanup
4  capabilities that we could consider.  There's a lot
5  we can do to impact, you know, the handling of
6  environmental claims, but seeing so many of them and
7  having a lot of resources to call on for that.
8    Q.  Next page, there's a reference to
9  expertise in Section 4.  Do you see that?
10    A.  Yes.
11    Q.  What was the expertise of the
12  environmental claims unit in the '80s and '90s?
13    A.  It would be the handlers with -- a lot of
14  background in claims, legal experience,
15  environmental coverage handling, management of
16  environmental claims, coverage litigation.
17    Q.  What were some of the more significant
18  types of environmental claims that Zurich was
19  handling or facing in the '80s and '90s?
20    MR. WRIGHT:  Objection.  It's outside the scope
21  of the 30(b)(6) topic designated for this witness.
22  BY THE WITNESS:
23    A.  I mean, the listing of Superfund sites and
24  cleanups that they were handling at that time.  That
25  would be just the pollution group.

Page 195

1    Q.  At the bottom of Page 1285 and the top of
2  1286, do you see the reference to the sentence that
3  begins:  Their purpose here, next turn the page, is
4  to ensure the best results for the U.S. group in any
5  environmental coverage litigation.
6        What is meant by the term "best results
7  for the U.S. group in any environmental coverage
8  litigation"?
9    A.  I'd say generally what we try to do is to,
10  you know, evaluate coverage.  And a lot of times
11  there is a part of a claim that might fall within
12  coverage, part that might fall outside of coverage,
13  and we try to, you know, reach an agreement on that
14  with the insured, if possible.
15        What we consider the best result is to
16  handle, under our policies, claims that are covered
17  and to work with the insured on areas that may fall
18  outside of coverage and retain our customer in the
19  end is what we're trying to accomplish there.
20    Q.  So here, the reference to environmental
21  coverage litigation, that would refer to
22  environmental coverage litigation between Zurich and
23  its policyholder?
24    A.  Yes.
25    Q.  About whether or not there's coverage?

Page 196

1    A.  Yes.
2    Q.  Next page, there's a reference to target
3  market exposures.  Do you see that on Page 1287?
4    A.  Yes.
5    Q.  What are some of these target market,
6  target markets or potential exposures faced by
7  particular types of groups of customers?  What is he
8  talking about there?
9    A.  It would be customers that have unique
10  exposures that Zurich is looking to retain the
11  customers but to recognize they have these exposures
12  that, you know, can be complicated to recognize and
13  manage.  So to understand what they are and to -- to
14  consult and to discuss, you know, and figure out the
15  best way to deal with those exposures for a
16  particular kind of customer.
17    Q.  So is the reference here to customers,
18  meaning policyholders that have large exposures?
19    A.  It could be large exposures.  It could be
20  just new types of exposures that haven't been
21  recognized in the past.
22    Q.  Was one of the concerns of Zurich in the
23  '80s and '90s, customers that had a lot of CERCLA
24  exposure where they were getting sued for disposing
25  of hazardous substances at various sites?

Page 197

```
 1        MR. WRIGHT:  Objection.  Outside the scope of
 2   the topics on which the witness has been designated
 3   for this deposition.
 4   BY MR. HUBER:
 5        Q.  Go ahead.
 6        A.  Yeah, I'm not sure what the target
 7   exposures were at this time period.
 8        Q.  Does Zurich believe that policyholders
 9   that were regulated by RCRA in the '80s and '90s had
10   significant environmental exposure?
11        MR. WRIGHT:  Objection.  Outside the scope of
12   the topics on which the witness has been designated.
13   You can answer, if you have personal knowledge.
14   BY THE WITNESS:
15        A.  I don't know what the -- what Zurich knew
16   of what the risks were at that time.
17        Q.  Well, did Zurich know that Landis+Gyr was
18   regulated by RCRA?
19        A.  I don't know.
20        Q.  Would that have made a difference if
21   Zurich had known that Landis+Gyr had CERCLA and RCRA
22   issues?
23        MR. WRIGHT:  Objection.  Vague.
24   BY THE WITNESS:
25        A.  I think that would be an underwriting
```

Page 198

```
 1   topic, the underwriting witness.
 2        Q.  Does it appear that this memorandum is
 3   intended to address the specific needs of particular
 4   types and groups of Zurich customers that had
 5   significant environmental exposures?
 6        A.  Can you repeat the question?
 7        Q.  Does it appear that this memorandum was
 8   intended to address the specific needs of particular
 9   types and groups of Zurich customers that had
10   significant environmental exposures?
11        A.  I'd say it's to relay the information to
12   the underwriters on what this specialized unit can
13   provide to the customers.
14        Q.  And what kind of services was Zurich
15   offering to clients like Landis+Gyr in the '80s and
16   '90s that are referenced in this memo about
17   specialized experience, knowledge of environmental
18   laws, things of that nature?
19        A.  Yes, it would be claim handling of those
20   types of exposures that was specialized that had
21   claim handlers that had resources that they could
22   use to benefit the insured in resolving those kind
23   of liabilities.
24        Q.  Including CERCLA and RCRA liabilities?
25        A.  Yes.
```

Page 199

```
 1        Q.  Wouldn't those be two of the main
 2   environmental statutes that created liability for
 3   Zurich customers in the '80s and '90s?
 4        MR. WRIGHT:  Objection.  Outside the scope of
 5   the topics on which the witness has been designated.
 6        You can answer to the extent that you know,
 7   have personal knowledge.
 8   BY THE WITNESS:
 9        A.  I didn't hear the question.
10        Q.  Wouldn't those be two of the main
11   environmental statutes that created liability for
12   Zurich customers in the '80s and '90s?
13        A.  Yeah, I don't know.  As far as all the
14   statutes that could exist to create liability for
15   customers, I ...
16        Q.  Can you name any environmental statute
17   that would subject a Zurich customer to more
18   broad -- broad liability than CERCLA or RCRA?
19        MR. WRIGHT:  Objection.  Outside the scope of
20   the topics on which the witness has been designated.
21        You can answer to the extent that you have
22   personal knowledge.
23   BY THE WITNESS:
24        A.  I didn't understand that the question was
25   were there more environmental statutes impacting
```

Page 200

```
 1   insureds at that time.  I would say those were very
 2   impactful to insureds that had environmental
 3   exposures.
 4        Q.  When did Zurich first know that Landis+Gyr
 5   was regulated by RCRA?
 6        A.  I don't know.
 7        Q.  Do you know when Zurich first knew that
 8   Landis+Gyr handled hazardous waste regulated by
 9   RCRA?
10        MR. WRIGHT:  Objection.  Assumes facts not in
11   evidence.
12   BY THE WITNESS:
13        A.  Again, it seems to me like underwriting
14   topics, which would not be part of my scope here.
15        Q.  Have you handled CERCLA and RCRA claims
16   for Zurich as part of the pollution claim unit?
17        A.  Yes.
18        Q.  And what is the CERCLA statute?
19        MR. WRIGHT:  Objection.  Outside the scope of
20   the topics on which the witness has been designated.
21        You can answer to the extent that you have
22   personal knowledge.
23   BY THE WITNESS:
24        A.  What is the statute?
25        Q.  Yeah.  What does it do?
```

Page 201

1    A.   Oh, it holds parties responsible for
2  cleaning up pollution that they were -- somehow
3  contributed to.
4    Q.   And what does the RCRA statute do just in
5  general terms?
6    MR. WRIGHT:  Same objection.
7  BY THE WITNESS:
8    A.   It's similar.  It just has different -- I
9  guess we usually see it where private actions are
10 filed versus government actions, additional rights
11 to the parties.
12   Q.   CERCLA generally applies to landfills or
13 disposal sites where there's no one there, the
14 government is trying to do the cleanup?
15   A.   Yes.
16   MR. WRIGHT:  Same objection.
17 BY MR. HUBER:
18   Q.   And RCRA would apply to facilities that
19 are still active?
20   MR. WRIGHT:  Same objection.
21 BY THE WITNESS:
22   A.   Okay.  I don't think they're mutually
23 exclusive, but ...
24   Q.   No, I'm not saying they are.
25   A.   Okay.

Page 202

1    Q.   Have you ever heard the term TSD,
2  treatment storage and disposal facility, under RCRA?
3    MR. WRIGHT:  Objection.  Outside the scope of
4  the topics on which the witness has been designated.
5      You can answer to the extent that you have
6  personal knowledge.
7  BY THE WITNESS:
8    A.   Not particularly.
9      (Deposition Exhibit Number 32
10       marked for identification.)
11 BY MR. HUBER:
12   Q.   Ms. Hairrell, I'm handing you what's been
13 marked as Exhibit 32.  Is that a true and accurate
14 copy of an interoffice memo at Zurich dated June 8,
15 1994 from Tom Lysaught?
16   A.   Yes.
17   Q.   And what is the point of this memo?
18   MR. WRIGHT:  Objection.  Vague.
19 BY THE WITNESS:
20   A.   It looks like another best practices
21 outline.  This is directed to the underwriting group
22 rather than the claims group.
23   Q.   Page 2, do you see the reference to
24 coverage determinations?
25   A.   Yes.

Page 203

1    Q.   Within 30 days of our receipt of a new
2  claim or account, we will issue a coverage
3  determination letter to the insured.  Our coverage
4  determination letters will advise the insureds of
5  whether or not coverage is or potentially may be
6  available.
7      Do you see that?
8    A.   Yes.
9    Q.   Was that a policy of Zurich to make a
10 coverage determination that quickly in the 1990s?
11   A.   Yes.
12   Q.   Was that a policy of Zurich to make that
13 coverage determination thereafter in the 2000s or
14 even up to today, 2018?
15   A.   Yes.  We try to issue coverage within
16 30 days of receiving all the information we need to
17 make that determination.
18   Q.   And is that part of the duty to act
19 reasonably vis-à-vis the policyholder in your view?
20   MR. WRIGHT:  Objection.  Calls for a legal
21 conclusion.
22 BY THE WITNESS:
23   A.   Yes.
24   Q.   What was the policy in 1990 with respect
25 to declination letters?  Was it Zurich's policy to

Page 204

1  issue a declination letter as stated in Paragraph 5
2  within a reasonable time if it decided there was no
3  coverage?
4    A.   Yes.
5    Q.   And is that still Zurich's policy?
6    A.   Yes.
7    Q.   And why hasn't Zurich simply just denied
8  coverage to Landis+Gyr if it doesn't believe there's
9  coverage?
10   A.   Because we didn't have that information to
11 determine if there's coverage or not.  The insurance
12 counsel advised us that there was more information
13 that needed to be considered on the claim, so we
14 awaited that information.
15     (Deposition Exhibit Number 33
16       marked for identification.)
17 BY MR. HUBER:
18   Q.   Is this a true and accurate copy of a
19 claims update produced by Zurich dated 6/17/94?
20   A.   Yes.
21   Q.   The environmental specialty and claims
22 office there, was that a new unit or did it have a
23 new name?
24   A.   No, it would be the same, the same unit.
25   Q.   Do you have an understanding as to why

Page 205

1    Zurich was defining environmental claims sending out
2    a memo like this in the 1994 time frame?
3        A. It looks like it's clarifying which claims
4    should be directed to the environmental group for
5    handling.
6        Q. And this claims unit that is referenced
7    here in this exhibit, that is what now became your
8    claims unit?
9        A. It would apply to the pollution department
10   and the mass litigation department.
11           (Deposition Exhibit Number 34
12            marked for identification.)
13   BY MR. HUBER:
14       Q. Handing you what's been marked as
15   Exhibit 34, is this a true and accurate copy of a
16   Zurich interoffice memo dated September 1, 1994,
17   from Tom Lysaught?
18       A. Yes.
19       Q. This memo looks very similar to some of
20   the other memos we've seen from Mr. Lysaught. Was
21   there a particular need to update the standards that
22   he's referencing here with respect to claim
23   acknowledgment, confirmation of coverage,
24   investigations, coverage determinations, and
25   declination letters?

Page 206

1        A. The policy generally is updated frequently
2    to address any changes that are needed. I don't
3    know if there was any particular issue addressed or
4    change in this version.
5        Q. We just went through a whole stack of
6    memos that were all issued within a span of about
7    8 months. Why would Mr. Lysaught be issuing so many
8    memoranda during that time period?
9        A. Well, they were directed to different
10   audiences. There was a memo to the underwriting
11   business unit. There was an update to the
12   assignment, the group that would be looking at claim
13   assignments. And it looks like they're addressing
14   slightly different topics and audiences.
15       Q. So you don't believe it was unusual for
16   him to issue this many memos like this?
17       A. No.
18           (Deposition Exhibit Number 35
19            marked for identification.)
20   BY MR. HUBER:
21       Q. Handing you what's been marked as
22   Exhibit 35, is that a true and accurate copy of a
23   memo from Tom Lysaught dated June 19, 1995?
24       A. Yes.
25       Q. Does that have Bates number ZURICH1301 on

Page 207

1    it?
2        A. Yes.
3        Q. Who's the audience here of this memo?
4        A. This is the environmental claims staff.
5        Q. Was there a particular problem that
6    Mr. Lysaught was trying to address or remedy with
7    this memo?
8        A. Yes. It looks like he's reminding the
9    group that once the claim has been resolved, the
10   file should be timely closed.
11       Q. Last paragraph, there's a reference to
12   "our file and account statistics." What is meant by
13   that phrase?
14       A. I'm not sure I see where you're looking at.
15       Q. Last paragraph: We wish to emphasize
16   that ... We wish to emphasize that while we are not
17   looking for you to close accounts prematurely, the
18   integrity of our files and account statistics
19   requires that, quote, dead, end quote, files do not
20   appear on our active pending list for any longer
21   than is prudent or necessary.
22       A. I believe that is referring to the
23   handler's listing of accounts, which is not accurate
24   if they have claims that have been resolved included
25   on their claim list.

Page 208

1        Q. Does it appear Mr. Lysaught was
2    encouraging folks to close out their claims unless
3    there was a good reason not to?
4        A. It looks like he's saying upon resolution,
5    there's no reason why the claim wouldn't be promptly
6    closed, that it's improper to leave it open as it
7    skews the open claim count.
8        Q. And one way in which that would happen
9    would be if there was a denial letter and no
10   response within 6 months as stated in Paragraph 1?
11       A. Yes.
12       Q. Or in the case of a settlement,
13   Paragraph 2, all the releases and settlement
14   paperwork has been signed, go ahead and close the
15   file?
16       A. Yes.
17       Q. Do you know what the response was to this
18   memo?
19       MR. WRIGHT: Objection. Outside the scope of
20   the topics on which the witness has been designated.
21           You can answer to the extent that you have
22   personal knowledge.
23   BY THE WITNESS:
24       A. I do not know.
25       Q. Would you expect it to increase the number

Page 209

1   of resolutions and closed files?
2        MR. WRIGHT: Objection. Calls for speculation.
3   Outside the scope of the topics on which the witness
4   has been designated.
5   BY THE WITNESS:
6        A.   I would expect that the staff would comply
7   by closing claims that were resolved.
8        Q.   And in your experience, do environmental
9   claims personnel at Zurich follow the instructions
10  of their superiors?
11       A.   Yes.
12            (Deposition Exhibit Number 36
13            marked for identification.)
14  BY MR. HUBER:
15       Q.   Handing you what's been marked as
16  Exhibit 36, The Zurich Way Claims Best Practices,
17  Mass Litigation and Pollution Claims Department,
18  January 2015.
19       Do you see that?
20       A.   Yes.
21       Q.   Is this a true and accurate copy of a
22  document produced by Zurich bearing Bates label
23  ZURICH1404 through ZURICH1418?
24       A.   Yes.
25       Q.   And what is this?

Page 210

1        A.   These were the best practices for the
2   environmental department for -- effective
3   January 2015.
4        Q.   And would you expect this directive to
5   apply to the notice that Zurich received from
6   Landis+Gyr in September 2014?
7        A.   Yes.
8        Q.   Go to page ZURICH1408.
9        A.   Okay.
10       Q.   When is the coverage determination
11  supposed to be made according to this document?
12       A.   Within 30 days from receipt of all
13  necessary coverage-related information.
14       Q.   Page ZURICH1409, if you could turn the
15  page.
16       A.   Okay.
17       Q.   Do you see at the bottom, review for large
18  loss exposure?
19       A.   Yes.
20       Q.   Did the Landis+Gyr claim for Sagamore
21  present an exposure to Zurich in excess of
22  1 million?
23       A.   Yes.
24       Q.   So what does this directive say with
25  respect to that type of claim?

Page 211

1        A.   That refers to the early-warning memo.
2        Q.   And was an early-warning memo sent
3   regarding the Sagamore site?
4        A.   Yes.
5        Q.   What would that memo look like?
6        A.   It would be a report to the vice president
7   saying that a claim has been tendered that has a
8   potential liability or defense costs that could
9   amount to over a million dollars, and it would have
10  some basic information about the policies and the
11  loss details.
12       Q.   And is that a privileged memo to Bob, your
13  boss?
14       A.   I think it would depend on when it was
15  created.
16       Q.   I don't recall seeing anything like that
17  that said early-warning memo on it.  Do you have an
18  understanding as to why that might be the case?
19       A.   I believe because it was created after the
20  litigation ensued.
21       Q.   So the early-warning memo was not created
22  until sometime after the lawsuit was filed?
23       A.   Yes.
24       Q.   Even though the notice was sent in
25  September 2014?

Page 212

1        A.   It was an incomplete claim tender, so there
2   wasn't information to warrant a reporting.  We
3   didn't know what the coverage impact would be.
4        Q.   And I know you partially explained this
5   before, but what was incomplete about Landis+Gyr's
6   request for coverage?
7        MR. WRIGHT: Objection.  Asked and answered.
8   BY THE WITNESS:
9        A.   There was a claim made for past costs that
10  were incurred by the insured decades prior to the
11  notice without any information that the policy terms
12  were complied with.
13       Q.   So has there been more than one
14  early-warning memo to your boss?
15       A.   There would generally be one early-warning
16  memo.
17       Q.   On page ZURICH1412, do you see the
18  reference to interim reserve?
19       A.   Yes.
20       Q.   Is this the same type of coded reserve
21  that you talked about earlier?
22       MR. WRIGHT: Objection.  Vague.
23  BY MR. HUBER:
24       Q.   You used the term "factor reserve" before.
25       A.   Yes, that would be the same type of

Page 213

```
 1  reserve.
 2       Q.  And what's the purpose of setting that
 3  interim reserve?  What does that do?
 4       A.  It designates the status of the claim so we
 5  could run reports or determine at a glance what the
 6  status is on any particular loss.
 7            (Deposition Exhibit Number 37
 8              marked for identification.)
 9  BY MR. HUBER:
10       Q.  What is Exhibit 37?
11       A.  It's the best practices for the
12  environmental claims group as of January 2016.
13       Q.  Any significant changes between the
14  January 2015 version and the January 2016 version
15  that you know of?
16       A.  I don't believe so.
17            (Deposition Exhibit Number 38
18              marked for identification.)
19  BY MR. HUBER:
20       Q.  What is Exhibit 38?
21       A.  This is the best practices for
22  environmental claims group as of June 2016.
23       Q.  Does it appear to be an accurate copy of
24  the claims best practices document?
25       A.  Yes.
```

Page 214

```
 1       Q.  Any significant changes that you're aware
 2  of in this June document as opposed to the January
 3  and then the 2015 document?
 4       A.  I don't believe so.
 5       Q.  Is this kind of document updated every
 6  year?
 7       A.  Yes.
 8       Q.  Who updates it?
 9       A.  The environmental claim group updates the
10  best practices, and senior management reviews and
11  approves them.
12       Q.  And does the claim department try to
13  follow this claims directive?
14       A.  It's the best practice, so it's the
15  aspire-to claim handling by the claim department.
16            (Deposition Exhibit Number 39
17              marked for identification.)
18  BY MR. HUBER:
19       Q.  Handing you a document named -- marked
20  Exhibit 39, it's entitled Environmental Units
21  Principal Responsibilities/Accountabilities, bearing
22  Bates number 1302.
23            Do you see that?
24       A.  Yes.
25       Q.  Is this a true and accurate copy of a
```

Page 215

```
 1  Zurich document?
 2       A.  Yes.
 3       Q.  Where did this come from?
 4       A.  I'm not sure.
 5       Q.  The font would indicate it's a little bit
 6  older.  Do you have any way of knowing to what it
 7  pertained with respect to Zurich and the handling of
 8  pollution claims?
 9       A.  I'm not sure.
10       Q.  Do you know who prepared it?
11       A.  No.
12       Q.  It was someone at Zurich, right?
13       A.  And if it was in our files, I assume it was
14  a Zurich guideline at some point in time.
15       Q.  Does this appear to be a set of Zurich
16  guidelines that would have applied in the '80s and
17  '90s?
18       A.  I don't know.
19       Q.  Is this a document that you reviewed in
20  preparing for your deposition?
21       A.  Not in particular, no.
22       Q.  Why don't we take a break and look at it.
23  I'd like to know if you believe it applied at any
24  point in time in the '80s or '90s to environmental
25  claims.  I just need to have some authentication as
```

Page 216

```
 1  to, like, where it came from, what it applied to
 2  because it doesn't really say on itself.
 3            MR. WRIGHT:  Do you have any of the surrounding
 4  documents that were produced?
 5            MR. HUBER:  We don't.
 6            MR. WRIGHT:  It might help to look at it in
 7  context with the other documents.
 8            MR. HUBER:  Two pages.  So let's go off the
 9  record.
10            THE VIDEOGRAPHER:  We are going off the record
11  at 4:18 p.m.
12            (A short break was taken.)
13            THE VIDEOGRAPHER:  We are back on record at the
14  beginning of tape 5 at 4:27 p.m.
15  BY MR. HUBER:
16       Q.  Ms. Hairrell, we were looking at
17  Exhibit 39.
18       A.  Yes.
19       Q.  Is this a Zurich-prepared document?
20       A.  It was produced by Zurich.  I don't know
21  who prepared the document.
22       Q.  Would it have been generated by anyone
23  other than Zurich?
24       A.  No.
25       Q.  Does it look like it accurately sets forth
```

Page 217

1  guidelines or directives that would be applicable to
2  the Zurich pollution claim unit for the period 1980s
3  and '90s?
4      A.  It looks like it's a document referring to
5  both the accountabilities of the environmental group
6  and the claims legal department.
7      Q.  And does the environmental pollution or
8  claim unit take directions in part from the claims
9  legal folks?
10     A.  No.
11     Q.  What's the relationship between the two,
12 then?
13     A.  The claims unit consults with the coverage
14 unit on legal issues.  The legal group provides
15 support to the claim unit as requested, and the
16 legal group would handle coverage litigation.
17     Q.  Let's go back to Exhibit 17 in your stack
18 there.
19     A.  Okay.
20     Q.  Go to page ZURICH959.  Do you see that?
21     A.  Yes.
22     Q.  And this is shortly after David Olson was
23 assigned to the claim, right?
24     A.  Yes.
25     Q.  The claim was first received on what date?

Page 218

1  According to this document anyway.
2      A.  It looks like -- the letter was
3  September 16th.  It looks like David received it on
4  the 19th.
5      Q.  And did he set a reserve on October 3rd,
6  2014?
7      A.  Yes.
8      Q.  And what were those reserves?
9      A.  He entered a factor reserve of $1 indemnity
10 and $7 expense.
11     Q.  Is that the same reserve level for the,
12 quote, Let Rest claims?
13     A.  No.
14     Q.  Why not?
15     A.  This wasn't a notice-only or Let Rest
16 claim.  The 1 and 7 was for coverage under
17 investigation.
18     Q.  And what's the difference?
19     A.  Let Rest-type claims are claims where there
20 was just a notice but there was no claim.  So the
21 insured might report they had a release of some sort
22 but nobody is making a claim.
23     Q.  A notice of circumstances, for instance?
24     A.  Yes.
25     Q.  So if there had been a notice of

Page 219

1  circumstances, would there be any difference
2  between -- would you also use $1 indemnity and $7
3  expense reserve?
4      A.  Possibly.  It would be situation specific.
5  Like if we were going to investigate coverage, we
6  would put a 1 and 7.  If it was just a notice and we
7  were not going to -- if there was nothing being
8  requested, like the insured didn't feel like it was
9  anything that was going to amount to anything, we
10 would just close the file.
11     Q.  Would there be another type of code other
12 than the $1 and $7 reserve that would be used in the
13 notice of circumstances only situation?
14     A.  No.
15     Q.  Okay.  You can set that aside.
16         (Deposition Exhibit Number 40
17          marked for identification.)
18 BY MR. HUBER:
19     Q.  Do you have Exhibit 40?
20     A.  Yes.
21     Q.  Is that a true and accurate copy of a
22 letter from Landis+Gyr to Marsh McLennan dated
23 October 1, 1987, that Zurich produced?
24     A.  Yes.
25     Q.  And does that relate to -- first of all,

Page 220

1  does it have ZURICH910 on it, 910 and -11 as a Bates
2  number?
3      A.  Oh, yes.
4      Q.  And did Zurich receive this notice from
5  the broker, Marsh McLennan?
6      A.  Yes.
7      Q.  And does this appear to be the first
8  notice Zurich received regarding the -- what you
9  described earlier as the Lakeland case?
10     A.  Yes.
11         (Deposition Exhibit Number 41
12          marked for identification.)
13 BY MR. HUBER:
14     Q.  Do you have Exhibit 41?
15     A.  Yes.
16     Q.  Is that another document that Zurich
17 produced bearing label ZURICH912?
18     A.  Yes.
19     Q.  Does that appear to be a copy of a letter
20 from Marsh McLennan to a Charles Maki, M A K I,
21 executive vice president of Landis+Gyr?
22     A.  Yes.
23     Q.  Did Zurich receive a copy of Exhibit 41?
24     A.  Yes.
25     Q.  Do you recall when Zurich received a copy

Page 221

1    of Exhibit 41?
2        A.   No.
3        Q.   Do you know if Zurich was copied by Marsh
4    on this letter?
5        A.   I don't recognize all the copy names
6    listed.
7        Q.   What was the relationship between Marsh
8    and Zurich in the 1980 time frame?
9        MR. WRIGHT:  Objection.  Outside the scope of
10   the topics in which the witness has been noticed.
11       You can answer to the extent you have
12   personal knowledge.
13   BY THE WITNESS:
14       A.   My only understanding is that Marsh is a
15   broker for insureds in the purchase of insurance.  I
16   don't know of any particular relationship between
17   Zurich and Marsh.
18       Q.   Was Marsh's -- was Marsh Zurich's agent
19   such that notice to Marsh would constitute notice to
20   Zurich in Zurich's view in the 1980s or '90s?
21       A.   No.
22       Q.   Why not?
23       A.   Marsh would be the agent of the insured,
24   not of the insurance company.
25       Q.   So do you know if Zurich received

Page 222

1    Exhibit 41?
2        A.   It appears they did.  There's a stamp that
3    shows a received date.
4        Q.   The received date of November 2, 1987, is
5    that a Zurich stamp?
6        A.   I don't know.  I would think so.
7        Q.   Going back to Exhibit 40, what was
8    Zurich's understanding in the 1987 time frame as to
9    what the Landis+Gyr claim entailed?  Feel free to
10   look at Exhibit 41 or 40 or your own --
11       A.   It looks like it involves a landfill
12   Superfund site in Indiana.
13       Q.   And what was the nature of the claim?
14       A.   It was for disposal of materials at the
15   Lakeland Disposal Services landfill in Claypool,
16   Indiana.
17       Q.   Meaning waste from Landis+Gyr was disposed
18   at the Lakeland site creating some liability?
19       A.   Yes.
20       (Deposition Exhibit Number 42
21        marked for identification.)
22   BY MR. HUBER:
23       Q.   Well, let's go to the next exhibit.  What
24   is Exhibit 42?
25       A.   It's a letter from Marsh to Zurich from

Page 223

1    November 12th, 1987.
2        Q.   Is that a true and accurate copy of a
3    notice that appears to be dated November 12, 1987,
4    including a coverage chart?
5        A.   Yes.
6        Q.   And does this relate to the Lakeland
7    Disposal claim that we had talked about earlier?
8        A.   Yes.
9        Q.   And the reference to this handwriting
10   here, do you know whose handwriting that was?
11       A.   No.
12       Q.   Does that number mean anything?
13       A.   It looks like a claim number.
14       Q.   Whose claim number?
15       A.   It looks like it would be the Zurich claim
16   number.
17       Q.   Just looking at Exhibit 42, does it appear
18   that certain policies were left off in the notice?
19   It looks like the last policy was ending in 1983.
20       Do you see that?
21       A.   Yes.
22       Q.   Did Zurich also issue other policies to
23   Landis+Gyr between 1983 and 1987?
24       A.   Yes.
25       Q.   Do you have any understanding why those

Page 224

1    policies wouldn't also apply to a claim like this,
2    at least potentially?
3        A.   There could be a whole variety of reasons
4    why.
5        Q.   Such as?
6        A.   If the loss was known or ongoing, those
7    policies might not be applicable.
8        Q.   Did you see anything in the communication
9    so far to indicate that there was a known loss or
10   some kind of ongoing known problem in 1983 regarding
11   the Lakeland case?
12       A.   In what we've reviewed?
13       Q.   Right.
14       A.   No.
15       Q.   So would you have any explanation as to
16   why more policies wouldn't be listed?
17       MR. WRIGHT:  Objection.  Calls for speculation
18   about why Marsh included certain policies on this
19   document.
20   BY THE WITNESS:
21       A.   I haven't reviewed the Lakeland matter.  I
22   don't know which policies were evaluated and which
23   ones were not.
24       (Deposition Exhibit Number 43
25        marked for identification.)

Page 225

1    BY MR. HUBER:
2        Q.   Is Exhibit 43 a true and accurate copy of
3    a letter dated November 30, 1987 from Zurich to Joan
4    Considine at Marsh?
5        A.   Yes.
6        Q.   Is this a document Zurich produced?
7        A.   Yes.
8        Q.   And is this a copy of the document that
9    Zurich found in its search for claims information
10   that we talked about earlier today?
11       A.   Yes.
12       Q.   Do you know why this one is not signed?
13       A.   No.
14       Q.   In the '80s when Zurich would be
15   sending -- well, what type of letter is this?
16       A.   It looks like a reservation of rights.
17       Q.   In this time frame, was it Zurich's
18   practice to also keep a signed copy of the letter in
19   its files?
20       A.   I don't know.
21       Q.   This letter in the first paragraph, do you
22   see that?
23       A.   Yes.
24       Q.   It refers to claims, plural.  What claims
25   was Zurich referring to there?

Page 226

1        A.   It's talking about the claims that were
2    tendered, which would be listed above, at U.S. EPA
3    Lakeland Disposal site.
4        Q.   Go to page ZURICH922.  Do you see that?
5        A.   Yes.
6        Q.   Paragraph 5, is this the same paragraph
7    that was copied in one of the claim notes that we
8    talked about earlier?
9        A.   Possibly.
10       Q.   Well, what was Zurich's understanding of
11   the other sites referred to in the complaints, that
12   phrase -- that follows the phrase: Landis+Gyr
13   repeated continued storage and/or disposal and
14   discharge of all hazardous substances at its
15   Lakeland site facility and at other sites referred
16   to in other complaints over a period of years.  It
17   was not sudden and accidental.  Therefore, the
18   claims for cost of removal are excluded from the
19   pollution exclusion.
20            What claims was Zurich talking about
21   there?
22       A.   I'm not aware there were complaints, so I
23   don't know what that refers to.
24       Q.   So what were the claims?
25       A.   What were what claims?

Page 227

1        Q.   There's a reference to claims, in the
2    plural, here.
3        A.   Where?
4        Q.   "Over a period of years, was not sudden
5    and accidental.  Therefore, the claims for damages
6    and costs."  Why does it use the word "claims"
7    plural as opposed to "claim"?
8        A.   I don't know.
9        Q.   What are the other sites that are
10   referenced right above that?
11       A.   It talks about sites in a complaint or
12   complaints.  I don't -- I'm not aware there were
13   complaints.  I think this was just a pollution site.
14       Q.   Was it one site or multiple sites that was
15   the topic of this letter?
16       A.   The topic is for -- there's listing one
17   claim in one site.  There isn't listing any
18   complaints or any additional claims.  They would
19   have their own claim number.
20       Q.   And the one site that we know about from
21   Lakeland was at the Lakeland Disposal site, right?
22       A.   Yes.
23       Q.   That was in Lakeland, Indiana?
24       MR. LANSBERRY:  Claypool.
25       MR. HUBER:  Claypool, sorry.

Page 228

1    BY MR. HUBER:
2        Q.   Claypool, Indiana?
3        A.   Yes.
4        Q.   All right.  Turn the page.  Do you see
5    Page 4?
6        A.   Yes.
7        Q.   Do you see a reference in Paragraph No. 6
8    to an exclusion?
9        A.   Yes.
10       Q.   Is that the -- a reference to the owned
11   property exclusion, property owned or occupied by or
12   rented to the insured?
13       A.   Yes.
14       Q.   And what owned property was Zurich
15   referring to in this letter?
16       A.   I'm not sure.
17       Q.   Did Zurich believe that Zurich owned the
18   Lakeland Disposal site?  I'm sorry.  Did Zurich
19   believe that Landis+Gyr owned the Lakeland Disposal
20   site?
21       A.   I don't know.
22       Q.   Do you have any explanation why Zurich
23   would be reserving on the owned property exclusion
24   if this notice only related to the Lakeland Disposal
25   site?

Page 229

1    A.  I did not review the coverage of this
2    claim, so I don't know the details.
3    Q.  Would you agree that the owned property
4    exclusion would not apply to a claim involving a
5    Superfund site that was owned by a third party?
6    A.  Yes.
7        (Deposition Exhibit Number 44
8        marked for identification.)
9    BY MR. HUBER:
10   Q.  You have in front of you Exhibit 44.  Is
11   that a true and accurate copy of a letter Zurich
12   sent to Landis+Gyr's counsel dated January 23, 1995,
13   regarding the Lakeland Disposal site?
14   A.  Yes.
15   Q.  What is this letter?
16   A.  It's a denial of coverage.
17   Q.  Is this a copy of a letter that Zurich
18   produced?
19   A.  Yes.
20   Q.  And it bears Bates label ZURICH972 through
21   976, right?
22   A.  Yes.
23   Q.  And this one is not signed either.  Was it
24   Zurich's practice to keep a signed copy of letters
25   that it sent like this, a denial letter, in the

Page 230

1    1990s?
2    A.  I don't know.
3    Q.  And where did Zurich get this document in
4    its production?
5    A.  This would be in the Lakeland Disposal
6    claim file.
7    Q.  And where was that claim file found?
8    A.  At Retrievex storage facility.
9    Q.  And how did Zurich know to find this
10   particular file there?
11   A.  We had identified the claim when we
12   received the tender letter in September 2014 and
13   identified this as a potentially related matter to
14   investigate, so searched back through the storage
15   records to see if we could locate a paper file and
16   review that file.
17   Q.  Ms. Hairrell, when you look at this
18   Exhibit 44, do you see the file number there?
19   A.  Yes.
20   Q.  And is it 912-51141?
21   A.  Yes.
22   Q.  What does the 912 refer to again?
23   A.  That's the 9 is for the general liability
24   claim, and the 12 is for office 12, which is
25   environmental.

Page 231

1    Q.  And what does the 910 number refer to?
2    A.  It might have been an office 10 at some
3    point in time.  I think 10 is home office currently,
4    so that would also make sense.
5    Q.  What's the difference between office 10
6    and office 12?
7    A.  Just the type of claims that are handled by
8    each group.
9    Q.  Is it a different physical location?
10   A.  No.
11   Q.  If you look back at the first time Zurich
12   assigned a claim number to the Lakeland case, if you
13   look at Exhibit 43 --
14   A.  Yes.
15   Q.  -- do you see the claim number on
16   Exhibit 43 there?  It's claim No. 910-0051141.  Do
17   you see that?
18   A.  Yes.
19   Q.  Do you know at what point in time the file
20   number was changed?
21   A.  I do not.
22   Q.  Do you know why the file number was
23   changed?
24   A.  No.
25

Page 232

1        (Deposition Exhibit Number 45
2        marked for identification.)
3    BY MR. HUBER:
4    Q.  Handing you what's been marked as
5    Exhibit 45, do you see that?
6    A.  Yes.
7    Q.  Is Exhibit 45 a true and accurate copy of
8    a letter Zurich sent to Marsh McLennan regarding the
9    Lakeland case to Landis+Gyr's broker?
10   A.  Yes.
11   Q.  And is the date accurate, November 7,
12   1996?
13   A.  Yes.
14   Q.  Is this a copy of a letter that Zurich
15   produced that it got out of its records?
16   A.  Yes.
17   Q.  Why is this letter signed, this copy that
18   Zurich produced, whereas the other two for the
19   Lakeland matter were not signed?
20   A.  I don't know.
21   Q.  What is happening here in this letter?
22   A.  It looks like the claim office received
23   correspondence on the claim, so the handler is
24   questioning what the correspondence relates to.
25   Q.  So had Zurich declined coverage for the

Page 233

1    Lakeland claim by this point in time?
2        A.   Yes.
3        Q.   And did it deny coverage on or around
4    January 23, 1995?
5        A.   Yes.
6        Q.   And it then closed its file?
7        A.   Yes.
8        Q.   And then almost 2 years later in November
9    of 1996, it reopened its file?
10       A.   Yes.
11       Q.   It did so at the request of the insured or
12   the insured's representative?
13       A.   It looks like there was correspondence from
14   the insured that was forwarded in October relating
15   to something in June, so there was -- I guess the
16   broker forwarded something from the insured to
17   Zurich.
18       Q.   Okay.  And at this point in time, the file
19   number is the 912 number, 912-51141?
20       A.   Yes.
21            (Deposition Exhibit Number 46
22             marked for identification.)
23   BY MR. HUBER:
24       Q.   What is Exhibit 46?
25       A.   It's a screen print from the claim system.

Page 234

1        Q.   Is this a document that Zurich located and
2    produced?
3        A.   Yes.
4        Q.   What kind of claim system is it?
5        A.   It would be from the ACCESS claims system.
6        Q.   The eZACCESS?
7        A.   Originally it was referred to as ACCESS,
8    and then there were some enhancements and it was
9    later referred to as eZACCESS.
10       Q.   So what does this exhibit record?
11       A.   It appears to be a closing screen.
12       Q.   What do you mean by "closing screen"?
13       A.   It looks like where the handler would go to
14   close a claim.
15       Q.   And what would be the date of the closing?
16       A.   I see an archive date.  11/2/2001 looks
17   like an archive date.
18       Q.   If you go back to Exhibit 45, that
19   indicates that the file was closed for the Lakeland
20   matter after the denial in January of '95; is that
21   right?
22       A.   Yes.
23       Q.   Is there any new information that
24   Exhibit 46 contains?
25       A.   I don't believe so.

Page 235

1        Q.   There's a reference on the left here.  It
2    says:  Close entire claim, Y/N.  Do you see that?
3        A.   Yes.
4        Q.   What does that refer to?
5        A.   There could be multiple claimants under one
6    claim, and you might only be looking to close
7    certain claimants and not all of them so you could
8    specify.
9        Q.   Y/N is that a yes and a no?
10       A.   Yes.
11       Q.   And is that N for no is put there?
12       A.   Yes.
13       Q.   Recovery status, what does that refer to?
14       A.   Usually that would refer to if the claim
15   has been referred to the recovery group for any kind
16   of subrogation.
17       Q.   So is that a yes for recovery status?
18       A.   Yes.
19       Q.   And what would happen if when you close a
20   file, you put a no for recovery status and a yes for
21   close entire claim?  What effect would that have?
22       A.   I don't know with these old computer
23   screens, exactly how they work as far as -- this is
24   a closed claim, so I don't know what those boxes
25   refer to in this context.

Page 236

1        Q.   And who decides the inputs in the system?
2        A.   As far as in the claim system?
3        Q.   In this kind of system that is generating
4    the printout, Exhibit 46.
5        A.   The claim handler would be responsible to
6    close the claim.
7        Q.   Do we know who the claim handler was?
8        A.   Not from this screen.  It seemed there are
9    many claim handlers that had worked on the file with
10   the correspondence that was in the claim file.
11            (Deposition Exhibit Number 47
12             marked for identification.)
13   BY MR. HUBER:
14       Q.   Is Exhibit 47 a true and accurate copy of
15   a document Zurich produced regarding the Lakeland
16   Disposal matter?
17       A.   Yes.
18       Q.   Dated January 15, 1996?
19       A.   Yes.
20       Q.   Does it say there that the coverage was
21   denied on 1/23/95?
22       A.   Yes.
23       Q.   And is there a reference to a counsel,
24   letter from counsel dated 6/23/1995 in which counsel
25   indicates it had taken over the file from previous

Page 237

1    counsel.  Is that what that says?
2        A.  Yes.
3        Q.  And do you know who wrote this?
4        A.  Looks like KTX.
5        Q.  Do you know who that was?
6        A.  No.
7        Q.  It states:  In following, I reiterated
8    denial for mine of 7/19 of '95.  Did you ever find a
9    letter dated 7/19/95 reiterating a denial in your
10   search for the Lakeland file?
11       A.  Are you asking if the Lakeland file
12   contains a correspondence from 7/19/95?
13       Q.  Yes, this reiterated denial.
14       A.  I don't know.
15       Q.  So does this indicate that the file had
16   been closed at least by January 15, 1996, for the
17   Lakeland matter?
18       A.  And I don't know the dates when it was
19   closed and reopened and closed again.  It was
20   originally closed after the January denial, and then
21   it looked like it was reopened again.
22           (Deposition Exhibit Number 48
23            marked for identification.)
24   BY MR. HUBER:
25       Q.  Is Exhibit 48 a true and accurate copy of

Page 238

1    a letter -- or sorry, not a letter.  Strike that.
2           Is Exhibit 48 an accurate copy of an
3    interoffice memo dated January 15, 1996, to Amy Zyk
4    from Kipp Exline?
5        A.  Yes.
6        Q.  Amy Zyk is Z Y K?
7        A.  Yes.
8        Q.  Do you have any understanding as to who
9    she was?
10       A.  No.
11       Q.  Who was Kipp Exline?
12       A.  I understand he was the claim handler.
13       Q.  Do you know what file this came from, this
14   page Exhibit 48, ZURICH1511?
15       A.  I would assume from the Lakeland claim
16   file.
17       Q.  It says:  Please close physical file,
18   which should already be closed on ACCESS.  Place
19   contents of the blue file in the coverage drawer
20   under Landis+Gyr, which is an established coverage
21   drawer file.
22           What does that mean to say that it was an
23   established coverage drawer file?
24       A.  That there was information already in the
25   drawer or a folder in the drawer where this could be

Page 239

1    filed where the blue file would go in the
2    established file in the coverage drawer.
3        Q.  Does that mean that there were other
4    claims or other files already there?
5        A.  It could mean there were other claims
6    related to this claim.
7        Q.  Why would they use the term "established
8    coverage drawer file" if it only was referring to
9    this case?
10       A.  The handler might have set up a file to
11   store the information gathered in this case.
12       Q.  What is ACCESS, this system or this
13   reference here?
14       A.  That would be the claim system.
15       Q.  What is that called again?
16       A.  ACCESS.
17       Q.  eZACCESS or ACCESS?
18       A.  It was called ACCESS until about 2003 when
19   it became referred to as eZACCESS.
20       Q.  So was this a different system in 2003?
21       A.  No.
22       Q.  Why did the name change?
23       A.  There were updates to the screens and the
24   look of the system to make the handling easier for
25   the claim people.

Page 240

1        Q.  How is the information on ACCESS organized
2    or kept?
3        A.  It's by claim number.
4           (Deposition Exhibit Number 49
5            marked for identification.)
6    BY MR. HUBER:
7        Q.  Is Exhibit 44 a true and accurate copy --
8    I'm sorry.  Getting late.  I'm sorry.
9           Is Exhibit 49 a true and accurate copy of
10   another letter from Marsh to Zurich dated October 4,
11   1996, regarding the Lakeland Disposal site?
12       A.  Yes.
13       Q.  And there's a reference to 912-51741
14   there?
15       A.  Yes.
16       Q.  Do you know whose handwriting that was?
17       A.  No.
18       Q.  There's a stamp in the center:  Received
19   October 9, 1996, HO claims.  What does that mean?
20       A.  Home office.
21       Q.  There's another stamp:  Environmental
22   claims, October 9, 1996.  What does that refer to?
23       A.  That it was received by the environmental
24   claim department.
25       Q.  There's another reference to L L A N in

1  the top right corner.  What is that?
2      A.  I'm not sure.
3      Q.  Does this indicate that the Lakeland file
4  had to be opened up again?
5      A.  It may or may not be opened depending on
6  what the request was pertaining to.
7      Q.  Did Zurich find this in the Lakeland claim
8  file?
9      A.  Yes.
10         (Deposition Exhibit Number 50
11             marked for identification.)
12  BY MR. HUBER:
13      Q.  Handing you what's been marked as
14  Exhibit 50, is that a copy of a memo to the file
15  that was generated by Zurich on or around
16  November 5, 1996?
17      A.  Yes.
18      Q.  Is this from the same claim number,
19  912-51141?
20      A.  Yes.
21      Q.  And does this note state this file needs
22  to be reopened and reviewed?
23      A.  Yes.
24      Q.  Does that indicate that the Lakeland file
25  was opened again?

1      A.  Yes.
2      Q.  So what is the process for reopening a
3  file?
4      A.  If there's additional correspondence
5  received that requires review, investigation, you
6  know, anything further to be done on the claim, then
7  the handler or the manager would have the claim
8  reopened.
9      Q.  Who makes that decision?
10      A.  Either the handler or the manager.
11         (Deposition Exhibit Number 51
12             marked for identification.)
13  BY MR. HUBER:
14      Q.  Handing you what's been marked as
15  Exhibit 51, does this appear to be a true and
16  accurate copy of a letter from Marsh to Landis+Gyr's
17  broker to Zurich, March 1, 1991, regarding the
18  Lakeland Disposal site?
19      A.  Yes.
20      Q.  Here in this letter to Zurich, the Marsh
21  broker is using claim number 910-51141.
22         Do you see that?
23      A.  Yes.
24      Q.  And there are handwritten notes at the top
25  that says:  Return with file 912-51141.

1      A.  Yes.
2      Q.  Who wrote that?
3      A.  I think the claim handler or the
4  administrative staff.
5      Q.  And who is Watson?  It says to Watson.
6      A.  I don't know.
7      Q.  Was this claim No. 910-0051141, was it
8  closed?
9      A.  No.  I believe that the office number had
10  just changed, the 912, so that was the operating
11  claim number for this case.  910 would refer to home
12  office, which might have been the office number when
13  the claim originally came in.
14      Q.  How do you know that?
15      A.  Well, 910 is the current home office office
16  number; so I don't know when office 12,
17  environmental, got their own office number.
18      Q.  Do you know why the claim number was
19  changed on this file?
20      MR. WRIGHT:  Objection.  Asked and answered.
21  BY THE WITNESS:
22      A.  I don't know for certain.  But seeing that
23  the office number was changed, that's what I would
24  think, that it changed because the office number
25  changed.  But I don't know for certain.

1         (Deposition Exhibit Number 52
2             marked for identification.)
3  BY MR. HUBER:
4      Q.  Is Exhibit 52 a true and accurate copy of
5  a letter dated July 13, 1982, from Zurich to Marsh,
6  Landis+Gyr's broker?
7      A.  Yes.
8      Q.  Does that refer to a certificate of
9  insurance?
10      MR. WRIGHT:  Objection.  These appear to be
11  underwriting documents.  This would be within the
12  scope of the underwriting designee's testimony.
13      MR. HUBER:  I'm not sure.  I'm going to ask her
14  a couple questions.  It may or may not be
15  underwriting.
16      MR. WRIGHT:  She won't be answering them within
17  the scope of her 30(b)(6) testimony.  But if she
18  knows, she can answer.
19  BY MR. HUBER:
20      Q.  Do you know what a certificate of
21  insurance is?
22      A.  Yes.
23      Q.  Have you seen this document before?
24      A.  No.
25      Q.  Do you know where Zurich located this

1    document?
2        A.  No.
3        Q.  Was this document in any of Zurich's
4    claims files, to your knowledge?
5        A.  Not to my knowledge.
6        Q.  In your affidavit in this case,
7    Ms. Hairrell, you state in Paragraph 10 --
8        MR. WRIGHT:  Objection.  Could you provide a
9    copy of her affidavit?
10       MR. HUBER:  Sure.
11           (Deposition Exhibit Number 53
12           marked for identification.)
13   BY MR. HUBER:
14       Q.  Is Exhibit 53 a copy of your affidavit
15   that you signed in this case, less the attachments?
16       A.  Yes.
17       Q.  In Paragraph 10, you state:  If Zurich had
18   received notice of the Sagamore site after May 1,
19   1986, a record of the claim would have been
20   maintained in the claim database.
21       A.  Yes.
22       Q.  And you're referring to the eZACCESS
23   system?
24       A.  Yes.
25       Q.  Back then, it would have been called

1    ACCESS, though, right?
2        A.  Correct.
3        Q.  If Zurich had received notice of the
4    Sagamore site before May of '86, where would that
5    notice have been kept?
6        A.  There would have been a claim set up in the
7    keypunch system that I had referred to.
8        Q.  But it could not have been in eZACCESS?
9        A.  There were claims from that keypunch system
10   that were converted to eZACCESS depending on their
11   status.  Like any open claims would have been
12   converted.  Any claims recently closed would be
13   converted.  Or claims that had, like, information
14   received after the new system, the ACCESS system
15   went into effect that required reopening.
16       Q.  And the source of your information
17   regarding these issues would include your
18   conversation with Joel that you talked about
19   earlier?
20       A.  Yes.
21       Q.  Did it include any other conversations
22   with current or former Zurich employees regarding
23   how things were actually handled in the 1980s?
24       A.  Also I've spoken with the IT department in
25   the past, the systems and processes before the

1    eZACCESS system.
2        Q.  Did you take notes of that conversation
3    with the IT department?
4        A.  No.  I've had conversations with them more
5    than once.
6        Q.  Do you remember who you spoke to at the IT
7    department?
8        A.  Most recently it was Joel.  I can't think
9    of his last name.
10       Q.  Another Joel, different Joel?
11       A.  I'm sorry.  It was Larry.  It was Larry at
12   the IT.  Joel was with the records, paper records.
13   Joel was with the ...
14       Q.  You did have notes of your conversation
15   with Joel in records, right?
16       A.  Yes.
17       Q.  But you did not have notes of your
18   conversation with Larry in IT?
19       A.  No.  That was more kind of confirming what
20   my understanding was of how the records were kept.
21       Q.  And how long has Larry been working for
22   Zurich, if you know?
23       A.  Many years.  I can't say how many.
24       Q.  Do you know how old he is?
25       A.  I'd say 50s.

1        Q.  Do you know if Larry was working for
2    Zurich in 1985 or '86?
3        A.  I'm not sure.
4        Q.  So this information that you talked about
5    in these Paragraphs 9 and 10 and 11 would be based
6    on your conversations with Joel and Larry?
7        A.  Yes.
8        Q.  Do you have any idea how many claims
9    Zurich was handling when eZACCESS or actually
10   ACCESS, whatever system you had in place, ACCESS in
11   1986 went online?
12       A.  No.
13       Q.  Is it your testimony that all of that
14   claims information was added to eZACCESS?
15       A.  The open claims, yes.
16       Q.  Closed claims?
17       A.  Claims recently closed and then select
18   claims that needed to be converted for further
19   handling.
20       Q.  If the insured asked for something like in
21   this other case where they reopened the case?
22       A.  Yes.
23       Q.  Is there any memo or any writing or
24   documentation regarding how decisions were made with
25   respect to adding information to the ACCESS system

Page 249

1  in 1986 as opposed to just leaving it somewhere
2  else?
3      A.  I'm not sure.
4      Q.  So as you sit here today, can you really
5  be sure that Landis did not notify Zurich in the
6  1980s regarding the Sagamore site such as John
7  Masteron and Roger Bennett have testified?
8      MR. WRIGHT:  Objection.  Assumes facts not in
9  evidence.
10  BY THE WITNESS:
11      A.  There were several sources searched for the
12  claims.  So, I mean, the storage records and other
13  places that might have claim information wouldn't be
14  impacted by the change in the computer system, so
15  we'd expect to find paper files if there were no --
16  had the online record not be converted, we would
17  still expect to find paper files.
18      Q.  But you wouldn't expect to find paper
19  files at this point in time if the claim had been
20  closed, if the claim had been denied, and the
21  retention policy had been followed, correct?
22      A.  No.  We would expect to find paper files
23  because Zurich didn't destroy any files.  And even
24  if they destroyed files, we would have a record of
25  their destruction with the storage facility.  So

Page 250

1  there --
2      Q.  Based on the claim number?
3      A.  It would be based on the index, whatever we
4  could find.  If we had a claim number, we could find
5  that through the index or if there was a search for
6  insured name, we could find things that had a hit on
7  the insured name.
8      Q.  But isn't it entirely possible given the
9  document-retention policy that we just went through,
10  that folks at Zurich could have been following
11  instructions and purged and destroyed all records of
12  that pursuant to the claims file directive?
13      A.  Well, we would have had a record of that
14  destruction.  The storage company keeps a record of
15  what's been destroyed and what's still available in
16  the record, so we would see the file is no longer
17  available due to destruction.
18      Q.  Has Zurich produced these records of
19  documents that have been destroyed?  Are there
20  records that actually list what documents Zurich has
21  destroyed?
22      A.  I was informed that Zurich hasn't destroyed
23  any claim or policy files, that there have been
24  other types of files destroyed for which there's
25  records that they're destroyed and no longer in

Page 251

1  storage.
2      Q.  Who informed you of that?
3      A.  Joel.
4      Q.  Joel in records?
5      A.  Yes.
6      Q.  And is that really the sum total of the
7  factual basis at its root for what you're saying
8  here in Paragraphs 9, 10, and 11 of your affidavit?
9      A.  About searching the claim system for a
10  record of the claim?  There isn't a record in the
11  claim system that doesn't have to do with Joel or
12  Larry.
13          Larry gave me the information as far as
14  when the records would definitely be in the claim
15  system from 1986 forward and then selectively before
16  then depending on the status if they're opened or
17  closed.
18      Q.  Well, given that it's selective and you
19  have a document-retention policy, how can you be
20  sure as you sit here today that no Sagamore file was
21  destroyed prior to 1985?
22      A.  Because the storage records would reflect
23  that a claim file sent to storage has been
24  destroyed.
25      Q.  What storage records are you referring to?

Page 252

1      A.  It would be either Iron Mountain or
2  Retrievex.
3      Q.  And those are storage records from
4  Retrievex or Iron Mountain that could be produced by
5  Zurich?
6      A.  I don't know how voluminous they are or
7  what the --
8      MR. WRIGHT:  Can you clarify the scope of what
9  you're asking?  Every single record?
10      MR. HUBER:  She's claiming the storage records
11  are now a basis for her testimony, and I'd like to
12  know where those are and who reviewed them.
13      MR. WRIGHT:  The storage records of every claim
14  that's been maintained by Zurich historically?
15      MR. HUBER:  She said storage records would
16  reflect a claim had been sent to storage or
17  destroyed.
18      MR. WRIGHT:  Correct.  I just don't understand
19  what you're asking in response to that.
20  BY MR. HUBER:
21      Q.  Are there records indicating what
22  documents and files Zurich has destroyed?
23      A.  Yes.
24      Q.  And what are those documents and records
25  called?

Page 253

1    A.  It would be the storage record of general
2  documents that didn't involve claims or policies.
3    Q.  Did anyone look at those records?
4    A.  For ...
5    MR. WRIGHT:  Can you clarify the scope of the
6  question.  Which records?
7  BY MR. HUBER:
8    Q.  The records you just testified about that
9  detail what documents Zurich has destroyed.  Is that
10  really true, that when Zurich destroys records, it
11  keeps a record of what files have been destroyed?
12    A.  Yes, the storage facility would keep track
13  of what's been destroyed.
14    Q.  Okay.  And what storage facility are you
15  talking about?
16    A.  Wherever the records are maintained.  If
17  they're -- most of them are at Iron Mountain.  Some
18  are at Retrievex.  There might be other facilities
19  that different locations have used.
20    Q.  What other facilities would there be other
21  than Retrievex and Iron Mountain who would have
22  these types of records?
23    A.  There could be, I mean, as far as the
24  policies go, I understood that the different
25  underwriting offices utilized different storage

Page 254

1  facilities at different points in time.  So the
2  underwriter could probably provide more on that.  I
3  know from when we searched for policies, they
4  sometimes have to check.  They check with the field
5  office to get information on where any records might
6  be stored.  Now it's centralized, but it wasn't
7  always centralized.
8    Q.  Well, are you here to testify that anyone
9  at Zurich has reviewed these records of Retrievex
10  and Iron Mountain and any other facility that would
11  have records as to which old files may have been
12  destroyed?  Has anyone checked to see whether the
13  documents that we've all been looking for are
14  destroyed?
15    A.  Whether they're claim files in the
16  non-claim file records?
17    Q.  The records that you're talking about.
18    A.  They didn't involve claim files or
19  policies.
20    Q.  Okay.  So what is recorded in these
21  records of destroyed files?
22    A.  They're general company records.  Those
23  were not retained indefinitely.  After time, some of
24  those were destroyed.
25    Q.  We're talking about claims files for

Page 255

1  claims that were reported to Zurich prior to 1986.
2  What happened to those files under the retention
3  policy?
4    A.  They would be in storage.
5    Q.  And it's your testimony today that Zurich
6  didn't follow its retention policies regarding old
7  claim files that have been closed out?
8    A.  That Zurich didn't destroy any claim files
9  and didn't -- also didn't destroy any online
10  records.  So both of those sources would be
11  available to find old reported claims from the '80s.
12    Q.  So Zurich has kept every single claim
13  file?
14    A.  Yes.
15    Q.  How many documents is that?
16    A.  I understand it's a lot.  I don't know.
17    Q.  In hard copy form?
18    MR. WRIGHT:  Objection.  This is outside the
19  scope of the notice.  She's not here to testify
20  about every single claim file --
21    MR. HUBER:  I think it's absolutely relevant to
22  what her testimony is.  That's an outrageous claim.
23  BY MR. HUBER:
24    Q.  I want to understand really what you're
25  saying.

Page 256

1    A.  Well, we found the 1987 claim for Lakeland.
2  I mean, we've obviously retained claims back in the
3  entire claim file.
4    Q.  Your testimony is Zurich had a retention
5  policy and didn't follow it with respect to claims
6  file and kept every claim file even back to 1986?
7    A.  Yes.
8    Q.  Okay.  How long does Zurich plan to keep
9  every single claim file, even those back prior to
10  1986?
11    MR. WRIGHT:  Objection.  Outside the scope of
12  the topics on which she's been noticed.  You can
13  answer if you have knowledge.
14  BY THE WITNESS:
15    A.  Yeah, I'm not part of the records group, so
16  I don't know what their plans, if any, are.
17    MR. HUBER:  We can go off the record.
18    THE VIDEOGRAPHER:  We're going off the record
19  at 5:44 p.m.
20    (A short break was taken.)
21    THE VIDEOGRAPHER:  We're back on record at
22  5:51 p.m.
23  BY MR. HUBER:
24    Q.  So earlier, Ms. Hairrell, we talked about
25  the Lakeland Disposal case, and we talked about how

Page 257

1    Zurich denied coverage and reiterated the denial of
2    coverage.  Do you recall that?
3        A.  Yes.
4        Q.  Was it Zurich's practice to pay on these
5    types of claims had it been given sufficient proof,
6    in its view, of notice regarding the Sagamore site?
7    In other words, would this notice issue have made
8    any difference at all to Zurich?
9        A.  I don't understand the question.
10       Q.  Was it Zurich's practice to pay claims in
11   the nature of the Sagamore claim in the 1980s under
12   a general liability policy over a sudden accidental
13   pollution exclusion?
14       A.  That would be case specific.  I can't
15   answer that in general.
16       Q.  Would it have been Zurich's view that the
17   owned property exclusion barred coverage on the
18   Sagamore claim based on Zurich's nationwide,
19   consistent, and uniform practice regarding handling
20   of claims in the '80s?
21       A.  Each claim is separately reviewed for the
22   jurisdiction, the facts, the policy language, so
23   there would be no uniform position on that.
24       Q.  So is it your testimony that Zurich would
25   have provided coverage for the Sagamore claim in the

Page 258

1    1980s?
2        A.  I don't know.  I can't answer that.
3        Q.  Has Zurich analyzed whether there's
4    coverage under the Sagamore claim based on the facts
5    that you have before you?
6        A.  Only in the coverage litigation.
7        Q.  And has it undertaken any independent
8    analysis of whether or not there's coverage for the
9    Sagamore claim other than that?
10       A.  No.
11       MR. HUBER:  Nothing further at this time.
12          We are going to reserve our right to follow
13   up on some of the documents that have been redacted
14   and some of these records that she mentioned that
15   we've never seen.  Other than that, I don't have any
16   more questions this evening.
17       THE WITNESS:  Okay.  Thank you.
18       MR. HUBER:  Do you have any questions?
19       MR. WRIGHT:  No redirect.
20       THE VIDEOGRAPHER:  Signature?
21       MR. HUBER:  Yes, I'd like to have signature.
22       MR. WRIGHT:  Oh, this is subject to a
23   protective order.  We'd like to -- or we'd like to
24   make this deposition subject of the protective order
25   because of the confidentiality of the exhibits being

Page 259

1    discussed.
2        MR. HUBER:  What kind of legend should I have,
3    confidential or subject to protective order, or
4    what?
5        MR. LANSBERRY:  Just put confidential on the
6    documents.
7        MR. HUBER:  So it's not necessarily the entire
8    deposition; it's just the documents that are marked
9    confidential?
10       MR. LANSBERRY:  And the corresponding testimony
11   that would go with the documents.
12       MR. WRIGHT:  Correct.
13       MR. HUBER:  Okay.  So how is he going to ...
14       MR. LANSBERRY:  You know, I think we can just
15   put on the cover subject to protective order and
16   figure it out later.
17       MR. WRIGHT:  I think that works.  If you need
18   to use selected testimony, we can figure out what to
19   do with it.
20       MR. HUBER:  Let's talk about that more offline.
21   We'll try to let you know.  It's late.  We'll need
22   to look at that protective order.  So we'll work
23   with you on that.  I'm a little reluctant to say we
24   just blanket designate the whole thing.  The whole
25   point of free access to the courts and all that is

Page 260

1    to just focus on what's confidential.  I know we
2    talked about a lot of exhibits.  I don't think all
3    were marked confidential, but some certainly were.
4        MR. WRIGHT:  That's fair.
5        MR. HUBER:  All right.  Thanks.  Appreciate
6    your time.
7        THE VIDEOGRAPHER:  All right.  Going off the
8    record with end of the deposition of Cherish
9    Hairrell at 5:55 p.m.
10          (Witness excused, 5:55.)
11
12
                    _____
13       CHERISH HAIRRELL
14
15   Subscribed and sworn to before me
     this _____ day of _____ 2018.
16
17
                    _____
18
19
20
21
22
23
24
25

Page 261

```
 1              C E R T I F I C A T E
 2   STATE OF ILLINOIS  )
                        ) ss.:
 3   COUNTY OF COOK     )
 4
 5       I, RACHEL F. GARD, CSR, RPR, CLR, CRR, within
 6   and for the State of Illinois do hereby
 7   certify:
 8       That CHERISH HAIRRELL, the witness whose
 9   deposition is hereinbefore set forth, was
10   duly sworn by me and that such deposition
11   is a true record of the testimony given by
12   such witness.
13       I further certify that I am not
14   related to any of the parties to this
15   action by blood or marriage; and that I am
16   in no way interested in the outcome of this
17   matter.
18       IN WITNESS WHEREOF, I have hereunto
19   set my hand this 2nd day of March, 2018.
20
21
     _____
22   RACHEL F. GARD, CSR, RPR, CLR, CRR
23
24
25
```