# EXHIBIT A

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF INDIANA
 2                  LAFAYETTE DIVISION
 3            CAUSE NO. 4:16-cv-000082
 4
      LANDIS+GYR INC.,            )
 5                                )
              Plaintiff,          )
 6                                )
              -vs-                )
 7                                )
      ZURICH AMERICAN INSURANCE   )
 8    COMPANY,                    )
                                  )
 9            Defendant.          )
10
11
12        30(b)(6) DEPOSITION OF LANDIS+GYR INC.
                         BY
13                  JOHN MASTARONE
14
15
16      The deposition upon oral examination of
    JOHN MASTARONE, a witness produced and sworn before me,
17  Amy Doman, RPR, CRR, CSR No. 10-R-3022, Notary Public
    in and for the County of Hamilton, State of Indiana,
18  taken on behalf of the Defendant, at the offices of
    Lewis Wagner, LLP, 501 Indiana Avenue, Suite 200,
19  Indianapolis, Indiana, scheduled to begin at 9:00 a.m.,
    on Thursday, May 31, 2018, pursuant to the Federal
20  Rules of Civil Procedure.
21
22
23
24
25
```

Page 2

```
 1              A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
 3        Brent W. Huber
          Amy Berg
 4        ICE MILLER, LLP
          One American Square
 5        Suite 2900
          Indianapolis, IN 46282-0200
 6        317.236.5942
          brent.huber@icemiller.com
 7        amy.berg@icemiller.com
 8  FOR THE DEFENDANT:
 9        Timothy Wright
          HINSHAW & CULBERTSON, LLP
10        222 North LaSalle Street
          Suite 300
11        Chicago, IL 60601
          312.704.3698
12        twright@hinshawlaw.com
13
          Kyle Lansberry
14        LEWIS WAGNER
          501 Indiana Avenue
15        Suite 200
          Indianapolis, IN  46202
16        317.251.0500
          klansberry@lewiswagner.com
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                 INDEX OF EXAM
 2                                              Page
 3  DIRECT EXAMINATION.............................   6
      Questions by Timothy Wright
 4  CROSS-EXAMINATION.............................. 236
      Questions by Brent W. Huber
 5  REDIRECT EXAMINATION........................... 242
      Questions by Timothy Wright
 6  RECROSS-EXAMINATION............................ 244
      Questions by Brent W. Huber
 7  FURTHER REDIRECT EXAMINATION................... 245
      Questions by Timothy Wright
 8  FURTHER CROSS-EXAMINATION...................... 246
      Questions by Brent W. Huber
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                INDEX OF EXHIBITS
 2  Deposition Exhibits:                           Page
 3  Exhibit 96   - Notice of Rule 30(b)(6) .......  16
                   Deposition and Subpoena Duces
 4                 Tecum to Landis+Gyr, Inc.
    Exhibit 97   - Letter dated 12/9/1982 to Dee .  38
 5                 Craft, Landis 49051 - 52
    Exhibit 98   - Letter dated 3/3/1982, ........  40
 6                 ZUR002149
    Exhibit 99   - Letter dated 1/31/1983, .......  44
 7                 Landis 0063247 - 49
    Exhibit 100  - Letter dated 10/29/1987, ......  52
 8                 ZUR000912
    Exhibit 101  - Facts and Documents in re: ....  55
 9                 Rule 30(b)(7) Deposition of
                   Landis+Gyr Inc., 12 pages
10  Exhibit 102  - Letter dated 6/18/1982, .......  80
                   Landis 0045081 - 5082
11  Exhibit 103  - Letter dated 12/12/1984, ......  83
                   Landis 0044646 - 650
12  Exhibit 104  - Letter dated 6/1/1995, Landis .  87
                   006820 - 6624
13  Exhibit 105  - Letter dated 4/4/1995, ZUR ....  89
                   000977 - 978
14  Exhibit 106  - Affidavit of Roger ............  91
                   Wm. Bennett
15  Exhibit 107  - Letter dated 6/23/1995, ZUR ...  93
                   001424
16  Exhibit 108  - Letter dated 9/29/1997, .......  94
                   Landis 0063286
17  Exhibit 109  - Letter dated 7/10/1995, ....... 111
                   Landis 0063269 - 3270
18  Exhibit 110  - Letter dated 7/12/1995, ....... 112
                   Landis 0063250 - 251
19  Exhibit 111  - Letter dated 10/1/1987, ZUR ... 122
                   000910
20  Exhibit 112  - Complaint and Demand for Jury . 136
                   Trial
21  Exhibit 113  - Letter dated 1/23/1995, ZUR ... 137
                   000972 - 976
22  Exhibit 114  - Spreadsheet.................... 152
    Exhibit 115  - File folder, Lakeland ......... 152
23                 Disposal, Landis 0055116 -
                   55151
24  Exhibit 116  - Duke Energy Bill, Landis ...... 160
                   0004623
25  Exhibit 117  - Duke Energy Bill, Landis ...... 160
                   0004663 - 4664
```



## Page 5

Deposition Exhibits (Continued)
```
Exhibit 118  - Letter dated 10/1/1986, ....... 166
               Landis 0045019 - 020
Exhibit 119  - Report, Landis 0012550 - ...... 174
               12633
Exhibit 120  - QAPP for Preliminary .......... 177
               Remediation Work Plan, Landis
               0054061 - 54081
Exhibit 121  - Arcadis response, Landis ...... 179
               0005611 - 5623
Exhibit 122  - Cardno 2014 Groundwater ....... 179
               Monitoring Program Data,
               Landis 0004782 - 4785
Exhibit 123  - Letter dated 2/7/2005, Landis . 194
               0006801 - 6805
Exhibit 124  - Plaintiff's Responses and ..... 201
               Objections to Defendant
               Zurich American Insurance
               Company's First Set of
               Interrogatories
Exhibit 125  - Second Affidavit of John ...... 202
               Mastarone
Exhibit 126  - Affidavit of John Mastarone.... 204
Exhibit 127  - Affidavit of Chris Abel........ 207
Exhibit 128  - Consent Decree, Landis ........ 212
               0039930 - 39939
Exhibit 129  - Letter dated 12/15/1987, ...... 213
               Landis 0044237 - 44244
Exhibit 130  - Letter from Stuart & Branigin . 224
               dated 2/20/1989
Exhibit 131  - Agreed Order, IDEM............. 230
Exhibit 132  - Certificate of Completion, .... 233
               Voluntary Remediation
               Program, Landis 0042884 -
               42896
Exhibit 133  - Landis & Gyr, Inc., Premium ... 239
               Allocation 10/1/84 - 10/1/85,
               Landis 0063326
Exhibit 134  - Narrative Report, ZUR 001717 .. 239
               - 1718
```

## Page 6

(Time noted: 9:10 a.m.)
(Witness sworn.)

MR. WRIGHT: My name is Timothy Wright of Hinshaw & Culbertson. I represent Zurich American Insurance Company, the defendants in this action. I'll be taking your deposition today. I'm here with Kyle Lansberry of Lewis Wagner, who also represents Zurich American Insurance Company.

MR. HUBER: Brent Huber, Ice Miller, for Landis+Gyr.

MS. BERG: Amy Berg with Ice Miller for Landis+Gyr.

JOHN MASTARONE, having been duly sworn to tell the truth, the whole truth, and nothing but the truth relating to said matter, was examined and testified as follows:

DIRECT EXAMINATION
QUESTIONS BY TIMOTHY WRIGHT:

Q   Mr. Mastarone, could you state your full name and business address?
A   John Fiorindo Mastarone. My business address is 2800 Duncan Road, Lafayette, Indiana.
Q   If you have a direct business phone line and email

## Page 7

address, would you please state that for the record?
A   It is john.mastarone@landisgyr.com. My office phone number 765-429-1238.
Q   Mr. Mastarone, have you ever been deposed before today?
A   I have.
Q   How many times?
A   Once.
Q   What type of matter was it when you were deposed?
A   It was a suit and I was a witness. It was an insurance suit.
Q   Insurance coverage lawsuit?
A   Yes, not involving Landis+Gyr, however, I was the witness.
Q   What was the nature of the lawsuit, if you can recall?
A   It was an asbestos claim.
Q   And who were you testifying on behalf of?
A   I was an expert witness. I was not testifying on behalf of anyone. I was simply stating facts because I knew them, due to a prior business arrangement.
Q   Do you recall the names of the parties to that action?

## Page 8

A   I recall one of them. INOK, I-N-O-K, the company that purchased the property from Landis+Gyr.
Q   Do you know where that lawsuit was pending?
A   In Lafayette, Indiana.
Q   Is that in federal court or in state court?
A   I don't know.
Q   If I ask you a question today that is unclear or that you don't understand, please ask me to clarify it. I will gladly do so. Does that sound fair?
A   Yes.
Q   If I use a word that you do not understand or if you would like a definition of a word, please let me know and I will define the word; is that okay?
A   Yes.
Q   Are you represented by counsel today?
A   I am with -- yes.
Q   And who is your counsel?
A   It is Brent Huber, Ice Miller, and Amy Berg, Ice Miller.
Q   If you need to take any breaks today, please let me know.
A   Yes.
Q   During the deposition, your lawyer may object to a question that I ask. After an objection has been made, you may answer my question unless your lawyer



Connor Reporting
www.connorreporting.com
317.236.6022

**129**

1  BY MR. WRIGHT:
2  Q  And you understand that the insurance file was
3     destroyed by Siemens?
4  A  Yes.
5  Q  But you don't know who at Siemens would have been
6     responsible for destroying it?
7  A  No.
8  Q  Has Landis asserted a claim against Siemens for the
9     destruction of insurance documents related to their
10    claims in this lawsuit?
11 A  No.
12 Q  Do you know why not?
13 A  We have insurance --
14    MR. HUBER: Object to the form of the question
15    to the extent it's beyond the scope of the notice.
16    Go ahead and answer if you can, John.
17 A  Our insurance carrier is Zurich and we believe we
18    are insured by them.
19    BY MR. WRIGHT:
20 Q  Are you aware of any indemnity agreements running
21    between Landis and Siemens?
22 A  There is an indemnity agreement that was written
23    into the sale of the property indemnifying the new
24    owners. However, the terms of that agreement were
25    met when we received closure for the site.

**130**

1  Q  So there's no longer any indemnity agreement
2     running as between Landis and Siemens with respect
3     to the Sagamore site?
4  A  Not to my knowledge.
5     MR. HUBER: Object to the form of the question
6     and I think it's confusing the purchaser of the
7     property with Siemens. And I think you may have
8     misunderstood that last exchange there. Go ahead.
9     BY MR. WRIGHT:
10 Q  Is there --
11 A  I'm not aware of any current indemnity agreement.
12 Q  Can you tell me when Landis first provided notice
13    to Zurich that a governmental agency was demanding
14    Landis to clean up or investigate contamination at
15    the site?
16    MR. HUBER: Objection; asked and answered.
17 A  The knowledge that this might occur, we've already
18    discussed with Marsh, when we requested coverage
19    for a hazardous waste -- for a surface impoundment.
20    And in addition, Marsh McLennan recommended that --
21    I'm referring here to Exhibit 99 -- where the M&M
22    Protective Consultants stated that they were
23    wanting to get a feel for the extent of liability
24    exposure. And that there is a need to evaluate
25    possible toxic sludge accumulation in the pond, and

**131**

1     where they recommended two reputable environmental
2     consultants. And so those -- so at this point --
3     BY MR. WRIGHT:
4  Q  You have no evidence --
5  A  At this point, Marsh McLennan knew and was actively
6     involved and they understood that there would be
7     liability. The liability was first the
8     contamination that was first proven when the -- in
9     the groundwater when samples were taken in 1986.
10    And then there was, as a result of the cleanup of
11    the surface impoundment, exposure to liability
12    under the Superfund sites, Lakeland Landfill
13    followed by Four County.
14 Q  And again, you don't know whether that letter that
15    you just referred to was ever sent to Zurich,
16    correct?
17 A  Zurich's agent is Marsh McLennan. So notification
18    of Marsh McLennan is notification of Zurich.
19 Q  What is the factual basis for your belief that
20    Marsh is the agent of Zurich?
21 A  There is a document that says so.
22 Q  Which document would that be?
23 A  Now you're hunting and pecking. Let me return
24    these in order. Forgive me, it's taking a long
25    time to get to the exact document I referred to.

**132**

1     MR. HUBER: Is that what you're looking for?
2     THE WITNESS: Yes.
3     BY MR. WRIGHT:
4  Q  Let the record reflect that Landis' counsel is
5     handing the witness two documents to answer this
6     question.
7     MR. HUBER: I would be happy to take them back
8     and you can take the next hour looking for it, if
9     you prefer.
10    MR. WRIGHT: I'm just letting the record
11    reflect it.
12    MR. HUBER: Okay. Which do you prefer?
13    MR. WRIGHT: It's up to you.
14    MR. HUBER: It's really up to you. It's your
15    deposition and the clock is ticking.
16    BY MR. WRIGHT:
17 Q  Well, if you can't find the factual evidence
18    supporting your belief that Marsh is the agent of
19    Landis -- or, Marsh is the agent of Zurich, then we
20    will leave it at that.
21 A  We covered this actually in a section, in the first
22    part of the deposition under Topic Number 1.
23    BY MR. WRIGHT:
24 Q  Okay. Setting aside communication --
25 A  And that is in Landis 0063312 and Landis 0063313.



```
                                                      141
 1       Do you know who would have corresponded with
 2    Zurich from the Bennett firm?
 3  A  Roger Bennett.
 4  Q  And do you know how the communication between the
 5    Bennett firm and Zurich was made in 1995?
 6  A  Only by reference to the letter dated July 23rd,
 7    1995.  Or, I'm sorry, that's wrong.  Forgive me.
 8    I'm getting the exhibits mixed up again.
 9       The letter dated July 12th, 1995, and entered
10    in as Exhibit 110.  And the letter was to James
11    Schlatter.
12  Q  And that's the basis for your belief that the
13    Bennett firm communicated with Zurich in 1995?
14  A  That, in conjunction with Marianne Owen's letter,
15    Exhibit 109.
16  Q  Do you know if the Bennett firm ever followed up
17    with Zurich to confirm that it was put on notice of
18    Landis' Sagamore site claim?
19  A  I do not know.  That information would be in the
20    file that was lost.
21  Q  So Bennett did not retain copies of any of its
22    alleged communications with Zurich related to the
23    Sagamore site?
24  A  That's correct.
25  Q  Do you know why they did not retain copies?
```

```
                                                      142
 1       MR. HUBER:  Object to the form of the
 2    question.  We're looking at some documents that
 3    came from the Bennett file.
 4    BY MR. WRIGHT:
 5  Q  I'm asking about Bennett firm communications to
 6    Zurich.
 7       MR. HUBER:  Ah, okay.
 8  A  Those files were sent to Latham & Watkins and at
 9    about that time period, Siemens entered into the
10    picture and I have no further knowledge about them
11    after that happened, other than a few pieces of
12    paper that were still available for retrieval.
13    BY MR. WRIGHT:
14  Q  So Bennett did retain -- the Bennett firm did
15    retain some copies of correspondence about the
16    Sagamore site claim?
17  A  Well, I can't speak for Roger Bennett.
18  Q  Are you aware of any copies of communications that
19    the Bennett firm made about the Sagamore site
20    claim?
21       MR. HUBER:  Object to the form of the
22    question.  We just covered two exhibits from the
23    Bennett firm.  Are you talking about something
24    else?
25       MR. WRIGHT:  That's what I'm trying to
```

```
                                                      143
 1    establish.
 2  A  These two are the --
 3    BY MR. WRIGHT:
 4  Q  The Bennett firm retained copies of some
 5    communications about the Sagamore site claim, but
 6    not others?
 7  A  I cannot speak for Roger Bennett and the Bennett
 8    firm.  I know that we have these documents.
 9  Q  Turning to paragraph 2 of the complaint, this is
10    Exhibit 112 --
11       THE WITNESS:  Can we take a break?
12       MR. WRIGHT:  Of course.
13       (A recess was taken between 2:16 p.m. and
14    2:22 p.m.)
15    BY MR. WRIGHT:
16  Q  Mr. Mastarone, we were talking about Exhibit 112,
17    Landis' complaint in this lawsuit.  I wanted to
18    call your attention to paragraph 2, which provides,
19    "The lead primary liability insurer claims has no
20    record of this claim, even though it was notified
21    many years ago and wrongfully denied coverage."
22       When does Landis contend that Zurich denied
23    coverage for the Sagamore site?
24  A  Well, it did so on at least two occasions.  It did
25    so when it denied coverage for Lakeland Landfill
```

```
                                                      144
 1    and it did so more recently when coverage was
 2    requested again.
 3  Q  So Landis contends that Zurich's denial of coverage
 4    for the Lakeland site was a denial of coverage for
 5    the Sagamore site?
 6       MR. HUBER:  Objection; misstates the
 7    testimony.  He just said just the opposite.
 8    BY MR. WRIGHT:
 9  Q  The question was:  "When does Landis contend that
10    Zurich denied coverage for the Sagamore site?"
11       "Answer:  Well, it did so on at least two
12    occasions.  It did so when it denied coverage for
13    Lakeland Landfill."
14  A  In the general policy exclusion and the reasoning
15    for it.
16  Q  So Landis' position is that it deduced that Zurich
17    has denied coverage for the Sagamore site claim
18    based on Zurich's denial of the Lakeland site
19    claim?
20       MR. HUBER:  Objection; misstates the
21    testimony, asked and answered already.  Go ahead.
22  A  The communication that we have in our possession is
23    for the Lakeland site when coverage was denied.
24    BY MR. WRIGHT:
25  Q  And when Landis received that, their understanding
```



## Page 145

1  was that Zurich was also denying coverage for the
2  Sagamore site claim?
3  A   Those records would be in the file that was lost.
4     I cannot speak further than that.
5  Q   I'm still trying to get at why Landis contends that
6     Zurich denied coverage for the Sagamore site claim?
7        MR. HUBER:  Objection; asked and answered.  We
8     already covered the basis for that in the letters
9     that he's talked about.
10       MR. WRIGHT:  I would like to understand a bit
11    more from Mr. Mastarone because I don't believe
12    that that was addressed.
13   BY MR. WRIGHT:
14 Q   How was it that Landis came to believe that Zurich
15    was denying coverage for the Sagamore site claim
16    based on Zurich's denial of coverage for the
17    Lakeland site claim?
18       MR. HUBER:  Objection; misstates the
19    testimony.  He testified earlier that there were
20    two claims, two denials.
21 A   Once again, I would refer to Marianne Owen's letter
22    of July 10th, Exhibit 109, where reference to all
23    the sites are made.  And the July 12th,
24    Exhibit 110, letter from Roger Bennett to Jim
25    Schlatter, that all of the carriers have been

## Page 146

1     properly notified.
2    BY MR. WRIGHT:
3  Q   But does either of those letters state that Zurich
4     had denied coverage for the Sagamore site claim?
5  A   Not at this time, no.
6  Q   So why do those two letters lead you to conclude
7     that Zurich denied coverage for the Sagamore site
8     claim?
9        MR. HUBER:  Objection.  I think the documents
10    speak for themselves.  Go ahead and answer.  The
11    two letters you're talking about, are which two?
12       THE WITNESS:  This is Exhibit 110 and 109.
13 A   This provides evidence that a claim was made.  We
14    believe that the claims included all the sites and
15    that the file that contained that information is
16    lost.
17   BY MR. WRIGHT:
18 Q   Okay.  Does that information help you answer my
19    original question, which is:  When does Landis
20    contend that Zurich denied coverage for the
21    Sagamore site?
22 A   I don't have that letter.
23 Q   And you don't know the date?
24 A   I do not.
25 Q   Do you know the approximate date?

## Page 147

1  A   I do not.
2  Q   Do you know the decade?
3  A   The information would be in the file that was lost.
4  Q   But you're certain, based on the information that
5     you've reviewed, that Zurich had issued a denial of
6     coverage for the Sagamore site claim?
7  A   The information I have that would provide that
8     information, has been lost.  I do not have that
9     file.
10 Q   So Landis has no opinion about the date on which it
11    believes that Zurich denied coverage for the
12    Sagamore site claim?
13       MR. HUBER:  Objection; misstates the testimony
14    and misstates the two documents that you're asking
15    about.
16   BY MR. WRIGHT:
17 Q   You can answer.
18 A   The information is missing.
19 Q   Why did Landis not file a coverage action against
20    Zurich whenever it believed that Zurich denied --
21    wrongfully denied coverage for the Sagamore site
22    claim?
23 A   I don't know that we did not.  That information
24    will be in the insurance file.  And that file was
25    taken over by Siemens.

## Page 148

1  Q   You don't know whether Landis filed a coverage
2     action against Zurich at any point in time before
3     2016?
4  A   2015 or '14.
5        MR. HUBER:  Object to the form of the
6     question.  I think we are well beyond the scope of
7     the deposition topic.  So I don't believe this
8     should bind the company.  Go ahead and answer.
9        MR. WRIGHT:  The deposition topic is:  "A
10    complete deposition of the facts and circumstances
11    and the identity of all witnesses that support your
12    allegation that Zurich denied coverage."
13       MR. HUBER:  Yeah, I don't think that has
14    anything to do with the question.  You just asked
15    about other lawsuits, but go ahead and answer as to
16    your own knowledge.
17   BY MR. WRIGHT:
18 Q   I asked why Landis did not file a coverage action
19    against Zurich.
20       MR. HUBER:  Hold on.  Object to the extent
21    you're asking for legal strategy or legal opinions
22    and advice of counsel.  Go ahead and answer as best
23    you can, and if you can, as to any nonprivileged
24    information relevant to that question.
25 A   I do not know that we did not.  I do not have the



### Page 149

1    information.
2    BY MR. WRIGHT:
3  Q  I'd like to go to a document, and I believe it may
4     have already been marked as an exhibit. Has Landis
5     63250 been marked? This is a letter from
6     Mr. Bennett to Schlatter.
7  A  Exhibit 110.
8  Q  Thank you. The end of the second paragraph,
9     Mr. Bennett states: "The statute of limitations
10    doesn't run until at least August of 1997, by my
11    reckoning, and the matter is diaried accordingly in
12    our office."
13        Does this refer to the statute of limitations
14    applicable to Landis' Sagamore site claim?
15       MR. HUBER: Object to the form of the question
16    to the extent that it calls for attorney-client
17    privileged communication beyond the scope of that
18    letter or to a different subject matter. Also to
19    the extent that it asks him to read Mr. Bennett's
20    mind.
21       Go ahead and answer if you can.
22  A  I do not know what Roger meant.
23    BY MR. WRIGHT:
24  Q  And do you know whether the statute of limitations
25    referenced the Sagamore site claim?

### Page 150

1  A  I do not know.
2       MR. HUBER: Let's slow it down a little bit.
3    Object to the extent that it calls for a legal
4    conclusion and the interpretation of statute of
5    limitations. Go ahead.
6  A  I do not know.
7    BY MR. WRIGHT:
8  Q  Do you have an understanding -- any understanding
9    of the basis for the position that the statute of
10   limitations could run by August of 1997?
11      MR. HUBER: Again, object to the extent you
12   are asking for a legal interpretation from this
13   witness. He is here to talk about facts, not how
14   to interpret the statute of limitations. Go ahead
15   and answer based on your own personal knowledge, if
16   you can.
17  A  I do not know.
18    BY MR. WRIGHT:
19  Q  You previously stated that the first sentence in
20   this letter, which, and I quote it: "It appears
21   that your CGL carriers have all been properly
22   notified."
23      You previously testified that that refers to
24   the Sagamore site claim, correct?
25  A  Based on the letter from Marianne Owen to me dated

### Page 151

1    two days earlier, and Marianne Owen reports to
2    Roger Bennett. And point 4 of that July 10th
3    letter concerns insurance coverage for Four County
4    Landfill, Lakeland Landfill, and the surface
5    impoundment. I would think that that may have been
6    for all the coverage. And this is a letter to
7    Mr. Schlatter. And it's talking about a
8    conversation. And so in that sense, I did not
9    participate in that conversation. So I cannot
10   say -- report as to what was said.
11       But based on the July 10th letter and the
12   declaration, that all the carriers have been
13   notified, and then there is reference to the
14   Supreme Court.
15  Q  And all of what --
16  A  So I'm not sure.
17  Q  Everything that you just said leads you, or leads
18    Landis to conclude that the first sentence
19    encompasses the Sagamore site claim?
20  A  These two taken together lead us to that
21    conclusion.
22  Q  But Landis takes no position as to whether the last
23    sentence about the statute of limitations applies
24    to the Sagamore site claim; is that correct?
25  A  I don't know.

### Page 152

1        MR. HUBER: Objection; misstates the
2    testimony. He's not here to talk about that type
3    of a legal question. Go ahead and answer based on
4    your own personal knowledge.
5  A  I have no knowledge about that subject.
6        (Deposition Exhibit 114 was marked for
7    identification.)
8        MR. WRIGHT: Would you mark this as well?
9        (Deposition Exhibit 115 was marked for
10    identification.)
11  Q  Mr. Mastarone, have you seen Exhibit 115 before?
12       MR. HUBER: Which is which here?
13       MR. WRIGHT: Exhibit 115 is the document
14    Bates-stamped Landis 55116. The full Bates range
15    is Landis 55116 through 5151.
16       MR. HUBER: I would object to Exhibit 115,
17    lack of foundation. And also seemed to be a great
18    big combination of a lot of different things. So
19    I'm not sure where we're going. But it is more
20    than one document, more than one exhibit.
21    BY MR. WRIGHT:
22  Q  Have you seen this document, or any of these
23    documents before, Mr. Mastarone?
24  A  The first series of pages, 117 through 120, are
25    attached to my affidavit. I have seen these

Page 157

1 Q How would the invoice reflect that the invoice had
2 been paid?
3 A It would have been marked, stamped "paid" in some
4 way.
5 Q And how would the other spreadsheet that you were
6 referring to reflect that the invoice had been
7 paid?
8 A What other -- what are you talking about?
9 Q You said that: "There was a summary spreadsheet
10 saying how much the company had spent or charged us
11 in a given year."
12 A That would have been provided by a consultant. I'm
13 referring particularly to Levine Fricke. They
14 provided us a summary of payments, expenditures.
15 Q How does that summary reflect that the charges were
16 paid as opposed to invoiced?
17 A If payments were late, I would receive emails
18 saying, "Please pay us for this invoice."
19 Q So you presume --
20 A They continued to work for a very long period of
21 time.
22 Q So that you're working off of a presumption that if
23 there was a summary sheet provided by a vendor --
24 A No. I'm working off the assumption that the vendor
25 would have stopped work had they not been paid.

Page 158

1 They were paid.
2 Q Do you know whether any of this evidence of payment
3 has been produced in this litigation?
4 A I do not.
5 Q All of these invoices are dated 1999 or later,
6 correct?
7 A Yes.
8 Q In fact, most of them, apart from the first one,
9 which is dated 1999, and the second which is dated
10 2001, the remainder are dated 2002 or later?
11 A Yes.
12 Q Why is Landis not seeking payment from Zurich or
13 any costs that were incurred before those dates?
14 A We don't have the invoices and therefore, we do not
15 feel we could make the claim without the --
16 THE REPORTER: I'm sorry, I couldn't hear that
17 last part.
18 A We don't have invoices.
19 Q Do you know what happened to them?
20 A No. Lost. They were paper invoices, not
21 electronic.
22 Q Are any of the costs incurred on this
23 spreadsheet -- I'm sorry. Strike that.
24 Are any of the costs identified by this
25 spreadsheet incurred for RCRA closure-related

Page 159

1 activities?
2 MR. HUBER: Objection. That's really kind of
3 a vague question in this context. Go ahead.
4 A I believe they all are.
5 BY MR. WRIGHT:
6 Q They all relate to RCRA closure-related activities?
7 A Yes. Encompassing the fact that our voluntary
8 remediation agreement was a subset for RCRA
9 closure. In other words, the RCRA group required
10 that we obtain voluntary remediation agreement
11 completion before they would grant closure for the
12 site.
13 Q So the VRP activity and the RCRA-related activity
14 are really two sides of the same coin?
15 MR. HUBER: Objection; misstates the
16 testimony. It's a closure within a closure.
17 A Yeah, the VRP was a subset of RCRA.
18 BY MR. WRIGHT:
19 Q Okay. But you don't get to the VRP without first
20 getting to the RCRA?
21 MR. HUBER: Object to the form of the
22 question, misstates the testimony and the statutes.
23 BY MR. WRIGHT:
24 Q Strike that.
25 Did the RCRA-related activities give rise to

Page 160

1 the VRP-related activities?
2 A Yes.
3 Q Were any of these invoices submitted to Zurich for
4 approval before they were paid?
5 A No.
6 Q Do you know why not?
7 A At this point, we believe coverage had been denied.
8 Q So by 1999, Landis contends that Zurich had denied
9 coverage?
10 A Based on the rejection for the Lakeland Landfill,
11 yes. But the file is missing that would have that
12 information.
13 (Deposition Exhibit 116 was marked for
14 identification.)
15 MR. WRIGHT: And if you could mark this.
16 (Deposition Exhibit 117 was marked for
17 identification.)
18 Q Mr. Mastarone, have you seen these two invoices
19 before?
20 A I have seen invoices similar to it.
21 Q These are from Duke Energy, they appear to reflect
22 cost of electricity being charged to Landis. The
23 first invoice is for electricity usage from
24 December 17th, 2017, to January 21st, 2018, and
25 it's for $20,571.36. The second invoice is for

**Page 173**

1 representing Landis+Gyr to the RCRA section of IDEM
2 as opposed to the Fricke, LLR, who -- Arcadis, who
3 were retained to manage and represent Landis+Gyr
4 for the VRP.
5 Q  Is it fair to say that ATEC handled matters related
6    to compliance with RCRA?
7 A  Yes.
8 Q  Did Landis provide any notice to Zurich about its
9    retention of ATEC?
10      MR. HUBER: Object to the form of the
11   question. We've asked and answered this same type
12   of question over and over. And by the date of this
13   Exhibit 104, which is June of '95, Zurich had
14   already denied coverage.
15    BY MR. WRIGHT:
16 Q  You can answer.
17 A  Yes. By this date, June 1st of 1995, Zurich had
18   already denied coverage.
19 Q  For the Sagamore site claim?
20 A  I can't answer that specifically because I don't
21   have that file.
22 Q  My question was, why -- my first question was: Was
23   notice provided to Zurich about the retention of
24   ATEC? And your answer was, by that date, June 1st
25   of 1995, Zurich had already denied coverage. What

**Page 174**

1    did you mean by that?
2 A  If the coverage had been denied, why would we -- is
3    it required?
4 Q  I'm asking you why no notice was provided to Zurich
5    of the retention of ATEC.
6       MR. HUBER: Object to the form of the question
7    to the extent it calls for a legal conclusion,
8    insurance coverage analysis, that sort of thing.
9    Go ahead and testify as to the facts as best you
10   can.
11 A  At this point in time, Landis+Gyr believed the
12   coverage had been denied.
13    BY MR. WRIGHT:
14 Q  At that point in time, Landis+Gyr believed the
15   coverage had been denied for the Sagamore site
16   claim?
17 A  For all of our claims.
18      (Deposition Exhibit 119 was marked for
19   identification.)
20 Q  Mr. Mastarone, this is a large document. I only
21   have questions for you on two or three specific
22   pages. My first one is about ATC Associates.
23 A  Yes.
24 Q  Was this assessment plan prepared by ATC
25   Associates, Inc.?

**Page 175**

1 A  Their name changed over time. At this time they
2    were known as ATC, as opposed to ATEC, A-T-E-C, and
3    a series of other names.
4 Q  So they are the same company as ATEC?
5 A  Yes.
6 Q  And they performed the same roles --
7 A  Yes.
8 Q  -- as ATEC?
9      Looking at page 12552, Landis+Gyr, Inc.
10   Certification. Is it safe to say that any reports
11   by ATC with this certification were reviewed by
12   Landis and are accurate?
13 A  Yes.
14 Q  Turning to page 12555 at the top of the page, it
15   says, "ATC Project Number 86.21925.0004."
16      MR. HUBER: Hold on just a second.
17    BY MR. WRIGHT:
18 Q  I'm sorry, strike that.
19     I'd like to go to page 12555 and 12556,
20   sections 1.1 and 1.2. It provides a history of
21   closure at the site. To the best of your
22   knowledge, is this history of the closure accurate?
23     MR. HUBER: Object to the form of the
24   question. It's overbroad and requires a summary of
25   years and years of work.

**Page 176**

1    BY MR. WRIGHT:
2 Q  If you can say.
3 A  We're talking about section 1.1 and 1.2?
4 Q  That's correct.
5     MR. HUBER: I would object. I think you're
6   asking him to talk about the structure of the
7   company and the various Siemens and Landis entities
8   during that time frame projecting his -- beyond the
9   scope. Really not the point of the document
10  anyway. But go ahead and answer.
11 A  What's the question?
12   BY MR. WRIGHT:
13 Q  Are sections 1.1 and 1.2 accurate, to the best of
14   your knowledge?
15 A  To the best of my knowledge, they are.
16 Q  Same question for section 1.3, it's three
17   paragraphs.
18 A  I've read it.
19 Q  Is that accurate to the best of your knowledge?
20 A  Not quite.
21 Q  Not quite. What is not accurate about it?
22 A  There were two additional releases -- well,
23   actually, that is -- that is correct. I'm sorry.
24 Q  On the second paragraph, do you see the reference
25   to: "An uncontrolled release of approximately



181

1  initially. And it's separate from the sanitary
2  treatment system that existed on the site as well.
3  Q  Is it fair to say that Landis knew that waste
4     sludge had been dumped into the surface impoundment
5     unit since 1953?
6        MR. HUBER: Object to the term "waste" as to
7     what type of waste you're referring to.
8        MR. WRIGHT: The same waste sludge that's
9     referenced in the report in paragraph 2.
10 A  It was not regulated, other than as part of a
11    discharge under, at a later time, an NPD that's
12    permanent.
13   BY MR. WRIGHT:
14 Q  Right. But Landis always knew that waste sludge
15    had been dumped into that unit?
16 A  That was part of -- that was the intent, was for
17    the sludge to settle out. That was the purpose.
18 Q  When did Landis first become aware that it was
19    potentially liable for releases coming from the
20    surface impoundment?
21 A  It gradually became aware beginning about 1983.
22    The company thought that perhaps that was not the
23    case. However, a series of visits by the EPA and
24    IDEM convinced us that maybe it was, in fact,
25    subject to RCRA.

182

1  Q  And Landis became aware that it was liable for
2     those releases as of 1987?
3        MR. HUBER: Objection to the term "releases"
4     as to what you're talking about on this specific
5     day and the time.
6        MR. WRIGHT: The releases described by
7     paragraph 2.
8  A  The statement is that the surface impoundment was
9     active from approximately 1953 to 1985 when the
10    surface impoundment was no longer -- was bypassed
11    and taken out of service because we were not, at
12    that point, going to apply for a Part B permit, and
13    reconstruct that surface impoundment as a lined
14    structure as required under RCRA.
15   BY MR. WRIGHT:
16 Q  My question was, when did Landis become aware that
17    it was liable for releases that were coming from
18    the surface impoundment?
19 A  I think that Marsh McLennan pointed that out to us
20    in 1983. This document, Exhibit Number 99,
21    addresses that issue exactly.
22 Q  Okay. Turn to -- I'm sorry. On the same page,
23    there is a reference in paragraph 3, section 1.2?
24 A  Paragraph 3 of section 1.2.
25 Q  Two vapor degreasing units?

183

1  A  Yes.
2  Q  What do the degreasers do?
3  A  They remove oils from metal parts.
4  Q  Was TCE used as a solvent in degreasers?
5  A  It was.
6  Q  Why was TCE used as a solvent?
7  A  It was a chemical commonly used for that purpose in
8     many industries across the world.
9  Q  When did Landis become aware that TCE was contained
10    in the solvent?
11 A  The solvent was purchased as TCE.
12 Q  So as of the first usage of the degreasers, Landis
13    was aware that TCE was involved?
14 A  That's why they bought it.
15 Q  Where were the degreasers located in relation to
16    the surface impoundment?
17 A  It depends on the year we're talking about. In my
18    personal -- since I've been with the company, they
19    were located more or less in the center of the
20    building. Prior to that, I am told they were
21    located further to the south.
22 Q  Were they near the surface impoundment?
23 A  Not very.
24 Q  When did Landis first become aware of TCE
25    contamination at the site's degreasing operations?

184

1        MR. HUBER: Object to the form of the question
2     as to whether you are talking about soil or other
3     contamination. Go ahead.
4    BY MR. WRIGHT:
5  Q  Any TCE contamination from the site's degreasing
6     operations?
7  A  There was a Phase 2 investigation that determined
8     that there was a large concentration in that area.
9     And a Phase 2 investigation is dated August 8,
10    2000, and you have -- I don't have a Landis IND
11    number for this.
12 Q  That's fine. Is that the date on which Landis
13    first became aware that it was potentially liable
14    for TCE contamination at the site?
15 A  No.
16 Q  When did it learn or become aware that it was
17    potentially liable for TCE contamination at the
18    site --
19 A  When the results --
20 Q  -- from -- excuse me, from the degreasing
21    operations?
22 A  Well, it's very difficult to say what molecule went
23    where. There were several other sources for -- of
24    release. And there is a -- I've got to find the
25    right section here we're talking about. Which



Connor Reporting
www.connorreporting.com
317.236.6022

185

1   section are we talking about?
2 Q   I'm just asking for when Landis first became aware.
3 A   There's a section concerning this whole subject.
4   I'd like to look at that. Section 23 addresses
5   that. There is a -- in Document Landis 0044164,
6   there is an EPA soil investigation that was
7   conducted that showed contamination of soil by TCE
8   in five or six locations scattered around the
9   facility.
10      And I can recall having a conversation with my
11   supervisor, Ed Rockhill, who was employed by
12   Landis+Gyr during the 1970s and '80s, regarding
13   sudden and accidental releases. And he
14   particularly mentioned to me that prior to my --
15   earlier, he was not specific as to the date, but
16   prior to my employment, there was a tanker truck
17   that was delivering TCE to one of our outdoor
18   storage facilities. And the truck driver was not
19   paying attention and lost about half of his load to
20   the ground. I'm not sure exactly where that was
21   around the facility, because our outdoor storage
22   tanks were at various locations at different times.
23 Q   Again, I'm just interested in knowing when Landis
24   first became aware.
25 A   In 1986 when we did a groundwater sampling, we knew

186

1   we had trichlor in the water.
2 Q   That's when it first learned of TCE contamination
3   at the site?
4 A   Yes. That's when we first learned we had TCE.
5 Q   Is that also the date when Landis became aware of
6   its potential liability for TCE contamination?
7 A   Well, that was when the -- the following year when
8   the closure plan was accepted, therefore as part of
9   the closure plan, for the surface impoundment, we
10   had to define the nature and extent of the
11   contamination and determine the plume's location,
12   both horizontally and vertically.
13 Q   So the date of that report, 1987 is the date when
14   Landis first learned of TCE contamination at the
15   site -- or I'm sorry -- of Landis' potential
16   liability or TCE?
17      MR. HUBER: Object to the form of the
18   question. You said "report" and I believe he said
19   it was an IDEM document.
20      MR. WRIGHT: Okay. The date of the IDEM
21   document.
22      MR. HUBER: There's a couple different things
23   happening in '86 and '87.
24   BY MR. WRIGHT:
25 Q   The date of the IDEM document is the date on which

187

1   Landis became aware of its potential liability for
2   TCE contamination at the site?
3 A   Uh-huh.
4      MR. HUBER: Actual liability.
5   BY MR. WRIGHT:
6 Q   And actual liability. They were both learned at
7   the same time?
8 A   Simultaneity is probably impossible.
9 Q   What I'm saying is, Landis had no awareness that it
10   would potentially be liable for TCE contamination
11   prior to 1986 or '87?
12 A   We had hard knowledge in 1986.
13 Q   I'm asking about partial.
14 A   We had potential knowledge based on Marsh McLennan
15   Protection Consultants group saying that
16   exposure -- that there might be a possible toxic
17   nature introduced into the holding pond and a need
18   to evaluate possible toxic sludge contamination
19   from the pond.
20 Q   Okay. And what's the date of that?
21 A   1983, January 31.
22 Q   So as of 1983, Landis was aware of potential
23   liability for TCE contamination?
24 A   And Marsh McLennan.
25 Q   At that time, did Landis know about the source of

188

1   the TCE contamination?
2 A   At that time, we had no proof that there was
3   contamination. That did not occur until 1986.
4 Q   Did Landis know of the potential sources of the
5   potential TCE contamination in 1983?
6 A   At that point, I believe the emphasis was on the
7   sludges and methyls associated with those sludges,
8   and not much attention was being directed toward
9   TCE because we didn't realize it was something that
10   had been released. And it was subject, again, to
11   RCRA as hazardous waste and had to be managed as a
12   hazardous waste at that point. So that was -- at
13   that time period, Landis+Gyr's concern was managing
14   TCE as a hazardous waste.
15 Q   At that time period meaning 1983?
16 A   No. It was probably 1984.
17 Q   Okay.
18 A   After -- as a result, as a consequence of the
19   notices of deficiencies or the consent decrees.
20 Q   In 1984, was it aware of the various potential
21   sources of TCE at the site?
22 A   Again, at that time, TCE was looked at as a
23   hazardous waste that would be managed and
24   acknowledged of its release to the environment, and
25   as a contaminate that had to be remediated was not

193

1  new facility in 2002."  My question is, where did
2  the facility go?
3  A   Into a building next door, adjacent to the building
4      that was abandoned and I think the date -- this is
5      an ATC document.  The date is actually 2000.
6         This was a complicated period for the company.
7      We had moved half of our manufacturing to Mexico in
8      1997.  And the remaining manufacturing was moved to
9      a new facility next door to the former facility in
10     2000.
11 Q   Was that new location 2800 Duncan Road?
12 A   Yes.
13 Q   Is it correct to say that Landis is not seeking
14     recovery from Zurich for any payments made to
15     investigate or remediate contamination at 2800
16     Duncan Road?
17        MR. HUBER:  Object to the form of the
18     question.  It's confusing the addresses.  Go ahead.
19 A   Remediation under the VRP covered the original
20     Duncan Electric site, which had transferred
21     ownership to different entities at that time.  The
22     period you're talking about, there were at least
23     two owners of the property.  And Landis'
24     responsibility, under our agreements with the VRP
25     and RCRA, extended over all of those sites, the

194

1   locations.
2      So there were sampling wells and equipment on
3   that site.
4      (Deposition Exhibit 123 was marked for
5   identification.)
6  BY MR. WRIGHT:
7  Q   This is a letter addressed to you from IDEM.  Did
8      Landis receive a copy of this cover letter and the
9      enclosures?
10        My only question is:  Did Landis receive this?
11 A   Before I respond, I would like to see what's in it.
12 Q   Sure.
13 A   Yes, we received this.
14 Q   The first page says that:  "On January 13th, 2005,
15     2800 Duncan Road was inspected," and there's a
16     check mark indicating that "no violations were
17     observed."
18 A   Yes.
19 Q   But nevertheless, Landis is seeking to recover
20     money from Zurich for costs of remediating and
21     inspecting 2800 Duncan?
22 A   I don't think that was an accurate statement.
23 Q   Okay.  What was not accurate about it or what
24     statement was not accurate?
25 A   You're stating that 2800 Duncan for the purposes of

195

1   remediation is different from 3601 Duncan Road.
2   And for the purposes of remediation, they are not,
3   and...
4  Q   And it's 3601 Sagamore Parkway North?  Is that
5      the --
6  A   That's the original -- the old site, yes.
7  Q   And then 2800 Duncan --
8  A   The new building.
9  Q   -- is the new building and they are adjacent?
10 A   They are about 500 or 600 feet apart.
11 Q   So they are not connected?
12 A   Well, there is a technicality there with respect to
13     the identification number assigned by the EPA for
14     the site.  And the technicality is that if two
15     sides are adjacent and joined by a crossroad, then
16     the identification number remains the same for both
17     sites.  So that's why the IND005408 number
18     referenced both locations for the purposes of EPA
19     identification.
20 Q   And Landis did investigate and remediate
21     contamination at 2800 Duncan?
22        MR. HUBER:  Object to the form of the
23     question.  Gee whiz.  Go ahead, John.
24 A   We had to identify the extent of the plume and it
25     extended into that location site.

196

1  BY MR. WRIGHT:
2  Q   After Landis moved its site to 2800 Duncan, did it
3      continue to operate degreasers at the new site?
4         MR. HUBER:  Object to the form of the
5      question.  How do you move the site?
6  BY MR. WRIGHT:
7  Q   The third paragraph on page 6803 says that:
8      "Landis moved the facility from 3601 Sagamore to
9      2800 Duncan in 2000."  So you're right, I don't
10     think it's fair to say that the site was moved.
11        Landis moved its facility.  Is that an
12     accurate statement?
13 A   Yes.  Electroplating, rather, degreasing was
14     discontinued in 1995.
15 Q   Okay.  So Landis did not continue to operate
16     degreasers at the 2800 Duncan location?
17 A   Right.
18 Q   Second-to-last paragraph on 6803, it says that:
19     "In December 2004, 90 percent of the assembly work
20     at the facility was relocated to Mexico and that
21     the rest" -- or "that it was anticipated that the
22     rest would be gone by March 2005."
23        Did assembly work stop as of March 2005 at the
24     Duncan -- 2800 Duncan location?
25 A   Yes.  Which page are you on?

